## IN THE UNITED STATES DITRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **MATTHEW FORTKAMP** | : | **CASE NO:  3:14-CV-438** |
| | : | |
| **Plaintiff,** | : | **JUDGE JAMES G. CARR** |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF CELINA** | : | |
| | : | |
| **Defendant.** | : | |

---

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, CITY OF CELINA

---

Defendant, City of Celina ("Celina"), moves the Court for summary judgment under Civil Rule 56 as to all of the Plaintiff's claims.  There are no genuine issues of material fact, and Celina is entitled to judgment as a matter of law.  The attached memorandum and Rule 56 evidence support this motion.

Respectfully submitted,

s/Jamey T. Pregon
Lynnette Dinkler (0065455)
Lead Trial Counsel
lynnette@dinklerpregon.com
Jamey T. Pregon (0075262)
Co-Trial Counsel
Jamey@dinklerpregon.com
DINKLER PREGON LLC
5335 Far Hills, Suite 123
Dayton, OH 45429
(937) 426-4200          (866) 831-0904 (fax)
*Attorneys for Defendant City of Celina*

s/Eugene Peter Nevada Jr.
Eugene Peter Nevada Jr. (0008962)
pnevada@clemansnelson.com
485 Metro Place South, Suite 200
Dublin, OH  43017
(614) 923-7700          (614) 923-7707 (fax)
*Co-Counsel for Defendant City of Celina*

## **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

Table of Contents ..................................................................................i

Table of Authorities .............................................................................iii

I.   Introduction........................................................................................1

    A.  Statement of the Case .................................................................1

    B.  Relevant Facts ...........................................................................2

       1.  The Electric Lineman Position ...........................................2
       2.  Fortkamp's Injury and Controversial Spinal Disc Implant
           and Fusion Surgeries .........................................................5
       3.  Fortkamp's Time Off Work ...............................................7
       4.  Fortkamp's Request to Return to Work in Late 2008 .........8
           a.  Dr. Mullin ................................................................9
           b.  Dr. Snow ................................................................11
           c.  Rick Wickstrom ....................................................12
       5.  Dr. Randolph's IME and Opinions ...................................14
       6.  Celina's Reliance Upon Dr. Randolph's Opinions ...........18

II.  Law and Argument ...........................................................................20

    A.  Standard for Deciding Motions for Summary Judgment .......20

    B.  Plaintiff's ADA Claims Fail as a Matter of Law ...................20

       1.  Overview ...........................................................................20
       2.  Celina Can Rely On Dr. Randolph Under Either Version
           of the ADA .......................................................................22
       3.  The "Regarded As" Claim ...............................................28
           a.  2008 Decision To Send Fortkamp To IME ..............28
           b.  2009 Decisions Refusing to Return Fortkamp to Work
               and Employment Separation ..................................29
               1.  Duration of the Risk ....................................30

        2.  Nature and Severity of the Potential Harm ..............................31

        3.  Likelihood that Potential Harm Will Occur ............................31

        4.  Imminence of Potential Harm ...................................................33

      4.  The "Record Of" Claim .....................................................................33

   C.  Fortkamp's State Law Claims Likewise Fail as a Matter of Law .........37

III.    Conclusion ...................................................................................................40

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                              <u>**Page(s)**</u>

*Angel v. United States,* 650 F. Supp. 434, 439 (S.D. Ohio 1986)
aff'd, 836 F.2d 1347 (6th Cir. 1988)...........................................................................2

*Belasco v. Warrensville Heights City Sch. Dist.,* 2015 U.S. Dist. LEXIS 5671
(N.D. Ohio 2015) ..................................................................................................29

*Bloomfield v. Whirlpool Corp.,* 984 F. Supp. 2d 771, 777 (N.D. Ohio 2013) ........21

*Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001) ...........................26, 27

*Breitkreutz v. Cambrex Charles City, Inc.,* 450 F.3d 780, 784 (8th Cir. 2006) .......24

*Brenneman v. MedCentral Health Sy.,* 366 F.3d 412, 418 (6th Cir. 2004)................2

*Brown v. DePuy Spine, Inc.,* 22 Mass. L. Rep. 425 (Superior Ct. Mass 2007).........6

*Brunko v. Mercy Hospital,* 260 F.3d 939, 941-42 (8th Cir. 2001) ...........................24

*Buckner v. Montgomery County Jobs & Family Services Div.,* 3:11-CV-320,
2012 WL 6044754 (S.D. Ohio Dec. 5, 2012) .........................................................15

*Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 n.4 (6th Cir. 2009) .............................25

*Columbus Civ. Serv. Comm. V. McGlone,* 82 Ohio St. 3d 569, 697 N.E.2d 204,
207, 1998-Ohio-410 (Ohio 1998) ...........................................................................38

*Dabney v. Ohio Dep't of Admin. Servs.,* 2006 U.S. Dist. LEXIS 23435, 30-31
(S.D. Ohio Mar. 22, 2006) .......................................................................................15

*Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 707 (6th Cir. 2008)......................20

*Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 509 (7th Cir. 1998)....................34

*Davis v. Mich. Agric. Commodities, Inc.,* 2009 U.S. Dist. LEXIS 5582, 2009 WL 94534, *7 (E.D. Mich.).............................................................28, 33, 39

*DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir. 2004) ...............................................21

*EEOC v. Daimler Chrysler Corp.,* 111 Fed. Appx. 394, 404 (6th Cir. 2004).........34

*Esparza v. Pierre Foods,* 923 F. Supp. 2d 1099, 1104 (S.D. Ohio 2013)..............37

*Garner v. Gwinnett County,* 1998 WL 1048471, *4 (N.D. Ga.) aff'd, 170 F.3d 189 (11th Cir. 1999) (Table) ...........................................................31

*Geiger v. Tower Auto.,* 579 F.3d 614 (6th Cir. 2009)...............................................25

*Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004) .....................27

*Hout v. City of Mansfield,* 550 F.Supp.2d 701, 726 (N.D. Ohio, 2008).................37

*Jones v. Econ. Opportunity Planning Ass'n of Greater Toledo,* 2013 U.S. Dist. LEXIS 15511 (N.D. Ohio 2013)..............................................37, 40

*Jones v. Honda of Am. Mfg.,* 2015 U.S. Dist. LEXIS 28682 (S.D. Ohio 2015)......37

*Jones v. St. Jude Med. S.C., Inc.,* 504 Fed. Appx. 473, 477 (6th Cir. 2012)......26, 27

*Jones v. U.P.S., Inc.,* 502 F.3d 1176, 1190-91 (10th Cir. 2007).............................24

*Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tn.,* 136 Fed. App'x 755, 760 (6th Cir. 2005).........................................................................................34

*Knox County Educ. Ass'n v. Knox County Bd. Of Educ.*, 158 F.3d 361, 377 (6th Cir. 1998) ...........................................................................................................2

*Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 502-03 (6th Cir. 2009).....26

*Lattimore v. Wild Flavors, Inc.,* 09-Civ-023, 2012 U.S. Dist. LEXIS 7826, 2012 WL 208078, *13 (E.D. Ky. Jan. 23, 2012)....................................................26

*Lewis v. Humboldt Acquisition Corp., Inc.,* 681 F.3d 312 (6th Cir. 2012) ........21, 38

*Lusk v. Ryder Integrated Logistics,* 238 F.3d 1237, 1241-42 (10th cir. 2001).........24

*Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116-17
(6th Cir. 2001) ...........................................................................................26, 27

*Manzer v. Diamond Shamrock Chems.,* 29 F.3d 1078, 1084 (6th Cir. 1994) .........25

*McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817,
36 L. Ed. 2d 668 (1973) ..............................................................................21

*McClenaghan v. Ohio DOC,* 2005-Ohio-1284 (Ohio Ct. Clms 2005) ..................39

*Milholland v. Sumner County Bd. Of Educ.,* 569 F.3d 562, 566 (6th Cir. 2009) .....22

*Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447-48 (11th Cir. 1996)...................33

*MX Group, Inc. v. City of Covington,* 293 F.3d 326, 339 (6th Cir. 2002)...............34

*Neely v. Benchmark Family Servs.,* U.S. Dist. Court, S.D. Ohio Case No.
3:13-cv-415, 31 Am. Disabilities Cas. (BNA) 864, 2015 U.S. Dist. LEXIS
52267, 2015 WL 1809369 (S.D. Ohio 2015) ...........................................34

*Parks v. UPS Supply Chain Solutions, Inc.,* 607 Fed. Appx. 508, ____
(6th Cir. 2015)...........................................................................................27

*Pesterfield v. TVA,* 941 F.2d 437, 437-38 (6th Cir. 1991).......................................15

*Rakity v. Dillon Cos.,* 302 F.3d 1152, 1162-63 (10th Cir. 2002) ............................24

*Reed v. Metro. Gov't of Nashville & Davidson County,* 286 Fed. Appx. 251,
255, 2008 U.S. App. LEXIS 13909 (6th Cir. 2008) ..................................24

*Reid v. Rexam Bev. Can Co.,* 434 F.Supp.2d 500 (N.D. Ohio 2006).....................27

*Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir. 2001)................................39

*Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 550
(6th Cir. 2004) ..................................................................................... 27

*Sigman v. Gen. Elc. Co.,* 77 Ohio App. 3d 430, 434 (1991) ...................................... 2

*Simpson v. Vanderbilt Univ.,* 359 F. App'x 562, 570 (6th Cir. 2009) ..................... 26

*Skinner v. Railway Labor Executives' Ass'n,* 109 S.Ct. 1402, 1419 (1989) ......... 2, 3

*Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998) .............................. 24, 26

*Spine Solutions, Inc. v. Medtronic Sofamor Danek, Inc.,* 2009 U.S. Dist.
LEXIS 88623, 2009 WL 2958340 (W.D. Tenn. 2009) ............................................ 6

*State ex rel. Cambridge Home Health Care, Inc. v. Indus. Comm.,* 124 Ohio
St. 3d 477, 2010-Ohio-651 ..................................................................................... 12

*State ex rel. Kish v. Kroger Co.,* 2013-Ohio-1931 ................................................. 14

*Sullivan v. River Valley School Dist.,* 197 F.3d 804, 811 (6th Cir. 1999) .......... 28, 39

*Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S. Ct. 2139,
144 L. Ed. 2d 450 (1999) ........................................................................................ 39

*Thompson v. Henderson,* 226 Fed. Appx. 466 (6th Cir. 2007) ................................. 24

*Vance v. City of Maumee,* 960 F. Supp. 2d 720, 726 (N.D. Ohio 2013) ................. 20

*Wallace v. Mantych Metalworking,* 189 Ohio App. 3d 25, 937 N.E.2d 177, 183,
2010-Ohio-3765 (Ohio Ct. App. 2010) ................................................................. 38

*Washington v. Occidental Chem. Corp.,* 24 F. Supp 2d 713, 728
(S.D. Tex. 1998) ...................................................................................................... 33

*Williams v. London Util. Com'n.,* 375 F.3d 424, 428 (6th Cir. 2004) ..................... 21

*Wingfield v. Escallate, LLC,* 2014 U.S. Dist. LEXIS 139885
(N.D. Ohio 2014) .................................................................................................... 40

*Wisbey v. City of Lincoln,* 23 Am. Disabilities Cas. (BNA) 618, 2010 U.S. App. LEXIS 13684 (8th Cir. 2010) ...................................................................................24

*Wurzel v. Whirlpool Corp.,* U.S. Dist. N.D. Ohio Case No. 3:09CV498, 2010 U.S. Dist. LEXIS 36635, 2010 WL 1495197 (N.D. Ohio April 14, 2010) aff'd by *Wurzel v. Whirlpool Corp.,* 482 Fed. Appx. 1 (6th Cir. 2012) ................................................................. 23, 24, 25, 28, 30, 31, 32, 33, 39

*Young v. UPS,* 784 F.3d 192 (4th Cir. 2013) ...........................................................24


**Regulations**

29 C.F.R. 1630.2(j)(1)(ii)...................................................................................38, 39

Ohio Administrative Code 123:1-33........................................................................20

O.R.C. 124.385 .......................................................................................................20

O.R.C. 4112.01 .......................................................................................................38

O.R.C. 4112.02 ..................................................................................................37, 39

O.R.C. 4755.40 .......................................................................................................12

<u>MEMORANDUM</u>

## I.    INTRODUCTION

### A.    STATEMENT OF THE CASE

This employment case arises out of Celina's decision to not return Plaintiff Matt Fortkamp ("Fortkamp") to an electric lineman position in March of 2009.  It is undisputed that Celina relied upon the medical opinions of Dr. Randolph, following an independent medical exam ("IME") of Fortkamp, in order to determine whether Fortkamp could safely be returned to work following a serious back injury which prompted two complex surgeries: a highly controversial artificial disc replacement and disc fusion.  The exact device implanted into Fortkamp has landed its manufacturer, Johnson & Johnson, in product liability litigation, and Johnson & Johnson terminated production of the device implanted into Fortkamp in 2010, just six short years after it received its FDA approval.  Fortkamp's surgeon who authorized Fortkamp's return to work participated in the FDA study seeking approval of the new device he then implanted into Fortkamp's spine in 2007.

Dr. Randolph's opinion was, and still is, that Fortkamp could not safely return to an inherently dangerous position such as the electric lineman position, and Celina proceeded to separate Fortkamp from the electric lineman position.  Fortkamp was then hired by Celina for the meter reader position, and he continues to serve Celina in that position to this day.

Fortkamp brings this action under the Americans with Disabilities Act ("ADA"), and Chapter 4112 of the Ohio Revised Code.[1]  As to the ADA claim, Plaintiff is only bringing causes of action for (1) a "regarded as disabled" claim, and (2) a "record of disability" claim.[2]  The

---

1 See generally, Doc. #18, First Amended Complaint, at PAGEID#204-210.
2 Doc. #18, First Amended Complaint, at PAGEID#208.

Chapter 4112 claims essentially mirror the ADA claims, as federal courts subject the Chapter 4112 claims to the same analysis as ADA claims.  See, e.g., *Brenneman v. MedCentral Health Sys*., 366 F.3d 412, 418 (6th Cir. 2004).

Celina now moves for summary judgment as to all of the Plaintiff's claims.

**B.      RELEVANT FACTS**

This case has been litigated in some fashion since 2010, when Fortkamp's "regarded as" claim was litigated in the Ohio Civil Rights Commission ("OCRC") until the charge was withdrawn in lieu of proceeding to the scheduled hearing in 2013.  The Commission conducted extensive discovery depositions leading up the OCRC hearing, and transcripts from those depositions are filed with the Court, in addition to transcripts from depositions that have occurred in this lawsuit, to form the factual basis of this motion.[3]

**1.  The Electric Lineman Position**

There is no dispute with respect to the job duties and requirements associated with the position of an electric lineman with Celina.  As a matter of law, the lineman position is an inherently dangerous job.  *Sigman v. Gen. Elec. Co*., 77 Ohio App. 3d 430, 434, (1991) (noting there is significant risk inherent in an electric lineman's dangerous job duties); *Angel v. United States*, 650 F. Supp. 434, 439 (S.D. Ohio 1986) aff'd, 836 F.2d 1347 (6th Cir. 1988) (finding the work of an electrical linemen was "inherently dangerous."); *Skinner v. Railway Labor Executives' Ass'n*, 109 S.Ct. 1402, 1419 (1989)(permitting drug testing of employees whose work duties are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences"); *Knox County Educ. Ass'n v. Knox County Bd. of*

---

3 Depositions from the OCRC proceedings are filed with the Court, and are identified herein as "OCRC Deposition."

*Educ.*, 158 F.3d 361, 377 (6th Cir. 1998)(following the *Skinner* test for safety sensitive positions).

The job duties for electric linemen, as described by Fortkamp and Celina electric linemen, include the following:

- **Responding to Emergency Repair Calls**:  includes power outages due to weather related damage.  This requires linemen to be exposed to extreme weather conditions.  This can also require linemen to remove debris, such as fallen tree limbs, from power line areas.[4]

- **Setting Poles**:  includes drilling holes and erecting poles, typically done with equipment such as a digger derrick, but also utilizes manual labor such as guiding the pole into the ground and operating a hand tamp to backfill the hole.[5]

- **Running Cable**:  includes stretching cable out and lifting wires up to the pole, typically done with a bucket truck, but lifting and placing the wires onto the pole is done manually.[6]

- **Trimming Trees**:  Preventative maintenance includes trimming trees near power lines, involves chain saws, wood chippers, and bucket trucks.[7]

- **Climbing Poles**:  Climbing poles is necessary when situations arise where bucket trucks cannot be maneuvered into position, either due to space confinements or weather conditions.[8]

The equipment utilized by linemen include chain saws, extension ladders (weighing as much as 60 to 70 pounds[9]), and various tools.[10]  The linemen also occasionally must lift and move the hand tamp (which weighs approximately 250 pounds).[11]  Linemen sometimes lift or

---

4 Doc. 44, OCRC Deposition of Jeff Severns, at pp. 32-33, 43; Doc. 55, OCRC Deposition of Michael Mertz, at pp. 15-16; Doc. 54, OCRC Deposition of Keith Huber, at pp. 17-18; Doc. 36, OCRC Deposition of Matt Fortkamp, at pp. 76; Doc. 56, OCRC Deposition of Greg Pogue, at p. 13.
5 Doc. 55, OCRC Deposition of Michael Mertz, at pp. 17-18; Doc. 54, OCRC Deposition of Keith Huber, at p. 7; Doc. 36, OCRC Deposition of Matt Fortkamp, at pp. 86-87.
6 Doc. 55, OCRC Deposition of Michael Mertz, at pp. 19-20.
7 Doc. 55, OCRC Deposition of Michael Mertz, at pp. 12-13; Doc. 56, OCRC Deposition of Greg Pogue, at pp. 15-16.
8 Doc. 36, OCRC Deposition of Matt Fortkamp, at p. 79;  Doc. 55, OCRC Deposition of Michael Mertz, at p. 21; Doc. 54, OCRC Deposition of Keith Huber, at p. 31; Doc. 56, OCRC Deposition of Greg Pogue, at p. 21.
9 Doc. 54, OCRC Deposition of Keith Huber, at p. 30.
10 *Id.* at pp. 32-33.
11 Doc. 55, OCRC Deposition of Michael Mertz, at pp. 11-12.

otherwise manually move or maneuver equipment such as cross-arms (30 to 50 pounds)[12] and transformers (weighing anywhere from 300 to 1500 pounds).[13]

The written job description for the lineman position states that the job requires the ability to "perform manual tasks for extended periods of time under hazardous conditions."[14] Traditionally, the basic responsibilities for electric linemen include replacing faulty equipment, repairing storm damage, repairing equipment, and "keeping the power on" for Celina residents, 24 hours a day, 7 days a week.[15]  Celina's linemen agree that they depend on each other for their own physical safety while on the job.[16]  There is no material dispute with respect to any of the above facts.

During the OCRC proceedings, there was some sparring over whether the Dictionary of Occupational Titles from the Department of Labor ("DOT") gave the lineman position a classification of "medium," which was the OCRC and Fortkamp's initial position, or "heavy," which was Celina's position.  This disagreement resolved in Celina's favor when the only witness Fortkamp has relied upon to analyze the lineman position, Rick Wickstrom, concluded that the lineman position has a "heavy" classification.[17]  Fortkamp himself testified that he did his own online investigation of the DOT strength ratings for the lineman position, and he concluded that the DOT rated some lineman duties as "medium," but also classified some lineman duties as "heavy."[18]  Accordingly, there is no dispute before this Court as to whether the lineman position is classified by the Department of Labor at "medium" or "heavy," as it is

---

12 Doc. 55, OCRC Deposition of Michael Mertz, at p. 12.
13 *Id.* at pp. 23-24.
14 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at p. 88, authenticating Exhibit 1 to the depositions, the Position Description.
15 Doc. 44, OCRC Deposition of Jeff Severns, at pp. 18-19.
16 Doc. 54, OCRC Deposition of Keith Huber, at pp. 35-36; Doc. 55, OCRC Deposition of Michael Mertz, at p. 30.
17 Doc. 48, OCRC Deposition of Rick Wickstrom, at pp. 83, 92.
18 Doc. 37, Deposition of Matt Fortkamp, at pp. 96-99.

4

undisputed that the lineman position is at least a "heavy" classification as proven by the record.

### 2.  Fortkamp's Injury and Controversial Spinal Disc Implant and Fusion Surgeries

On November 10, 2003, Fortkamp was employed as an electric lineman for Celina, and he was injured on the job.[19]  Specifically, Fortkamp injured his back when assisting several other linemen in lifting a steel frame in a substation, which weighed several hundred pounds.[20] Eventually, on October 3, 2007, Fortkamp had two surgical procedures performed by Dr. Mullin, which included (1) artificial disk replacement at L-4 /L-5, and (2) a fusion at L-5 / S-1.[21]

The procedures that Fortkamp underwent have been the subject of much debate within the medical community, in particular, the charite artificial disc that was implanted into Fortkamp. See, e.g., "J&J's New Device For Spine Surgery Raises Questions," *The Wall Street Journal*, June 7, 2005;[22] "A Surgeon Stands Up To His Peers, and Fights for the Physician Payment Sunshine Act (Part 2 of 'On the Road to Reform')," Health Beat by Maggie Mahar, January 22, 2011;[23] "Complications of artificial disc replacement: a report of 27 patients with the SB Charité disc," J Spinal Disord Tech. 2003 Aug;16(4):369-83; "Charite Artificial Disc Generating Controversy," Medgadget, July 27, 2006;[24] "Complications and reoperations of the SB Charité lumbar disc prosthesis: experience in 75 patients," Eur Spine J. 2008 Jan; 17(1): 36–43; "Artificial Spinal Disc Generates Controversy," USA Today, July 25, 2006.[25]  Lawsuits involving the charite disc spread like wildfire.  See, e.g., "Lawsuits Multiply For Johnson &

---

19 Doc. 36, OCRC Deposition of Matt Fortkamp, at p. 32.
20 *Id.* at p. 32.
21 *Id.* at p. 47.
22 http://www.wsj.com/articles/SB111810358251652415 (visited Sept. 14, 2015).
23 http://www.healthbeatblog.com/2011/01/a-surgeon-stands-up-to-his-peers-and-fights-for-the-physician-payment-sunshine-act-part-2-of-on-the/ (visited Sept. 14, 2015).
24 http://www.medgadget.com/2006/07/charite_artific.html (visited Sept. 14, 2015).
25 http://usatoday30.usatoday.com/news/health/2006-07-25-spinal-disc_x.htm (visited Sept. 14, 2015).

Johnson's Charite Spine Disc," Lawyers and Settlements.com, Aug. 7, 2006;[26] *Brown v. DePuy Spine, Inc*., 22 Mass. L. Rep. 425 (Superior Ct. Mass 2007); *Spine Solutions, Inc. v. Medtronic Sofamor Danek, Inc*., 2009 U.S. Dist. LEXIS 88623, 2009 WL 2958340 (W.D. Tenn. 2009). The other doctor that Fortkamp saw for an IME in 2009, Dr. Borrillo, is also a lawyer who works at a plaintiffs' law firm that has actually been involved in implant litigation, possibly even with the charite disc.[27]   Ultimately, Johnson & Johnson stopped manufacturing the charite disc in 2010, just a few years after having received its FDA approval to market and sell the device.[28]

Dr. Mullin, Fortkamp's surgeon, participated in the initial study involving the charite disc which was used in obtaining FDA approval for it in 2004.[29]  The study Dr. Mullin participated in specifically excluded multi-level degenerative disc disease from the study, which is the condition Fortkamp was diagnosed with that Dr. Mullin concluded necessitated the surgery.[30]  Dr. Mullin had a financial interest in the study.[31]  Dr. Mullin also has a disclosed financial interest in the medical devices used in spinal fusions – the other surgery he performed on Fortkamp.[32]  Dr. Mullin testified that he understands the criticisms of the charite disc, and agrees that professional differences of opinion are common in the medical community.[33]  Dr. Mullin further agrees that bias can be found on both sides of the debate in the medical community,[34] and indeed, bias on the part of the treating surgeons having financial interests in using certain medical devices

---

26 http://www.lawyersandsettlements.com/articles/drugs-medical/Charite_Spinal_Disc_lawsuits-00263.html#.VfbXENJVhBc (visited Sept. 14, 2015).
27 Doc. 52, Deposition of Dr. Borrillo, at p. 20.
28 Doc. 50, Deposition of Dr. Mullin, at pp. 23-24.
29 Doc. 50, Deposition of Dr. Mullin, at pp.22-23.  Deposition exhibit 142 is the actual published study that Dr. Mullin participated in.
30 *Id.* at pp. 33-35.
31 *Id.* at pp. 36-38.
32 *Id.* at pp. 39-41.
33 *Id.* at pp. 41-43.
34 *Id.* at pp. 101-102.

ultimately resulted in Congress passing the Physician Payment Sunshine Act in 2010.[35]

### 3.  Fortkamp's Time Off Work

Fortkamp was off work for Celina from November of 2003 until November of 2009, when Fortkamp returned to work for Celina as a meter reader.[36]  Celina went to extraordinary lengths during this time to try to facilitate Fortkamp's return to work, including allowing him to work light duty for periods of time in 2004.[37]  Fortkamp was unable to even work light duty due to his back injury, and he then went on injury leave with Celina from 2004 through 2007.[38]

Celina actually extended the injury leave for Fortkamp far beyond what was required by the collective bargaining agreement with Fortkamp's union, CMERC.[39]  During the time Fortkamp was on injury leave, he was paid his normal salary and received his normal benefits, including health insurance and contributions to PERS.[40]  After being on injury leave with Celina, Fortkamp received temporary total disability benefits through the BWC.[41]

Fortkamp takes no issue with how he was treated by Celina during the period of time described above – when it provided him benefits in excess of what he was owed.[42]  Fortkamp also makes no claim that he was safely able to work as a lineman during that period of time, and in fact, recalls having to lay flat for 22 hours a day to get relief from pain in his lower back during that time.[43]

---

35 *Id.* at pp. 37-38.
36 See generally, Doc. 36, OCRC Deposition of Matt Fortkamp, at pp. 166-184, and Doc. 57, OCRC Deposition of Carl Bachelor, at pp. 120-121.
37 Doc. 36, Deposition of Matt Fortkamp, at pp. 164, 171-172.
38 *Id.* at pp. 172-173.
39 Doc. 38, OCRC Deposition of Jeff Hazel (Vol. 1), at p. 71.
40 Doc. 36, Deposition of Matt Fortkamp, at pp. 123-124; 173.
41 Doc. 36, Deposition of Matt Fortkamp, at p. 182.
42 *Id.* at pp. 163, 170, 184.
43 *Id.* at p. 174.

### 4.  Fortkamp's Request to Return to Work in Late 2008

The focal point of Fortkamp's lawsuit appears to be the period of time at the end of 2008, and into early 2009, when Fortkamp believed he was able to return to work following his controversial back surgeries.  It is anticipated that Fortkamp will argue that Celina should not have sent Fortkamp for an IME, despite the fact that Celina had the right to do so under the applicable collective bargaining agreement, and controlling law, given the obvious safety concerns that go with an inherently dangerous job such as the electric lineman position.

The exhibits relevant to this time period are as follows:

- December 3, 2008:  Wickstrom Workability Progress Report approves return to work[44]

- December 6, 2008:  Wickstrom Job Analysis (containing numerous errors)[45]

- December 6, 2008:  Wickstrom email to Hazel stating Celina could send Fortkamp to IME after reviewing the FCE completed by Wickstrom[46]

- December 11, 2008:  Dr. Snow BWC Return to Work form (MEDCO-14)[47]

- December 22, 2008:  Dr. Mullin BWC Return to Work form (MEDCO-14)[48]

- December 24, 2008:  Hazel letter to Fortkamp regarding IME being scheduled[49]

Because Fortkamp had been out of work on medical leave for approximately five years, Celina had concerns about whether Fortkamp could safely return to the inherently dangerous position of an electric lineman.[50]   Fortkamp was relying on the FCE report from Mr.

---

[44] Exhibit 4, Doc. 60-1, PageID #: 1439
[45] Exhibit 8, Doc. 60-1, PageID #: 1444-1450
[46] Exhibit 104, Doc. 61-4, PageID #: 1887-1888
[47] Exhibit 5, Doc. 60-1, PageID #: 1440
[48] Exhibit 6, Doc. 60-1, PageID #: 1441
[49] Exhibit 106, Doc. 61-4, PageID #: 1890-1891.  See also Doc. 40, Deposition of Jeff Hazel, at pp. 110-111.
[50] Doc. 38, OCRC Deposition of Jeff Hazel, at pp. 40-41; Doc. 43, Deposition of Pete Lowe, at pp. 46-47; Doc. 40, Deposition of J. Hazel, at p. 104.

Wickstrom—a physical therapist and not a medical doctor—that was rife with factual errors.[51] Celina chose Dr. Randolph to do an IME, based on the recommendation of Celina's human resources consultant, Clemans Nelson.[52]  Celina was advised to get an IME by Pete Lowe of Clemans Nelson, who rightfully told then-safety service director, Jeff Hazel, "Well, you know, you or I, neither one are capable of determining whether he is capable of performing the functions of the position, the job duties.  We need a medical exam to do that."[53]

Despite this obvious justification, and a contractual and legal right to send Fortkamp for an IME, it is anticipated that Fortkamp will argue that Celina should not have sent him to an IME.  Below is a detailed analysis of the information received by Celina from Fortkamp before Celina decided to send Fortkamp for an IME.  Celina further notes that Fortkamp has provided no medical evidence at the present time to suggest that he is currently able to safely perform the job functions of an electric lineman.[54]

### a.  Dr. Mullin

Fortkamp's surgeon, Dr. Mullin, did not initially authorize Fortkamp's return to work, which differed from Dr. Mullin's typical practice.[55]  On December 22, 2008, Fortkamp presented Celina with a BWC return to work form from Dr. Mullin, with the "restrictions" section of the form crossed out, and "n/a" written under the section "Physician's further explanation of work abilities or why the injured worker is unable to perform any work," and Celina was not sure what

---

51 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at p. 139.
52 Doc. 38, OCRC Deposition of Jeff Hazel (Vol. 1), at p. 43; Doc. 41, Deposition of Pete Lowe (Vol 1), at p. 68
53 Doc. 43, Deposition of Pete Lowe, at p. 47.
54 Doc. 50, Deposition of Dr. Mullin, at p. 91; Doc. 52, Deposition of Dr. Borrillo, at p. 89; Doc. 51, Deposition of Dr. Snow, at p. 39.  While Plaintiff's "rightful place" prayer for relief fails for the same reasons the claims fail, the fact that Plaintiff fails to provide any medical evidence on his current status and ability to work as a lineman is a separate ground upon which the "rightful place" prayer fails.
55 Doc. 36, OCRC Deposition of Matt Fortkamp. at pp. 120-121.

this was intended to mean.[56]  Fortkamp had not seen Dr. Mullin since October of 2008 at the time that Dr. Mullin completed the BWC form in December of 2008.[57]

Dr. Mullin could not recall ever discussing the job duties of an electric lineman with Fortkamp, but "guessed" that he would have asked Fortkamp what he does at some point.[58]  Dr. Mullin testified that Fortkamp's actual job duties really did not matter in formulating his opinion as to whether Fortkamp could return to the lineman position, because as far as Dr. Mullin was concerned, Fortkamp could do anything after the surgery.[59]

Given the safety concerns with returning Fortkamp to an inherently dangerous position following years off of work due to injury, Pete Lowe of Clemans Nelson further explained the reasoning in sending Fortkamp for an IME as follows:

> Q.  Okay.  And I am going to ask you a couple of questions.  There was -- Since this was the first time in your experience that an outside physician had been used to give an opinion on whether an employee was ready to return to work, was there any reason that there wasn't -- it wasn't recommended that you merely follow up with follow-up requests to the treating doctors for Matt Fortkamp?
> MR. PREGON:  Objection.  Go ahead.
> A.  Well, I mean, we had an independent medical examination.
> Q.  And --
> A.  And we felt that Mr. Wickstrom was a guy hired to rehab him, so he wasn't –
> Q.  Hired by --
> A.  He wasn't going to say, "I wasn't successful.  He wasn't rehabbed."  Dr. Mullin was the surgeon, so he wasn't going to say, "My surgery was a failure.  He will never be able to work again."  So we wanted an independent.[60]

Given the known controversy and litigation over the device that was only manufactured for six years, which Dr. Mullin had a personal stake in, no reasonable jury could dispute that Lowe reached his recommendation to the Celina in good faith, and that Celina followed it in good faith.

---

56 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at pp. 101-103.
57 Doc. 37, Deposition of Matt Fortkamp, at p. 119.
58 Doc. 50, Deposition of Dr. Mullin, at pp. 77-78.
59 Doc. 50, Deposition of Dr. Mullin, at pp. 103-104.
60 Doc. 43, Deposition of Pete Lowe, at pp. 124-125.

### b.  Dr. Snow

On December 11, 2008, Fortkamp presented Celina with a BWC return to work form signed by Dr. Snow.  Celina questioned why Dr. Snow did not fill out all of the form.[61]  Celina also knew that Dr. Snow solely treated Fortkamp for pain, including prescribing medication and epidural injections.[62]  Celina had concerns about Dr. Snow, known to be a pain management doctor, clearing Fortkamp to return to work, rather than Fortkamp's surgeon.[63]

Dr. Snow is and was a pain management doctor, and he treated Fortkamp in that capacity.[64]  Dr. Snow, as a pain management doctor, has treated "a lot" of patients who have had spinal fusion surgery failures or complications,[65] which is one of the two procedures Fortkamp underwent.  Fortkamp is the only patient Dr. Snow has ever seen who has undergone a disc replacement.[66]

Dr. Snow admits that he does not conduct any investigation into his patients' job duties if there is a functional capacity examination ("FCE") that clears the patient to return to work.[67]  Dr. Snow does not have any recollection of what Fortkamp told him about the lineman position, but does recall that he relied upon the FCE conducted by Mr. Wickstrom.[68]  No reasonable jury could conclude that Celina violated any legal duty owed to Fortkamp when it questioned, in good faith, Dr. Snow's return to work form.

---

61 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at pp. 72-73.
62 Doc. 36, OCRC Deposition of Matt Fortkamp, at pp. 147-149.
63 Doc. 43, Deposition of Pete Lowe, at pp. 45-46.
64 Doc. 51, Deposition of Dr. Snow, at pp. 10,
65 Doc. 51, Deposition of Dr. Snow, at pp. 14-15.
66 *Id.* at pp. 14-15.
67 *Id.* at pp. 54-55.
68 *Id.* at pp. 78-80.

### c.  Rick Wickstrom

Mr. Wickstrom is not a medical doctor,[69] and Ohio law prohibits him from providing medical diagnoses.  See O.R.C. §4755.40(A); *State ex rel. Cambridge Home Health Care, Inc. v. Indus. Comm*., 124 Ohio St. 3d 477,2010-Ohio-651,¶7 (citing R.C. 4755.40(A)).  Celina did not rely upon Mr. Wickstrom's opinions because Mr. Wickstrom was not a medical doctor.[70] Further, Celina had issues with the fact that Mr. Wickstrom's December 6, 2008 FCE report was riddled with inaccuracies, including indicating that electric linemen were "never" exposed to the elements or high voltage, and contained strangely inappropriate descriptions of Fortkamp, seeming to marvel at his physique.[71]  Regardless, wanting Dr. Randolph to have all the available information, Celina did forward all of Mr. Wickstrom's reports and opinions to Dr. Randolph.

Additionally, Mr. Wickstrom seemed more than a little biased and overzealous in his efforts.  While Celina never knew this at the time it made its challenged employment decisions, as it turns out, discovery in the OCRC proceeding revealed Mr. Wickstrom formerly shared office space with Dr. Randolph, and actually wrote a book chapter with Dr. Randolph on functional capacity evaluations.[72]  Mr. Wickstrom seemed put out that Dr. Randolph would dare disagree with him about whether Fortkamp could return to work, testifying as follows:

> Q.  Okay.  And you don't like the fact that he is not deferring to you in your functional capacity evaluation that you did in this case?
> A.  I don't like the fact -- I don't like that he is basing his opinion on -- that he is not considering all the facts in arriving at his opinion.  But, yes, there is some of that too, I mean, because I wrote a book chapter with Dr. Randolph on functional capacity evaluation, for Pete's sake, you know.  And he is well acquainted with

---

69 Doc. 48, OCRC Deposition of Rick Wickstrom, at p. 11.
70 Doc. 40, Deposition of Jeff Hazel, at pp. 103-104.
71 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at pp. 118-119; Doc. 38, OCRC Deposition of Jeff Hazel, at p. 92.
72 Doc. 48, OCRC Deposition of Rick Wickstrom, at pp. 144-147.

my skills and expertise, and frequently recommends me to address exactly those issues. So when he comes up with a contradictory opinion that's based on what I would characterize as just concern about the medical history, or what type of prosthesis someone has in them, rather than actually looking at the impact on performance, that concerns and disappoints me.[73]

Although Mr. Wickstrom told Celina in December of 2008 that Celina had the right to seek "another medical opinion" after providing Celina with his FCE,[74] Mr. Wickstrom saw fit to issue not-so-subtle threats to Celina that Fortkamp would sue Celina under the ADA if Celina did not return Fortkamp to the lineman position.[75]  Indeed, Mr. Wickstrom did make contacts with employment attorneys on behalf of Fortkamp in 2009.[76]  Mr. Wickstrom described this case as a "great test case for the ADA amendments" in speaking with attorneys on behalf of Fortkamp,[77] and even told Fortkamp that this was a "landmark case."[78]

There is ample evidence of Mr. Wickstrom's impartiality in this matter.  Mr. Wickstrom actually sent Fortkamp links to materials on the EEOC.gov webpage to "inform him better about the laws and regulations that impact employment of people that are perceived or determined to be disabled."[79]  Mr. Wickstrom sent Fortkamp a report of a multi-million dollar class action settlement, along with the quote "we have to motivate employers to keep the return to work process active.  If not, the EEOC will be glad to do it for them."[80]  Mr. Wickstrom also took it upon himself to help the OCRC's attorney research legal arguments during the OCRC proceedings.[81]

---

73 *Id.* at pp. 146-147.
74 *Id.* at p. 120.
75 *Id.* at pp. 117-123.
76 Doc. 49, Deposition of Rick Wickstrom, at pp. 25-26; 73-74.
77 *Id.* at pp. 73-76.
78 *Id.* at pp. 109-110.
79 *Id.* at pp. 67-68.
80 *Id.* at pp. 69-72.
81 *Id.* at pp. 88-90.

No reasonable jury could conclude that Celina violated any legal duty owed to Fortkamp when it questioned, in good faith, Mr. Wickstrom's FCE report and threats.

### 5. Dr. Randolph's IME and Opinions

The next focal point for Fortkamp's claims is likely Dr. Randolph's IME and resulting opinions. This occurred in 2009, and the relevant dates and exhibits for this period are as follows:

- January 2, 2009: letter from Celina to Dr. Randolph engaging him for IME[82]

- January 24, 2009: report from Dr. Randolph to Celina[83]

- June 12, 2009: report from Dr. Borrillo[84]

- July 7, 2009: addendum to report of Dr. Randolph[85]

- July 11, 2009: Functional Capacity Evaluation by Wickstrom[86]

- August 5, 2009: Dr. Snow BWC Return to Work form (MEDCO-14)[87]

- August 13, 2009: Dr. Mullin BWC Return to Work form (MEDCO-14)[88]

- August 13, 2009: Dr. Mullin letter disagreeing with Dr. Randolph[89]

- October 2, 2009: Second Addendum to Dr. Randolph report[90]

Dr. Randolph is and was a licensed medical doctor, and is and was board certified in

---

82 Exhibit 7, Doc. 60-1, PageID #: 1442-1443
83 Exhibit 9, Doc. 60-1, PageID #: 1451-1462
84 Exhibit 15, Doc. 60-1, PageID #: 1469-1472
85 Exhibit 18, Doc. 60-2, PageID #: 1476-1483
86 Exhibit 21, Doc. 60-2, PageID #: 1486-1497
87 Exhibit 22, Doc. 60-2, PageID #: 1498
88 Exhibit 23, Doc. 60-3, PageID #: 1499
89 Exhibit 27, Doc. 60-3, PageID #: 1515
90 Exhibit 28, Doc. 60-3, PageID #: 1516-1521

occupational medicine through the American Board of Preventative Medicine.[91]  Dr. Randolph

has been recognized as a credible expert recently by the Ohio Supreme Court.  *State ex rel. Kish*

*v. Kroger Co.*, 2013-Ohio-1931.  Celina was entitled to obtain an IME in this case as a matter of

law.  *Dabney v. Ohio Dep't of Admin. Servs.*, 2006 U.S. Dist. LEXIS 23435, 30-31(S.D. Ohio

Mar. 22, 2006);  *Pesterfield v. TVA*, 941 F.2d 437, 437-38 (6th Cir. 1991). See, also,*Buckner v.*

*Montgomery County Jobs & Family Services Div.*, 3:11-CV-320, 2012 WL 6044754 (S.D.Ohio

Dec. 5, 2012).  Further, the then-union president agreed that the collective bargaining agreement

governing Fortkamp's employment with Celina permitted Celina to send employees to

independent medical examinations.[92]  Fortkamp himself never challenged Celina's request to

submit to an IME when he was asked to do so.

Dr. Randolph performed his physical examination of Fortkamp in January of 2009, and

issued his initial report shortly thereafter, after Dr. Randolph had reviewed the records provided

to him by Celina and by Fortkamp.  Of significance, then-safety service director Hazel sent

Fortkamp an email on December 30, 2008, telling Fortkamp what medical records Celina had

available and was sending to Dr. Randolph, and suggesting that Fortkamp provide Dr. Randolph

records "to evaluate the initial injuries and subsequent surgical repair results."[93]  Fortkamp had

questions about this, but rather than ask Hazel, Fortkamp asked Eileen Mitchell-Welch, his

vocational rehabilitation caseworker, what she thought Hazel meant,[94] and Mitchell-Welch

responded by instructing Fortkamp to "always give the least, do not volunteer info" to Dr.

Randolph.[95]  Fortkamp claims that he had no idea what Mitchell-Welch meant by these

---

91 Doc. 46, OCRC Deposition of Dr. Randolph, at p. 18.
92 Doc. 53, OCRC Deposition of Randall Canary, the union president at the relevant times, at pp. 8, 32.
93 Doc. 37, Deposition of Matt Fortkamp, at p. 131.
94 *Id.* at pp. 132-133, referring to Exhibit 108 (Doc. 61-4, PageID #: 1893-1895).
95 *Id.* at pp. 139-141.

instructions,[96] but the instructions speak for themselves.

In any event, after completing his IME and records review, Dr. Randolph concluded that Fortkamp could not safely perform the job requirements of the electric lineman position because Fortkamp should not have been lifting over fifty pounds following his surgical procedure.[97]  Dr. Randolph's conclusion is in contrast with documentation Fortkamp provided from his surgeon, Dr. Mullin, but Dr. Randolph noted that the documentation provided by Fortkamp did not establish that Dr. Mullin had physically examined Fortkamp following the surgery, or that Dr. Mullin knew anything about the electric lineman position.[98] Dr. Randolph explained his opinion as follows:

> A.      He has not had just one surgery to his back. He's had three and a number of other invasive procedures. He had all those surgeries because he had problems with his low back, the nature of which I'm not entirely clear from the records I have available. Published science, and this is -- this goes back a number of years. Published science clearly shows that when you have had a prior history of low back problems of any kind, you are 7.2 times more likely to have future problems. It's a single, very important predictor for long-term back problems. If you have had a fusion done or if you had had a lumbar disc replacement done, the likelihood that you're going to have recurrent low back problems of a disabling nature goes progressively higher. If your job requires bending at all, the likelihood of a future low back problem, in terms of the odds of it occurring, is around 7.4. So we have an individual here who has had not one, not two, but three major back surgeries; his job is going to require heavy lifting and working in the extremes of weather conditions and extreme physical circumstances; his ability to perform that job is going to directly impact his own safety, the safety of the public at large and his coworkers. It would be patently absurd, based upon published science, to put him back in that situation because he is at risk -- at a significant risk for recurring low back problems, which could be disabling in nature. If, in fact, any of the so-called stabilizing devices placed in his back give out because of intensive pressures extrinsically placed, then he is going to be in a world of doo-doo, he is going to have a lot of trouble, it's going to be big-time pain, there's likely going to be neurologic sequelea, and he might be immediately disabled. If he's up on a -- on a lift and he's trying to work with a live wire in the middle of a sleet storm, he's

---

96 *Id.* at pp. 141-142.
97 Doc. 46, OCRC Deposition of Dr. Randolph, at pp. 73-75.
98 *Id.* at pp. 80-82.

in trouble and I don't know how anybody's going to get up there to help him. This is a bad idea. My job, sir, is to assess the risks involved and make a determination, based upon the totality of his medical presentation, and determine if he can or should return to that job. It was my duty, sir, to indicate that he could not because he was at significant risk.[99]

It seems apparent that Fortkamp intends to argue that Dr. Randolph's review of Fortkamp's medical records as part of the IME somehow constitutes a "record of" claim under the ADA.[100]  If that indeed is Fortkamp's contention, then Fortkamp will be asking the Court to find that any IME performed in any case may well lead to a "record of" ADA claim (if the claimant is unsatisfied with the IME report), as it is a standard practice for medical professionals performing IME's to review the subject's medical records.[101]  Indeed, the American Medical Association ("AMA") published an article in 2005 that sets forth proposed accepted standards for how to conduct a proper IME, and that includes "review of relevant records and applicable diagnostic studies."[102]  There is no serious debate as to whether IME doctors may rely upon a subject's medical records in forming opinions.  It is clear that is precisely what IME doctors do when conducting IME's.

There has been no argument that anyone has articulated to suggest that Dr. Randolph's IME was not conducted in compliance with these AMA proposed standards.  As a medical doctor who was board certified in occupational medicine, there has been no challenge to Dr. Randolph's abilities to provide a medical opinion on whether Fortkamp could safely perform the job functions of the electric lineman position.  It is undisputed that Fortkamp never challenged Dr. Randolph's qualifications in 2008 or 2009 when Celina was evaluating whether to return

---

99 Doc. 46, OCRC Deposition of Dr. Randolph, at pp. 54-56.
100 Doc. 47, Deposition of Dr. Randolph, at pp. 87-88.
101 See, e.g., Doc. 52, Deposition of Dr. Borrillo, at pp. 24-25
102 http://www.aimehi.com/PDFs/IME%20standards%20for%20AIMEHI%20web%20site.pdf (visited Sept. 17, 2015).  A copy of the article and 2005 proposed IME standards is attached hereto as Exhibit A.

Fortkamp to work.

Dr. Randolph's opinions are based upon medical literature that Dr. Randolph identifies in his reports, as well as his review of Fortkamp's medical records, the history that Fortkamp gave him as to his job and his back problems, as well as the physical exam, all of which is documented and explained in Dr. Randolph's report and addendums.  Dr. Mullin, while disagreeing with Dr. Randolph's opinions, acknowledged he was familiar with critical published medical white papers denouncing the surgical procedures Fortkamp had undergone.[103]

In any event, Celina continued to forward additional information that Fortkamp provided after January of 2009 to Dr. Randolph,[104] and Dr. Randolph issued addendums in July and October of 2009.  Celina had two pre-separation conferences for Fortkamp in 2009 after receiving Dr. Randolph's initial report in January of 2009, and at the first pre-separation conference, Celina agreed to permit Fortkamp to get a second IME that Celina would forward to Dr. Randolph.[105]  Fortkamp's union selected Dr. Borrillo to perform the IME, and when the report from Dr. Borrillo was received, Celina sent it to Dr. Randolph.[106]  None of the additional information that Dr. Randolph reviewed changed his opinions, which remain to this day that the procedures that Fortkamp underwent make it unsafe for Fortkamp to return to the electric lineman position.[107]

### 6.  Celina's Reliance Upon Dr. Randolph's Opinions

It is undisputed that Celina relied upon Dr. Randolph's medical opinions in deciding that Fortkamp could not return to work as an electric lineman.  Jeff Hazel, former Safety Service

---

103 Doc. 50, Deposition of Dr. Mullin, at pp. 78-82.
104 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at p. 82.
105 *Id.* at p. 152.
106 *Id.* at pp. 81-82.
107 Doc. 47, Deposition of Dr. Randolph, at p. 112.

Director for Celina, repeatedly testified that Celina relied upon Dr. Randolph's medical opinion in deciding to initiate the involuntary separation proceedings with Fortkamp.[108]  Pete Lowe of Clemons Nelson, who was advising Celina, also testified repeatedly that because neither Celina nor Clemons Nelson had medical backgrounds, they had to rely on Dr. Randolph's medical opinion.[109]

The timing of Celina's decision to separate Fortkamp from the lineman position formally in October of 2009 is clear evidence that Celina was solely relying upon Dr. Randolph's opinion. Rick Bachelor, in taking over the safety service director position from Jeff Hazel, sent a letter to Fortkamp on October 15, 2009, telling Fortkamp that Celina was separating him from the lineman position.[110]  The final decision was not made until Dr. Randolph had reviewed additional reports or documents submitted by Fortkamp and issued addendums discussing the additional information.[111]  The factual record makes it abundantly clear in this case that Celina only relied upon Dr. Randolph's opinions in not returning Fortkamp to work and in separating him from the lineman position.  No reasonable jury could conclude otherwise based upon the undisputed material evidence.

It is anticipated that Fortkamp will argue that Celina considered him to be disabled due to certain language contained in Celina's correspondence with Fortkamp regarding his separation.[112]  Specifically, the administrative procedure utilized to separate Fortkamp from the lineman position is called an "involuntary disability separation."  Any reliance Fortkamp chooses to place on this language is misguided.  The term "disability separation" is a term of art in public

---

108 Doc. 38, OCRC Deposition of Jeff Hazel (Vol. 1), at pp. 30, 156-157, 213.
109 Doc. 41, OCRC Deposition of Pete Lowe (Vol. 1), at pp. 76, 97, 102, 103, 128, 130, 135, 144.
110 Doc. 58, Deposition of Carl Bachelor (Vol. 1), at p. 66.
111 Doc. 43, Deposition of Pete Lowe, at pp. 69-70.
112 See, e.g., Exhibit 29 (Doc. 60-3, PageID #: 1522).

sector employment, and this does not mean that Fortkamp was considered to be "disabled" as defined by the Americans with Disabilities Act.[113]  Indeed, Ohio Revised Code 124.385 requires public employers to provide a "disability leave" benefit to employees, and the Ohio Administrative Code at regulation 123:1-33 sets forth additional guidelines for the benefit.  A simple reading of these statutes and regulations reveals that "disability" in this context is only specific to whether a public employee is able to perform the duties of a specific job.  This is not the same thing as whether an individual is deemed to be "disabled" under the ADA.

Celina, as required by Ohio law, had a "disability separation" policy in its Personnel Policy and Procedure Manual at all relevant times.[114]  Notably, Celina's policy permits Celina to request an IME to determine whether an employee is able to perform the job functions of a specific job.[115]  That is precisely what Celina did in this case, and Fortkamp has not challenged Celina's policy, nor has Fortkamp challenged Chapter 124 of the Ohio Revised Code, or its promulgated regulations on "disability separations."

## II.     LAW AND ARGUMENT

### A.  Standard for Deciding Motions for Summary Judgment

Celina adopts and incorporates herein by reference the standard of review articulated by this Court in *Vance v. City of Maumee*, 960 F. Supp. 2d 720, 726 (N.D. Ohio 2013).

### B.  Plaintiff's ADA Claims Fail as a Matter of Law

#### 1.  Overview

Fortkamp's disability discrimination claims are analyzed by the type of evidence he proffers: direct vs. indirect evidence.  Direct evidence is evidence which requires the finder of

---

113 Exhibit B, Declaration of Pete Lowe; Exhibit C, Declaration of Jeff Hazel, and Exhibit D, Declaration of Rick Bachelor.
114 See Exhibit C, Declaration of Jeff Hazel, and Exhibit D, Declaration of Rick Bachelor.
115 *Id.*, citing Section 5.10 of Celina's Personnel Policy and Procedure Manual.

fact to conclude the challenged employment action was the result of discrimination. *Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 707 (6th Cir. 2008); *Lewis v. Humboldt Acquisition Corp., Inc*., 681 F.3d 312 (6th Cir. 2012) (en banc)(the ADA "prohibit[s] discrimination that is a 'but-for' cause of the employer's adverse decision").  Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated by prejudice against members of the protected group.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  No evidence in the record before this Court satisfies this stringent standard.

Plaintiff may argue that Celina only had Fortkamp submit to an IME because of Fortkamp's back condition.  Such an argument does not constitute direct evidence.  Judge Helmick of the Northern District recently rejected this exact argument, holding it was not "direct evidence" of discrimination.  *Bloomfield v. Whirlpool Corp*., 984 F. Supp. 2d 771, 777 (N.D. Ohio 2013).

In the absence of direct evidence, Fortkamp must produce indirect evidence in order to prove his disability claims.  Indirect evidence claims require evaluation under the burden-shifting sequence of *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). A plaintiff must first prove a prima facie case by establishing that he: (1) suffers from a disability as defined by the ADA; (2) is otherwise qualified to perform the requirements of his position, with or without reasonable accommodation; and (3) was discriminated against because of the disability.  *Williams v. London Util. Com'n*, 375 F.3d 424, 428 (6th Cir. 2004).  Fortkamp has never contended that he is disabled.  Instead he claims he was "regarded as" disabled by Celina.  In any event, Fortkamp fails to make out any of the elements of the prima facie case required for his ADA claims.

If plaintiff establishes a prima facie case, which is denied here, the employer has to articulate, but not ultimately prove, a legitimate, non-discriminatory reason for its decision. *Id*. The undisputed material evidence satisfies the employer's burden here. Celina's concerns arose out of workplace safety, as the electric lineman position is an inherently dangerous job as a matter of law.  Celina relied upon the opinions of a medical doctor who is board certified in occupational medicine in making its decision to separate Fortkamp from the lineman position.

Having satisfied its burden, Fortkamp must produce sufficient evidence to prove that the articulated reasons offered by Celina were actually a pretext masking discrimination.  *Id*.  Celina knows of no such evidence that exists in this case.

The timeline discussed above in Section I(B) falls both before and after the ADA Amendments Act of 2008, which expanded the ADA's definition of "disabled."  The 2008 amendments do not apply retroactively to govern conduct occurring before the Act became effective on January 1, 2009.  *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009).  It is anticipated that Plaintiff's liability theory will include Celina's decision to send Fortkamp to an IME rather than return Fortkamp to the lineman position, and that occurred in December of 2008, even though Fortkamp's actual IME did not occur until January of 2009.

Under both versions of the ADA, Fortkamp must prove that he falls under the scope of the ADA by demonstrating either he (1) has a physical or mental impairment that qualifies as a disability under the ADA; (2) has a record of such impairment; or (3) is regarded by Celina as having such an impairment.  *Milholland*, supra at 565-66.  Fortkamp's amended complaint alleges (2) and (3) apply here.  Both claims fail as a matter of law.

### 2.  Celina can rely on Dr. Randolph under either version of the ADA.

Skipping past the first step (prima facie case) of the analysis momentarily, all of

22

Fortkamp's claims can immediately be decided on the second step, which is the legitimate, non-discriminatory reason for Celina's employment decisions. It does not matter whether Fortkamp can satisfy all of the elements of his prima facie case as to any of his claims, because Celina did not discriminate against Fortkamp by having him submit to an IME, and then relying upon the opinions of the IME doctor to separate Fortkamp from the lineman position. The material evidence is undisputed that Celina has safety concerns for Fortkamp, for other linemen, and for the general public in addressing a safety sensitive, inherently dangerous position such as an electric lineman. It is further undisputed, as set forth above, that Celina had the right to send Fortkamp to Dr. Randolph for an IME as a pure matter of law and separately had the contractual right as bargained for and agreed to under the governing CBA. Celina's Personnel Policy and Procedure Manual also permitted an IME in this context to determine whether Fortkamp could perform the job functions of a lineman. Lastly, the material evidence is undisputed that after Dr. Randolph provided his opinions, Celina was then presented with conflicting medical opinions as to whether Fortkamp could safely perform the lineman job. Such circumstances cannot form the basis of a disability discrimination claim as a matter of law.

This Court decided a similar case in *Wurzel v. Whirlpool Corp.*, U.S. Dist. N. D. Ohio Case No. 3:09CV498, 2010 U.S. Dist. LEXIS 36635, 2010 WL 1495197 (N.D. Ohio April 14, 2010), affirmed by *Wurzel v. Whirlpool Corp*., 482 Fed. Appx. 1 (6th Cir. 2012),[116] which involved conflicting medical opinions between the plaintiff's doctor and the employer's doctor/IME. The Court discussed this issue as follows:

> The gravamen of Whirlpool's case is that it relied on Dr. Marshall's medical judgment that plaintiff's recurrent, unforeseeable spasms created a risk of physical

---

116 The United States Supreme Court later denied certiorari. *Wurzel v. Whirlpool Corp.*, 133 S.Ct. 339, 184 L.Ed.2d 158 (2012).

injury to himself and others.

The only evidence plaintiff offers to contradict that contention is the opinions of Drs. Issa and Stockton. Aside from the fact that those opinions were based on incomplete information, **the law is clear that a court will not second-guess an adverse employment action where that action rests on an employer's assessment of conflicting evidence.** *Smith v. Chrysler Corp*., 155 F.3d 799, 807 (6th Cir. 1998) (holding that "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action") **Neither I nor a jury is charged with, or has the authority to assess de novo which medical judgment is more likely accurate**.

*Wurzel*, supra at *26 (emphasis added).

Indeed, this Court's reasoning on this point is squarely in line with other similar cases where employers have relied upon medical opinions from IME's or fitness-for-duty evaluations. *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1190-91 (10th Cir. 2007)("Reasonable reliance on a medical opinion may demonstrate that an employer did not act on the myths, fears, and stereotypes associated with disability that the 'regarded as' definition of disability was designed to redress.")(citing *Rakity v. Dillon Cos.,* 302 F.3d 1152, 1162-63 (10th Cir.2002); *Lusk v. Ryder Integrated Logistics,* 238 F.3d 1237, 1241-42 (10th Cir.2001)); *Reed v. Metro. Gov't of Nashville & Davidson County*, 286 Fed. Appx. 251, 255, 2008 U.S. App. LEXIS 13909 (6th Cir. 2008), (Sixth Circuit determined that the plaintiff police officer failed to make a prima facie case demonstrating disability discrimination, because once the physician deemed her unfit for the duty, she was no longer qualified to perform the essential functions of her position with the department (as set forth in the Tennessee code)); *Brunko v. Mercy Hospital*, 260 F.3d 939, 941-42 (8th Cir. 2001); *Breitkreutz v. Cambrex Charles City, Inc*., 450 F.3d 780, 784 (8th Cir. 2006); *Wisbey v. City of Lincoln*, 23 Am. Disabilities Cas. (BNA) 618, 2010 U.S. App. LEXIS 13684 (8th Cir. 2010); *Young v. UPS*, 784 F.3d 192 (4th Cir. 2013); *Thompson v. Henderson*, 226 Fed. Appx. 466 (6th Cir. 2007).

24

Accordingly, this case is not about which medical doctor was correct as to whether Fortkamp could safely return to the lineman position.  Dr. Randolph, deposed twice by Fortkamp, has provided detailed testimony about his opinions and the scientific and medical studies upon which his opinion is based.  Dr. Snow, Dr. Borrillo, and Dr. Mullin acknowledge the conflicting opinions in the medical community regarding the necessity and success rate of the surgical procedures Fortkamp underwent for his back problems.  ADA law does not mandate an employer, like Celina, to resolve the medical community's admitted vigorous debate regarding the fusion and disc replacement procedures Fortkamp underwent.  As noted in the *Wurzel* decision, neither is this Court or a jury.  Celina's reliance on the opinion rendered by a medical doctor, board certified in occupational medicine, to decide that Fortkamp could not safely perform the duties of an electric lineman comports with all applicable law.  Therefore, these undisputed material facts cannot form the basis of a disability discrimination claim.

As to the third step of the burden-shifting analysis, Fortkamp must demonstrate that Celina's safety concerns, and reliance on Dr. Randolph's opinions, are pretextual in nature.  To survive summary judgment, the plaintiff must produce evidence from which a jury could reasonably doubt the employer's explanation.  *Chen v, Dow Chem. Co*., 580 F.3d 394, 400 n.4 (6th Cir. 2009).  The plaintiff may prove pretext by showing that the reasons offered by the defendant (1) had no basis in fact; (2) were not the actual reasons for the defendant's actions; or (3) were an insufficient basis for the defendant's actions.  *Manzer v. Diamond Shamrock Chems*., 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds by *Geiger v. Tower Auto*., 579 F.3d 614 (6th Cir. 2009)).

No such evidence exists to overcome Celina's legitimate, nondiscriminatory reasons here.  No one can legitimately doubt or call into question the fact that the lineman position is an

inherently dangerous job because the law defines it as such. Therefore, Celina's legitimate safety concerns exist as a matter of law and, in furtherance of those interests, Celina exercised its legal and contractual right to have Fortkamp submit to an IME before returning him to the inherently dangerous position. Fortkamp can offer nothing to cause a jury to reasonably doubt Celina's safety concerns and request for an IME under the undisputed material facts of this case.

The Sixth Circuit recently discussed pretext in the context of the "honest belief" rule, as follows:

> "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason," the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001). The key in assessing whether an employer had an honest belief is "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp*., 155 F.3d 799, 807 (6th Cir. 1998). An employer has an honest belief in its rationale when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117 (quoting *Smith*, 155 F.3d at 807)). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807. Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co*., 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806-07).

*Jones v. St. Jude Med. S.C., Inc*., 504 Fed. Appx. 473, 477 (6th Cir. 2012).

The Sixth Circuit expanded on the "honest belief rule" more recently, stating the following:

> An employee cannot avoid summary judgment by challenging an employer's honest belief that he deserved discipline with hypothetical theories, conjecture, or an unsupported denial of wrongdoing. See *Simpson v. Vanderbilt Univ*., 359 F. App'x 562, 570 (6th Cir. 2009); *Lattimore v. Wild Flavors, Inc*., 09-Civ-023, 2012 U.S. Dist. LEXIS 7826, 2012 WL 208078, *13 (E.D. Ky. Jan. 23, 2012); *Ladd v. Grand Trunk Western R.R., Inc*., 552 F.3d 495, 502-03 (6th Cir. 2009). "To overcome the employer's invocation of the honest belief rule, the employee 'must allege more than a dispute over the facts upon which [the] discharge was based. He must put forth evidence which demonstrates that the employer did not

'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.'" *Blizzard,* 698 F.3d at 286 (quoting, *Braithwaite v. Timken Co*., 258 F.3d 488, 494 (6th Cir. 2001)).

*Parks v. UPS Supply Chain Solutions, Inc*., 607 Fed. Appx. 508, ___ (6th Cir. 2015).

Notably, this Court followed the "honest belief" rule before the Sixth Circuit formally articulated the rule in *Jones* and *Parks*. *Reid v. Rexam Bev. Can Co.*, 434 F.Supp.2d 500 (N.D. Ohio 2006). This Court applied the rule as follows:

> A plaintiff cannot satisfy the burden of proving pretext in a discrimination or retaliation claim by, without more, questioning the employer's business judgment. *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1116-17 (6th Cir. 2001); *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 550 (6th Cir. 2004). If an employer honestly believes the articulated nondiscriminatory reasons for an adverse employment action, a court will not consider those reasons pretextual merely because that reasoning is later proven incorrect. *Majewski*, 274 F.3d at 1107. A federal court may not second-guess an employer's business judgment. *Hedrick v. W. Reserve Care Sys*., 355 F.3d 444, 462 (6th Cir. 2004) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citation and quotation omitted).

*Id.* at 506-507.

There is no evidence whatsoever in the record to suggest that Celina did not have an honest belief in its rationale. As the Sixth Circuit dictates, it does not matter whether Dr. Randolph was right or wrong in his opinions. Celina had no reason to doubt Dr. Randolph's competence (he was board certified in occupational medicine, after all), and Celina gave Dr. Randolph all medical documentation that Fortkamp provided for Dr. Randolph to review and to supplement his opinions. Accordingly, Celina's decision to separate Fortkamp from the position as a result of Dr. Randolph's opinions bar any discrimination claims here. Celina's nondiscriminatory reasons are not pretextual. Summary judgment is appropriate here, regardless of whether Fortkamp can make out a prima facie case of discrimination, which is denied for the

27

reasons that follow.

### 3. The "Regarded As" Claim

Returning to step one, the prima facie analysis, Fortkamp's claims also do not survive this initial step.  As to establishing the first element of the prima facie case, Fortkamp maintains he does not have an actual disability, but instead was "regarded as" disabled by Celina.  This has no factual support, as no one has offered testimony that Fortkamp was disabled, and Dr. Randolph was clear that he did not conclude Fortkamp to be disabled; he concluded Fortkamp could not be returned to the inherently dangerous job of an electric lineman due to the significant failure rate of the surgical procedures performed by Dr. Mullin.  The undisputed material facts prove Celina then hired Fortkamp as a meter reader, and he continues to successfully perform the duties of a meter reader for Celina to this day.

As this Court noted the differences in "regarded as" claims under the ADA before and after the amendments took effect on January 1, 2009 (*Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *18-19), Fortkamp's claims are addressed accordingly.

### a. 2008 Decision to Send Fortkamp to IME

The decision to send Fortkamp to an IME falls under the pre-amendment ADA, which requires Fortkamp to show that Celina "regarded him as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(i)).  As this Court noted, "[u]nder the former version of the ADA, courts rejected claims based on an employer's determination that a plaintiff was limited in performing a particular position or job, rather than a broad range or class of jobs."  *Id.* (citing *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999); *Davis v. Mich. Agric. Commodities, Inc.*,

2009 U.S. Dist. LEXIS 5582, 2009 WL 94534, *7 (E.D. Mich.)).  The very purpose of the IME with Dr. Randolph was to determine whether Fortkamp could perform the job duties specifically for the lineman position.  As such, the decision to send Fortkamp to an IME in this case does not run afoul of the ADA as a matter of law.

Further still, the act of sending an employee to an IME does not constitute an adverse employment action.  The Northern District recently acknowledged that "[f]itness for duty examinations do not establish a perception of disability and such examinations are not adverse employment actions in the context of civil rights statutes."  *Belasco v. Warrensville Heights City Sch. Dist.*, 2015 U.S. Dist. LEXIS 5671 (N.D. Ohio 2015).

Accordingly, the "regarded as" claim based upon Celina's December 2008 decision to send Fortkamp for an IME, rather than return him to the lineman position, fails as a matter of law because the undisputed material evidence shows that Celina was solely sending Fortkamp to an IME to specifically determine whether Fortkamp could safely return to the particular job as an electric lineman, which is an inherently dangerous position as a matter of law.  Likewise, Dr. Randolph's opinions also mean that Fortkamp was not otherwise qualified to perform the job duties of an electric lineman, as Dr. Randolph emphatically opines that it would not be safe for him to do so.  Summary judgment is appropriate under the pre-amendment ADA as to Celina's decision to send Fortkamp to an IME, rather than return Fortkamp to the lineman position in December of 2008.

### b. 2009 Decisions Refusing to Return Fortkamp to Work and Employment Separation

At the outset, it is noted that all of the employment decisions in 2009 were solely guided by Celina's reliance on Dr. Randolph's opinion that Fortkamp could not safely return to the

electric lineman position.  As set forth in Section II(B)(2) above, such reliance precludes a cause of action for a "regarded as" claim under the ADA.  *Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *19 ("Actions motivated by bona fide concerns with worker safety cannot be deemed or found to be prohibited under the ADA, as amended or otherwise").  Dr. Randolph's opinions were unambiguous.  Dr. Randolph clearly reported to Celina that Fortkamp should not be returned to the lineman position, and Dr. Randolph again and again reported this to Celina in the two addendums he issued after January of 2009.  Thus, the employment decisions that flow from them do not form the basis of a discrimination claim as a matter of law.

Beyond this, the amendments to the ADA changed the "regarded as" claim to now only require a plaintiff to show "he was subjected to an action prohibited under [the ADAAA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity."   *Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *19 (citing 42 U.S.C. § 12102(3)(A) (2009)).  As this Court did in *Wurzel*, which the Sixth Circuit affirmed, the "direct threat" analysis set forth in 29 C.F.R. 1630.2(r) is applied to determine whether Fortkamp's surgically-repaired back poses "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *19.  As noted by the Court in *Wurzel*, factors to consider under the applicable regulation include: (1) duration of the risk; (2) nature and severity of the potential harm; (3) likelihood that the potential harm will occur; and (4) imminence of the potential harm.  *Id*.

### 1.)  Duration of the Risk

The procedures that Fortkamp underwent are permanent in nature, as described by the surgeon, Dr. Mullin.  Like the prinzmetal angina at issue in *Wurzel*, the fusion and disc

replacement are life-long conditions.  This Court noted the following in *Wurzel*:

> Whirlpool correctly argues that the duration of a risk is not measured simply by how long the symptoms of an individual spasm last. The duration of the risk depends, rather, on the longevity of the underlying condition, not the actual or relative brevity of its sporadic consequences, and the danger that those consequences pose while they are manifest.

*Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *22.

Accordingly, there is no dispute that the underlying condition—the fusion and disc replacement—is of unlimited duration.  Thus, this factor weighs in Celina's favor.

### 2.) Nature and Severity of the Potential Harm

The electric lineman position is a safety sensitive and inherently dangerous job.  This is undisputed, and is so defined as a matter of law.  If Fortkamp's fusion or artificial disc should fail while he was on the job, as this Court noted in *Wurzel*, "the consequences for his own well-being and others can hardly be disputed."  *Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *22-23. This factor again weighs in Celina's favor.

### 3.) Likelihood that Potential Harm Will Occur

The Court's analysis of factor three in *Wurzel* is instructive here.  The Court held:

> Given the **unforeseeability** of a spasm and the **unpredictability** of its effects, the odds are great that, were plaintiff to have continued to drive a tow motor or work near moving machinery or at a height and alone, he or someone else would have been injured.
>
> **This calculation is not subject to scientific measurement. Likelihood is not the same as certainty.** Under all the circumstances known to Whirlpool, no rational jury could find anything other than that the likelihood of harm was sufficiently great as to justify Whirlpool's concerns and actions.
> Plaintiff's argument that a future occurrence was not likely because nothing had happened in the past is off point. **Should the nearsighted drive without glasses because they have yet to run into something or somebody?**
>
> ***An employer need not wait to respond to risk of harm until someone is hurt.*** See *Garner v. Gwinnett County*, 1998 WL 1048471, *4 (N.D.Ga.), aff'd, 170 F.3d 189

(11th Cir 1999) (Table) ("The ADA did not require defendants to ignore this information, rely on the conflicting medical opinions of plaintiff's therapists, and take the risk that plaintiff would injure his co-workers or a member of the public once reinstated.").

*Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *23-24 (emphasis added).

Every concern identified for the employer in *Wurzel* applies here.  Celina was presented with conflicting medical opinions, primarily in the form of Dr. Mullin and Dr. Randolph.  Both Dr. Randolph and Dr. Mullin can point to scientific and medical studies to support their respective positions.  If Dr. Mullin is believed, then the likelihood of Fortkamp having future problems with his fusion or artificial disc is approximately 30%,[117] but if Dr. Randolph is believed, then a whopping 79% of disc replacement patients required a second surgery to either correct or remove the implant.[118]  Is 30% an acceptable percentage for Celina to risk in returning Fortkamp to work as a lineman?  Is 79% an acceptable percentage to risk?  How is Celina to evaluate the two when required to serve and protect the health, safety and welfare of Fortkamp himself, his co-workers, and the public at large?

It is not for Celina, the Court, or the jury to decide which doctor or studies to believe.  Celina was not required to wait until Fortkamp hurt himself or others in an inherently dangerous job to determine whether Dr. Mullin or Dr. Randolph was correct.  As the Court noted in *Wurzel*, "likelihood" does not mean "certainty" in this context.  Celina does not have to roll the dice, as a matter of law, on whether the likelihood of complications is 30% or 79%.  Fortkamp would not be sitting at a desk waiting for his artificial disc to give out if he was working as an electric lineman.  Rather, Fortkamp would be subjected to extreme weather conditions, heights, high

---

117 This percentage is not known to still be accurate, as this comes from the initial approval study from 2004 that only had studied two years post placement.  That study only lasted two years, and is not known to have ever been updated.  Doc. 50, Deposition Transcript of Dr. Mullin, at p. 53.
118 Exhibit 18, Doc. 60-2, PageID #: 1476-1483.

voltage and charged lines, heavy equipment, and unpredictable emergency conditions as an electric lineman, with not only his own safety at risk, but the safety of his co-workers and members of the public as well.  This factor weighs in Celina's favor as well.

### 4.) Imminence of Potential Harm

Once again, the *Wurzel* case is instructive here.  After noting cases where employees working in dangerous jobs were found to have posed imminent potential harm (*Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447-48 (11th Cir. 1996) (plaintiff with uncontrolled seizure disorder worked near dangerous machines); *Washington v. Occidental Chem. Corp.*, 24 F. Supp 2d 713, 728 (S.D. Tex. 1998) (plaintiff not qualified to operate heavy machinery in petrochemical plant); *Davis v. Mich. Agric. Commodities, Inc.*, 2009 U.S. Dist. LEXIS 5582, 2009 WL 94534, *7 (E.D. Mich.) (plaintiff's operation front end loader, and forklift was inherently dangerous), the Court concluded "[w]hile the risk of injury in this case might not have been in every instance and at every moment immediate, it was sufficiently likely to occur that at any given moment it might have been imminent, as the law understands that term in this context." *Wurzel*, 2010 U.S. Dist. LEXIS 36635, at *24.

Given the studies cited by Dr. Randolph on the artificial disc, and Dr. Randolph's insistence that returning Fortkamp to the inherently dangerous job as an electric lineman was not medically recommended, this factor also weighs in Celina's favor.  Accordingly, Fortkamp cannot make out a prima facie case of discrimination under the post-amendment ADA as to Celina's employment decisions in 2009.

### 4.  The "Record Of" Claim

Fortkamp amended his complaint to include an alternate theory of liability under the ADA, which is the "record of" claim.  The factual record of this case establishes that Fortkamp

cannot make out a prima facie case for a "record of" claim.  The Southern District of Ohio

recently discussed "record of" claims as follows:

> Plaintiff, however, also claims that he is disabled under the "record of
> impairment" prong of the definition of disability. A plaintiff has a "record of
> impairment" if he or she "has a history of, or has been misclassified as having, a
> mental or physical impairment that substantially limits one or more major life
> activities." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir.
> 2002); 28 C.F.R. § 35.104 (2005); 29 C.F.R. § 1630.2(k) (2005). Courts that have
> analyzed this prong have held that it includes "people who have recovered from
> previously disabling conditions ... but who may remain vulnerable to the fears and
> stereotypes of their employers." See *Davidson v. Midelfort Clinic, Ltd*., 133 F.3d
> 499, 509 (7th Cir. 1998) (holding plaintiff had established a genuine dispute of
> fact regarding whether she was disabled where she had a record of a learning
> disability in the past). The "plaintiff only needs to show that 'at some point in the
> past' he had [a substantially limiting impairment]." *Knight v. Metro. Gov't of
> Nashville & Davidson Cnty., Tn*., 136 Fed. App'x 755, 760 (6th Cir. 2005)
> (holding that a police officer who was not presently impaired, but who was
> previously injured in a motorcycle accident on the job and received disability
> pensions for twenty years, during which he worked intermittently as his injuries
> allowed, had raised a factual dispute as to whether he had a record of disability).

*Neely v. Benchmark Family Servs*., U.S. Dist. Court, S.D. Ohio Case No. 3:13-cv-415, 31 Am.

Disabilities Cas. (BNA) 864, 2015 U.S. Dist. LEXIS 52267, 2015 WL 1809369 (S.D. Ohio

2015).

The EEOC's interpretative guidance described the type of "records" that this claim can

be based upon are employment, education, or medical records.  *EEOC v. Daimler Chrysler

Corp*., 111 Fed. Appx. 394, 404 (6th Cir. 2004).  Celina knows of no legal authority that has held

an IME constitutes the type of "record" upon which a "record of" disability claim can be based.

Should Fortkamp actually argue that Dr. Randolph's IME somehow constitutes a "record of"

disability, Fortkamp would in essence be asking the Court to forbid employers from ever having

employees submit to an IME, as such an act would be discriminatory.

If the Plaintiff argues that the IME itself is not a "record," but instead, the medical records or history that Dr. Randolph relied upon are the "records" at issue in this claim, then Fortkamp would be asking the Court to gut the very IME process, which is defined not by courts but by the medical community, including the AMA.  IME doctors look at the claimants' medical records as part of the IME process and in preparing their reports.  If IME doctors are not permitted to review relevant medical records of the claimant, then how would the IME doctor be able to provide a thorough examination?  In this case, for example, Fortkamp's surgical procedures were internal, and if Dr. Randolph could not examine Fortkamp's medical records, then Dr. Randolph would only be limited to Fortkamp's lay impressions and opinions of what procedures he underwent.  He would have been guessing at what hardware was implanted, and then guessing at what literature and studies to review in order to arrive at an opinion.

Fortkamp's "record of" claim also misses the very point that the facts of this case present. At the heart of this case, the issue boils down to a difference in professional opinions as to whether a person who has undergone controversial surgical procedures (the fusion and the artificial disc replacement) can safely be returned to an inherently dangerous job.  Dr. Randolph says the answer is no, and cites studies and research to back up his opinion.  Dr. Mullin says the answer is yes, and he cites the study he participated in which was submitted to the FDA in 2004, and his own experience.  Dr. Borrillo says the answer is yes, although he also practices law with a plaintiffs' firm in Toledo that sues implant manufacturers in product defect cases, which makes him well aware of the criticisms of those devices.  Dr. Snow says the answer is yes also, but acknowledges that these procedures are rarely seen in his practice, and that they are complex and dangerous.

The doctors and their differing opinions and possible biases in this matter are a snapshot

of the vigorous debate within the medical community as to the necessity and long term success with the surgical procedures Fortkamp underwent.  It is debate such as this that fuels the evolution of the practice of medicine in this country, and indeed, across the world.  The charite disc that is in Fortkamp's spine is the subject of much debate and litigation, and may have even run its course, as Johnson & Johnson stopped manufacturing it in 2010, just three years after Fortkamp's surgery.

Further, it cannot go unsaid that an elementary element is missing from this claim as well.  There is no "disability" squarely at issue here.  Fortkamp denies he is disabled, and there is no evidence in the record that anyone—not even Dr. Randolph—has concluded or reasoned that Fortkamp is disabled.  Dr. Randolph was only asked to opine whether Fortkamp could safely return to the inherently dangerous job of a lineman.  Dr. Randolph did not—and has not— offered any opinion that Fortkamp is disabled.  Celina never asked him to do so.  And, as discussed above, if Fortkamp chooses to argue that the term "involuntary disability separation" means Celina thought Fortkamp was "disabled" under the ADA, such reliance is misplaced and wrong as a matter of law.

Celina was not succumbing to a fear or stereotype in this case.  Celina was dealing with conflicting medical opinions regarding controversial surgical procedures within the medical community, as articulated by the individual doctors in this case, and its inherent need to protect the health, safety and welfare of Fortkamp, its other employees, and the public it serves. Fortkamp would have the Court silence the medical science critics of his surgical procedures, ignore the nature of his position, and force Celina to return him to an inherently dangerous position.  The law, thankfully, does not require the Court to tyrannically silence or ignore debate in the medical community through a disability discrimination lawsuit.  The law instead dictates

36

that Fortkamp's "record of" claim, like his "regarded as" claim, fails in this case as a matter of law.

### C.     Fortkamp's state law claims likewise fail as a matter of law.

The state law disability discrimination claim utilizes the same framework as the ADA claims, including the use of the *McDonnell-Douglas* framework for indirect evidence claims. *Jones v. Honda of Am. Mfg.*, 2015 U.S. Dist. LEXIS 28682 (S.D. Ohio 2015).  Accordingly, the analysis from Section II(B)(2) is incorporated herein by reference, and Fortkamp's 4112 claims fail as a matter of law under the second and third steps of the burden-shifting analysis, regardless of whether Fortkamp can make a prima facie case of discrimination under Chapter 4112, which is denied.

While the state and federal statutes are not identical in all respects, courts may generally look to the ADA and its interpretation by federal courts for guidance in interpreting the Ohio statute, and federal courts have noted that generally, analysis of the federal claim will resolve the state claim as well.  *Esparza v. Pierre Foods*, 923 F. Supp. 2d 1099, 1104 (S.D. Ohio 2013). Thus, evidence sufficient to support a finding of discrimination under the ADA is necessary before a violation of Section 4112.02(A) can be shown.  *Jones v. Econ. Opportunity Planning Ass'n of Greater Toledo*, 2013 U.S. Dist. LEXIS 15511 (N.D. Ohio 2013); *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 726 (N.D. Ohio, 2008).  Accordingly, Fortkamp's 4112 claims fail for the same reasons set forth above in the ADA analysis.

Ohio Rev. Code § 4112.02(A) makes it unlawful for an employer to terminate an employee "**because of** . . . disability" without just cause. Ohio law requires a plaintiff to demonstrate the following "three essential elements" to state a prima facie case of disability discrimination: "(1) the claimant had a disability, (2) the defendant took an adverse employment

action, at least in part, because the plantiff had the disability, and (3) the claimant, while having a disability, could safely and substantially perform the essential functions of the job in question."
*Wallace v. Mantych Metalworking*, 189 Ohio App. 3d 25, 937 N.E.2d 177, 183, 2010-Ohio-3765 (Ohio Ct. App. 2010)(emphasis added).  It is noted that the Sixth Circuit has found that discrimination statutes utilizing the "because of" language are not subject to "mixed motive" analysis, meaning that discrimination must be the sole cause of the adverse employment decisions.  *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

Under Ohio law, the first element of a prima facie case of disability discrimination requires the plaintiff to show that he has a disability. *Wallace*, 937 N.E.2d at 183.  The statute defines the term "disability" in three ways:

> [1] a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; [2] a record of a physical or mental impairment; [3] or being regarded as having a physical or mental impairment.

Ohio Rev. Code Ann. § 4112.01 (A)(13).

Notably, Ohio law requires that the physical impairment must also "substantially limit one or more major life activities" of the plaintiff§ 4112.01 (A)(13). Federal regulations and case law interpreting the ADA may provide "guidance" when interpreting the Ohio anti-discrimination statute. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 207, 1998-Ohio-410 (Ohio 1998). The federal regulation defining "substantially limits" states that:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every

impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).

Under the regulation, "[m]ajor life activities include, but are not limited to . . . performing manual tasks . . . walking, standing, sitting, reaching, lifting, bending ... and working[.]" *Id.* § 1630.2(i)(1 )(i). Neither "substantially limits" nor "major life activity" are to be interpreted as imposing "demanding standard[s] for disability." Id. §§ 1630.2(i)(2) & 1630.2(j)(1)(i).  Ohio courts have held that a lifting restriction does not constitute a "substantial limitation." *McClenaghan v. Ohio DOC*, 2005-Ohio-1284 (Ohio Ct. Clms 2005)(pre-2008 ADA amendments).  Further, given the distinct "substantially limits" and "major life activity" language of Chapter 4112—which was not and has not been amended since the 2008 ADA amendments—there is no logical reason why the Court should not reject Fortkamp's claims, which are solely based on Celina's determination through Dr. Randolph that Fortkamp was limited in performing the particular position of an electric lineman, rather than a broad range or class of jobs." *Wurzel*, supra (citing *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999); *Davis v. Mich. Agric. Commodities, Inc.*, 2009 U.S. Dist. LEXIS 5582, 2009 WL 94534, *7 (E.D. Mich.)).

The Northern District recently discussed "regarded as" claims under Chapter 4112 as follows:

> Thus, to show she was regarded as "disabled" under R.C. 4112.02, the Plaintiff must show that her employer regarded her as physically or mentally impaired. To prove that the Defendant regarded her as disabled, the Plaintiff must show that "[the] employer ascribed to [her] an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). More precisely, the Plaintiff must establish that the Defendant misperceived her abilities in either of two ways: (1) that the Plaintiff had a substantially limiting impairment that she did not have; or (2) that the Plaintiff

39

> had a substantially limiting impairment when the impairment was not truly so limiting. *Sutton v. United Air Lines*, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).

*Wingfield v. Escallate, LLC*, 2014 U.S. Dist. LEXIS 139885 (N.D. Ohio 2014).

Fortkamp's 4112 claims suffer from the same deficiencies as his ADA claims. As to his 4112 "regarded as" claim, Fortkamp fails to demonstrate that Celina had any misperceptions as to his abilities. Celina relied upon the opinions of Dr. Randolph, and this does not constitute a misperception as a matter of law for the reasons stated previously. Thus, this case still does not turn into a "battle of the experts" case in which the Court must decide whether Dr. Randolph or Dr. Mullin is correct in their opinions.

Likewise, the "record of" claim under Chapter 4112 fails for the same reasons as the ADA claim fails. Further, Celina's mere knowledge or awareness of Fortkamp's back condition does not constitute a "record of" disability absent some evidence that Fortkamp suffered from an impairment that "substantially limited" Fortkamp in a major life activity. *Jones v. Econ. Opportunity Planning Ass'n of Greater Toledo*, 2013 U.S. Dist. LEXIS 15511 (N.D. Ohio 2013). In any event, Fortkamp's Chapter 4112 claims fail as a matter of law.

## III.   CONCLUSION

FOR THE FOREGOING REASONS, Celina respectfully requests the Court to SUSTAIN this motion for summary judgment, and ORDER that all claims be dismissed on their merits.

Respectfully submitted,

s/Jamey T. Pregon
Lynnette Dinkler (0065455)
Lead Trial Counsel
lynnette@dinklerpregon.com
Jamey T. Pregon (0075262)

40

Co-Trial Counsel
Jamey@dinklerpregon.com
DINKLER PREGON LLC
5335 Far Hills, Suite 123
Dayton, OH 45429
(937) 426-4200
(866) 831-0904 (fax)
*Attorneys for Defendant City of Celina*


s/Eugene Peter Nevada Jr.
Eugene Peter Nevada Jr. (0008962)
pnevada@clemansnelson.com
485 Metro Place South, Suite 200
Dublin, OH  43017
(614) 923-7700
(614) 923-7707 (fax)
*Co-Counsel for Defendant City of Celina*


## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of September, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:


Bruce B. Elfvin                              Eric J. Wilson
Stuart Torch                                 Wilson Law
Christina M. Royer                           101 North Front Street
ELFVIN & BESSER                              P O Box 69
4070 Mayfield Road                           St. Mary's, OH  45885-0069
Cleveland, OH  44121-3031                    *Attorneys for Plaintiff*
*Attorneys for Plaintiff*


s/Jamey T. Pregon
Jamey T. Pregon (0075262)


41