**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **MATTHEW FORTKAMP** ) | |
| ) | CASE NO. 3:14-cv-438 |
| *Plaintiff*, ) | |
| ) | JUDGE JAMES G. CARR |
| v. ) | |
| ) | |
| ) | **PLAINTIFF'S BRIEF IN OPPOSITION** |
| **CITY OF CELINA,** ) | **TO DEFENDANT CITY OF CELINA'S** |
| ) | **MOTION FOR SUMMARY JUDGMENT** |
| *Defendant*. ) | **[DOC. #69]** |
| ) | |

NOW COMES PLAINTIFF, Matthew Fortkamp, by and through counsel, and hereby opposes Defendant City of Celina's Motion for Summary Judgment [Doc. #69]. Based on the record, there are myriad factual disputes relative to highly material issues, such that a reasonable jury could easily find in favor of Fortkamp on all of his claims. Thus, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

*s/ Bruce B. Elfvin*

BRUCE B. ELFVIN (0015694)
CHRISTINA M. ROYER (0073695)
STUART TORCH (0079667)
Elfvin, Besser, Royer & Torch, LLC
4070 Mayfield Rd.
Cleveland, Ohio 44121
Tel:    (216) 382-2500
Fax:    (216) 381-0250
Email: bbe@elfvinbesser.com
          croyer@elfvinbesser.com
          stuart.torch@elfvinbesser.com

*Attorneys for Plaintiff  Matthew Fortkamp*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

I.    SUMMARY OF PLAINTIFF'S ARGUMENT ...................................................... 1

II.   ISSUES TO BE DECIDED .................................................................................. 2

III.  STATEMENT OF FACTS, INCLUDING MATERIAL DISPUTED FACTS ........................ 3

    A.  Matt Fortkamp was working for the City of Celina as an Electric Lineman in 2003, when
        he suffered a disabling back injury on the job, which kept him off work for a period of time
        before he underwent a surgery that dramatically improved his recovery; Fortkamp then
        engaged in an aggressive physical therapy regimen that put him in a better physical
        condition than he had ever been, and was fully cleared to return to his position in December
        of 2008. .......................................................................................................................... 3

    B.  After asking Fortkamp to submit to an IME in order to return to work, the City provided the
        medical examiner, Dr. David Randolph, with misleading information about Fortkamp and
        about the lineman job duties, for the purpose of precluding Fortkamp from returning to his
        position, out of an admitted fear of re-injury and financial liability. ..................................... 9

    C.  After Dr. Randolph refused to release Fortkamp because of his history of a disabling
        condition, the parties engaged in a lengthy back-and-forth, where Fortkamp provided more
        and more medical evidence of his fitness for duty, which the City ignored, instead relying
        solely on Dr. Randolph's illegal conclusions, which it used to preclude Fortkamp from
        returning to work, ultimately "disability separating" him on October 16, 2009. ................. 15

    D.  In November 2009, the City agreed to permit Fortkamp to return to work as a Meter Reader
        as "reasonable accommodation" for his non-disability – the position in which Fortkamp
        started in 1999 – in which he had no seniority and was earning less, despite, ironically,
        engaging in job tasks that the City believed he could not do in the lineman position. ........ 24

IV.   SUMMARY JUDGMENT STANDARD .............................................................. 27

V.    LAW AND ARGUMENT .................................................................................. 28

    A.  There is overwhelming evidence that the City of Celina unlawfully discriminated against
        Fortkamp based on his record of a past disability and based on its fallacious perception that
        he was physically unable to perform the essential functions of an Electric Lineman
        position, when it refused to return him to work as an Electric Lineman following his full
        recovery from his low-back injury and his full release by every single one of his treating
        providers. ...................................................................................................................... 28

        1)   The City of Celina discriminated against Matt Fortkamp by failing to engage in an
             individualized inquiry into whether, in December 2008 and after, he could perform the
             essential functions of the Electric Lineman position, instead relying solely on the opinion of

its third-party medical examiner, Dr. David Randolph, who admitted that his opinions are based on Fortkamp's "record" of a disability. ........................................................................29

2)    A jury could easily find that the City's providing Dr. Randolph with false and misleading information about the essential functions of the electric lineman position – and Dr. Randolph's erroneous and made-up conclusions about the essential functions of the position – are indicia of unlawful disability discrimination. ....................................................33

3)    The City of Celina unlawfully regarded Fortkamp as disabled when it refused to return him to the Electric Lineman position, based on its directly articulated fears and assumptions that Fortkamp would re-injure himself and cause the City to incur financial liability. ...........35

4)    The City of Celina cannot rely on the "honest belief rule" to escape liability for its discriminatory actions against Fortkamp because it never pled this affirmative defense and because a reasonable jury could easily believe that the City's actions and admissions belie any such claim. ...............................................................................................................................38

B. The City of Celina is not entitled to summary judgment on the basis that Fortkamp presents a "direct threat" to the health or safety of himself or others because the City and its medical provider ignored objective evidence of Fortkamp's current condition and abilities, and because the City never pled "direct threat" as an affirmative defense to Fortkamp's claims 40

VI.  CONCLUSION................................................................................................................45

CERTIFICATE OF COMPLIANCE ......................................................................... viii

CERTIFICATE OF SERVICE ....................................................................................ix

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ...............................................................36, 41

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004)............................28

*Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109 (D. Me. 2010) ..........................36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................27

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998) ...................................29

*Deleon v. Kalamazoo County Road Com'n*, 739 F.3d 914 (6th Cir. 2014).....................27

*Demyanovich Cadon Plating & Coatings, LLC*, 747 F.3d 419 (6th Cir. 2014) ..............28

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955 (10th Cir. 2002)....................36

*Hamlin v. Charter Twp. of Flint*, 165 F.3d 426 (6th Cir. 1999) ......................................40

*Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000) ......................................30

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .......................................................................27

*Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921 (6th Cir. 1999)............29

*Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013)................................30, 31, 33

*Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862 (6th Cir. 2007)..........................................28

*Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 136 Fed. App'x 755 (6th Cir. 2005)

....................................................................................................................................29

*Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)....................28

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)................................................36

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)..............................29

*Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014) ...........................................30, 33

*Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145 (1st Cir. 2009) .................36

*Shelton v. City of Cincinnati*, No. 1:11-cv-381, 2012 U.S. Dist. LEXIS 156595 (S.D. Ohio Nov. 1, 2012) ...................................................................................................................................29

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) ........................................................28, 29

*Sutton v. United Air Lines*, 527 U.S. 471 (1999) ......................................................................35

*Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861 (2014) ..............................................................27

*Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F. Supp. 2d 469 (S.D. Ohio 2012)..............40

*Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006).........................................................38

*Wurzel v Whirlpool Corp.*, 482 Fed. Appx. 1 (6th Cir. 2012) .......................................................41

*Wurzel v. Whirlpool*, 2010 U.S. Dist. LEXIS 36635, 2010 WL 1495197 (N.D. Ohio, Apr. 14, 2010) ...................................................................................................................................43

**Federal Statutes**

42 U.S.C. § 12101 ....................................................................................................................34

42 U.S.C. § 12102(1) ...............................................................................................................28

42 U.S.C. § 12102(3)(A)...........................................................................................................35

42 U.S.C. § 12111(8) ...............................................................................................................33

42 U.S.C. § 12112(a) ...............................................................................................................28

42 U.S.C. § 12113(b) ...............................................................................................................40

42 U.S.C. § 12206(c) ...............................................................................................................36

**Federal Regulations**

28 C.F.R. § 35.104....................................................................................................................29

29 C.F.R. § 1630.14(c)..............................................................................................................35

29 C.F.R. § 1630.2 ...................................................................................................................40

29 C.F.R. § 1630.2(k)................................................................................................................29

29 C.F.R. § 1630.2(r).................................................................................................................40

**State Cases**

*Carnahan v. Morton Bldgs., Inc.*, 2015-Ohio-3528 (Ohio Ct. App., Paulding County Aug. 31, 2015) ........................................................................................................................44

**State Statutes**

Ohio Rev. Code § 4112.01(A)(13) ...........................................................................28

Ohio Rev. Code § 4112.99............................................................................................45

**Rules**

Fed. R. Civ. P. 56...........................................................................................................27

**Other**

ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(4)-(6), 122 Stat. 3553 ...................35

Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act § 6.4 (1992)....................................36

## I.  <u>SUMMARY OF PLAINTIFF'S ARGUMENT</u>

Matt Fortkamp suffered a debilitating back injury while working for the City of Celina as an Electric Lineman, which kept him off work for a period of time and which substantially limited him in several major life activities. However, Fortkamp later underwent surgery that dramatically improved his life and paved the way for a full recovery. After engaging in an aggressive physical therapy regimen that lasted almost a year and that put Fortkamp in better physical shape than he had ever been in, he was fully released to return to his position in December 2008.

The City, however, had other plans – and those plans were based on fear, speculation, and stereotypes that are patently impermissible under the ADA, as amended. City officials admit that they made decisions about Fortkamp based on nothing but fear that Fortkamp would re-injure himself and might cost the City a bundle of money if he returned to the Electric Lineman position.

Although the City certainly had every right to request that Fortkamp undergo an independent medical exam to verify what his own providers were saying about his fitness for duty, it did not have the right to provide that third-party physician, Dr. Randolph, with erroneous and misleading information about the lineman job duties.  It also did not have the right to mechanically rely on Dr. Randolph's conclusions, which were unsurprisingly adverse to Fortkamp. Dr. Randolph himself admitted that his conclusions were based on Fortkamp's record of a past disability, and are, in essence, contrary to what he found during the single physical examination that he conducted on Fortkamp. Because Dr. Randolph did not base his conclusions on objective evidence of Fortkamp's then-current physical condition – which he noted was normal and "good" – the City's attempt to hide behind this opinion is discriminatory and unlawful.

After the City refused to reinstate him in February 2009, Fortkamp went to great lengths to try to get the City to change its mind and stop relying on false and discriminatory notions about his physical abilities. However, the City threw up road block after road block and dug in, refusing

1

to even countenance the notion that Fortkamp could return to the electric lineman position. This is so despite what numerous medical providers were saying about Fortkamp's current abilities, and despite the fact that Fortkamp himself was working in the cement and construction trades engaging in very heavy physical activity every single day. Instead, the City simply enlisted Dr. Randolph to reiterate his discriminatory conclusions so that it could once again claim blind reliance on them to justify its position.

Ultimately, the City "disability separated" Fortkamp in October of 2009, because he had run out of leave time, and based on the erroneous belief that he could never safely return to the lineman position. Even though Fortkamp had applied for a Meter Reader position in September 2009, the City felt it necessary to terminate him before rehiring him into the lesser paying position, causing him to lose a decade of seniority.  Ironically, the City characterizes this Meter Reader position as a "reasonable accommodation" – for a man who was not disabled at the time. The ultimate kicker is that, in this "reasonable accommodation" meter reader position, Fortkamp engages in some of the very type of heavy lifting that Dr. Randolph believes he can never do as an electric lineman – and he does so at the behest of Jeff Hazel, who is now the Mayor of Celina, but who at the time orchestrated the Dr. Randolph opinions.

Based upon the overwhelming evidence of discrimination in the record, a jury could easily find that the City of Celina violated the ADA, and therefore summary judgment is wholly inappropriate.

## II.  ISSUES TO BE DECIDED

1) Did the City of Celina impermissibly base its decision not to allow Matt Fortkamp to return to work as an electric lineman from 2009 onward on fear, stereotyping, and/or speculation about what *might* occur in the future, despite the fact that Fortkamp had no physical limitations since December 15, 2008?

2) Is the City of Celina able to rely on the medical opinions of Dr. Randolph, who performed only a cursory medical examination on Fortkamp, and lacked necessary and

accurate information regarding Celina's electric lineman job duties to make an individualized inquiry to determine whether Fortkamp should be permanently disqualified from returning to work in this position?

3) Are there genuine issues of material fact in dispute as to whether the City of Celina discriminated against Fortkamp based upon his "record of" a prior disability or based upon "regarding" Fortkamp as being disabled?

4) Can the City of Celina satisfy its heavy burden to establish an unpled and waived affirmative defense that Fortkamp poses a direct threat to the health and safety of others, or that the requirements of the electric lineman job would pose a direct threat to Fortkamp himself?

5) Can the City of Celina rely on the "honest belief rule" – another unpled and waived affirmative defense – to avoid liability for unlawfully discriminating against Fortkamp?

## III. STATEMENT OF FACTS, INCLUDING MATERIAL DISPUTED FACTS

**A. Matt Fortkamp was working for the City of Celina as an Electric Lineman in 2003, when he suffered a disabling back injury on the job, which kept him off work for a period of time before he underwent a surgery that dramatically improved his recovery; Fortkamp then engaged in an aggressive physical therapy regimen that put him in a better physical condition than he had ever been, and was fully cleared to return to his position in December of 2008.**

Matt Fortkamp began working for the City of Celina in 1999 as a Meter Reader. (Fortkamp Depo., Doc. 36, PageID 281, p. 14). After two years, Fortkamp was promoted to an "electric line maintenance worker one" position. (*Id.*). On November 10, 2003, Fortkamp's supervisor, Jeff Severns, asked Fortkamp and other linemen to assist a City contractor to perform a job relating to the contractor's work for the City. (Fortkamp Depo., Doc. 36, PageID 285-86, pp. 32-37). Unfortunately, while completing this task, which involved lifting a frame that weighed "several hundred pounds," Fortkamp severely injured his back. (*Id.*, PageID 285, p 32). Fortkamp experienced "a sharp shooting pain in his low back and down his back" and was ultimately diagnosed with an annular tear, among other things. (3/3/2008 J. Rusin, M.D., Independent Medical Examination ["IME"], Doc 60-1, PageID 1435; Fortkamp Depo., Doc. 36, PageID 287, p. 40).

3

Instead of submitting Fortkamp's injury to the Bureau of Worker's Compensation (BWC), which would have cost the City "around $180,000 more a year," the City chose a "cheaper" option by paying Fortkamp his salary (around $70,000 per year, with benefits) and keeping him on a paid leave of absence for almost four years. (Hazel Depo., Doc. 38, PageID 450-51, pp. 70-76; Page ID 469, pp. 145-48). By June 2007, Fortkamp's injury had occurred long enough ago that it would no longer impact the City's experience rating for BWC. (Hazel Depo., Doc. 38, PageID 451, pp. 74-76).

By taking Fortkamp off of paid injury leave status in mid-2007, it shifted him onto BWC's payroll, which the City claimed motivated BWC to allow and pay for Fortkamp's surgery. (*Id.*) On June 14, 2007, Jeff Hazel, then the City's Safety Services Director, notified Fortkamp that he would no longer extend Fortkamp's injury leave. (6/14/07 Ltr. Hazel to Fortkamp, Doc. #60-1, Page ID1432-33). In the same letter, Hazel described choices Fortkamp could make regarding his employment, including an option to pursue a claim through BWC (*Id.*).

Fortkamp ultimately chose the BWC option, which involved a treatment plan that included pain management, injections, therapy, and eventually surgery on his back, which took place on October 3, 2007. (Fortkamp Depo., Doc. 36, PageID 322, pp. 180-81; 1/2/09 Hazel Ltr. to Dr. Randolph, Doc. 60-1, PageID 1442; Dr. Rusin IME, Doc. 60-1, PageID 1435; Dr. Mullin File, Doc. 64-1, PageID 2363). Neurosurgeon Bradford Mullin, M.D, performed Fortkamp's surgery, which consisted of a disc fusion and a disc replacement with an artificial disc. (Dr. Mullin Depo., Doc. 50, PageID 1127, pp. 6-7). Dr. Mullin chose this surgery because of the "long-term functional outcome" of the "artificial disc … fusion." (Dr. Mullin Depo., Doc. 50, PageID 1134, pp. 34-35).

Before his October 2007 surgery, Fortkamp was unable to perform life functions such as stooping, bending, or lifting, and there were times when low back pain caused him to have to stop

engaging in certain activities. (Fortkamp Depo., Doc. 36, PageID 320, p. 171). In addition, Fortkamp had difficulty sleeping, walking, sitting, and standing. (*Id*.). During his recovery period, there were times when Fortkamp had "to lay flat for 22 hours a day" to get relief from his low back pain. (*Id*., PageID 321, p. 174).

In late September 2008, almost one year post-surgery, Fortkamp's vocational case manager at BWC, Eileen Mitchell-Welch, authorized Rick Wickstrom,[1] a physical therapist, to perform an assessment and analysis of Fortkamp's job duties, and then test Fortkamp to see if he was physically able to perform those job duties and hence return to work. (Wickstrom Depo, Doc. 48 at PageID 1021-1022, p. 41; p. 44). Dr. Wickstrom visited Celina personally and met with Fortkamp, as well as Hazel and Severns. (Wickstrom FCE 7-11-2009, Doc. 60-2, PageID 1486, recapping 10/2008 Functional Capacity Evaluation ["FCE"]).

Severns showed Dr. Wickstrom the worksite and identified the equipment the linemen were using, as well as the job tasks in which linemen engaged. (Severns Depo., Doc. 44, PageID 855, pp. 117-19). During the tour, Dr. Wickstrom weighed the equipment and items that linemen would lift or pull. (*Id*.). Dr. Wickstrom also met with Severns and Hazel to discuss the job demands, electrical-handling equipment, and to validate the requirements of the lineman position. (Wickstrom Depo., Doc. 48, Page ID 1027-1028, 1030, pp. 65-68, 76-77; Severns Depo., Doc. 44, PageID 856, p. 123).

Dr. Wickstrom prepared a six-page profile of the Celina Lineman position using the data he gathered during his visits to Celina. (10/2/2008 WorkAbility eJob Profile, Doc. 61-1, PageID 1703-1709). Despite the fact that Hazel and Severns actively participated in Wickstrom's job

---

[1] Wickstrom earned his Ph.D. in 2010. (Wickstrom CV 8/22/2014, Doc. 61-5, PageID 1938). Plaintiff refers to him as "Dr." out of respect for his degree, but wants to be clear that he obtained his advanced degree after the events involving Fortkamp took place.

analysis, and that Wickstrom engaged in this analysis pursuant to authorization from the BWC, the City now claims that Wickstrom's report is "riddled with errors and inconsistencies," including "*falsies about the electric lineman position itself*," and comes from "a physical therapist who allegedly performed a Functional Capacity Exam ('FCE') on the Plaintiff." (Answer to Plaintiff's First Amended Complaint, Doc. 19, PageID 214, 215; ¶¶19, 25, emphasis added).[2]

As to Fortkamp's physical fitness, Dr. Wickstrom's October 2, 2008, report opined that Fortkamp had made great strides in his recovery, noting only a couple of lingering concerns:

> … Mr. Fortkamp demonstrated []a remarkable degree of functional recovery. *This is one of the best functional outcomes I have seen for a fusion in combination with artificial disc surgery*. … There are a couple of issues that may require follow-up: 1) Tachycardia of unknown etiology…. 2) Matt needs to incorporate more functional box lifting endurance activities (knee to waist lift) into his current therapy regimen. This will improve his long-term stooping tolerance. 3) He is interested in being weaned from all prescribed medications.

(Wickstrom FCE 7-11-2009, Doc. 60-2, PageID 1486, recapping 10/2008 FCE, emphasis added). On October 7, 2008, Dr. Mullin saw Fortkamp for a follow-up. (Fortkamp Depo., Doc. 36, PageID 289, p. 48; Mullin File, Doc. 64-5, PageID 2508-12). Dr. Mullin wrote that Fortkamp "is doing extremely well," he "continues to improve," and "he is increasingly exercising his back." (Mullin File, Doc. 64-5, PageID 2512). Dr. Mullin also noted that "[o]n x-ray, his fixation and fusion construct looks good. The fusion is solid. The disc is functioning nicely." (*Id.*). Dr. Mullin planned to X-ray Fortkamp again in one year. (*Id.*).

Between October 2008 and early December 2008, Fortkamp engaged in additional physical conditioning and rehabilitation. (Wickstrom Depo., Doc. 48, PageID 1039, p. 112; Wickstrom

---

[2] In its Motion for Summary Judgment, the City relies on Pete Lowe's testimony to argue that Wickstrom's FCE is "rife with factual errors." Motion for Summary Judgment at p. 9; 12. Notably, Pete Lowe is a human-resources consultant and is not, and has never been, an electric lineman. Nor did Lowe participate with Hazel and Severns when they met with Wickstrom to verify the job functions that appear in his FCE.

FCE 7-11-2009, Doc. 60-2, PageID 1486, recapping 10/2008 FCE). On December 3, 2008, Dr. Wickstrom conducted another FCE, during which he examined Fortkamp and went back to the City to validate the job functions. (Wickstrom Depo., Doc. 48, PageID 1027, p. 65; 12/3/2008 Wickstrom Report, Doc. 60-1, PageID 1439).

Based on a thorough analysis of both the essential job requirements and Fortkamp's ability to perform those requirements, Dr. Wickstrom "released [Fortkamp] to FULL DUTY" without restrictions. (12/3/2008 Wickstrom FCE, Doc. 60-1, PageID 1439, emphasis sic). In the December report, Dr. Wickstrom stated that Fortkamp had "made outstanding progress since his last FCE on 10/2/08," and that he had weaned himself off of "most medications." (12/3/2008 Wickstrom Report, Doc. 60-1, PageID 1439).

Dr. Wickstrom also found that Fortkamp's "functional recovery [was] amazing . . ." and that he "…fully complied with all recommendations during his last FCE and **now demonstrates normal lower back and pelvic active range of motion**."  (12/3/2008 Wickstrom Report, Doc. 60-1, PageID 1439, emphasis added). Most importantly, Dr. Wickstrom found that Fortkamp was more fit than Celina linemen actually doing the job, and should be returned to work without restrictions:

> Because of his successful and motivated compliance with all rehabilitation recommendations, **Matt is probably more physically fit and healthy than many of the current workers performing lineman duties on a full-time basis**.  It is recommended that he be released to return to his full range of regular duties without restriction.

(12/3/2008 Wickstrom Report, Doc. 60-1, PageID 1439, emphasis added).

Hazel acknowledged that Dr. Wickstrom notified him of Fortkamp's recovery and great physical shape, but he told Dr. Wickstrom that he was concerned about Fortkamp's re-injuring himself: "…we also want to make sure **we do not accept an employee back that's been off for an**

7

*extended period with the type of injuries he sustained…that would have a realistic potential of being re-injured*" (12/4/2008 e-mail Hazel to Lowe, Doc. 60-3, PageID 1544, emphasis added).

Shortly after Dr. Wickstrom issued his report on December 3rd, Fortkamp's physician of record, Dr. Keith Snow, also cleared Fortkamp to return to work without restrictions on December 15, 2008. (Fortkamp Depo. Doc. 36, PageID 325, p. 190; 12/11/08 Dr. Snow RTW., Doc. 60-1, PageID 1440). On December 20, 2008, Dr. Mullin also cleared Fortkamp to return to work without restrictions as of December 15, 2008. (Mullin File, Doc. 64-5, PageID 2518). This was after Dr. Mullin received reports from Ms. Mitchell-Welch and Stacy Holland, Fortkamp's physical therapist, releasing him to work "Full Duty as a Lineman" and discharging him from BWC work conditioning. (Mullin File, Doc. 64-5, PageID 2517, 2521).

On December 23, 2008, Ms. Mitchell-Welch "actually offered for BWC to assume liability for a period of time and cover costs, if [the City] would bring Fortkamp back." (Hazel Depo., Doc. 39, PageID 510, p. 290; 12/29/2008 Vocational Rehabilitation Services Progress Report, Doc. 61-1, PageID 1672-1673). The offer was a 30-day work trial "to give [the City] an opportunity to evaluate and observe [Fortkamp]." (12/29/2008 Vocational Rehabilitation Services Progress Report, Doc. 61-1, PageID 1672-1673).

Hazel balked, telling Ms. Mitchell-Welch that he could not permit Fortkamp to return to work even though the BWC would cover the full liability and cost for the 30-day work trial, because he "… *feared a reinjury and the cost that the city would incur as a result*." (*Id.*, Hazel Depo., Doc. 39, PageID 510, p. 291, emphasis added). Despite the fact that Drs. Snow and Mullin, and Rick Wickstrom, released Fortkamp to work without restrictions, Hazel inexplicably insisted that Fortkamp have a "full release in order to come back" (Hazel Depo., Doc. 39, PageID 510, p. 291, emphasis added).

Ms. Mitchell-Welch's report notes that, because Hazel's response to her proposal would be "based on the outcome of the scheduled IME" she believed Fortkamp should consult with a lawyer: "[The City's] decision regarding [Fortkamp's return to work] is more of a labor relations issue than a BWC issue. *[Fortkamp] may need to seek legal advice from an ADA attorney*." (12/29/2008 Vocational Rehabilitation Services Progress Report, Doc. 61-1, PageID 1672-1673, emphasis added).

**B. After asking Fortkamp to submit to an IME in order to return to work, the City provided the medical examiner, Dr. David Randolph, with misleading information about Fortkamp and about the lineman job duties, for the purpose of precluding Fortkamp from returning to his position, out of an admitted fear of re-injury and financial liability.**

Despite the fact that multiple doctors and physical therapists had cleared Fortkamp to work as a lineman without restrictions, and despite the fact that the BWC case manager wanted the City to return Fortkamp on a trial basis – and apparently believed the City could be engaging in disability discrimination by refusing to do so – Hazel insisted that Fortkamp complete an IME with a City-selected doctor, Dr. David Randolph.[3] (12/16/08 Email Hazel to Fortkamp re: RTW, Doc. 60-3, PageID 1551; 12/24/2008 Ltr. Hazel to Fortkamp, Doc. 61-1, PageID 1693). Notably, Hazel does not recall recommending an IME for anyone other than Fortkamp, and, in his 20 years[4] of working with the City, Pete Lowe never once facilitated an IME for Celina. (Hazel Depo., Doc. 38, PageID 443, pp. 42-43; Hazel Depo., Doc. 40, PageID 577-78, pp. 93-94; Lowe Depo., Doc. 41, PageID 647, p. 77).

Hazel consulted with Pete Lowe from Clemans Nelson, the City's third-party human resources provider, about the IME and who could perform it. (Hazel Depo., Doc. 38, PageID 442-

---

[3] Dr. Randolph is not a surgeon or back specialist, and he was not familiar with Fortkamp. (Randolph Depo., Doc. 46, PageID 921-22, pp. 10-16 [describing background]; 12/16/08 Email Hazel to Fortkamp re: RTW., Doc. 60-3, PageID 1551; 12/24/2008 Ltr. Hazel to Fortkamp, Doc. 61-1, PageID 1693).

[4] Lowe Depo., Doc. 41, PageID 633, p. 23.

43, pp. 39-44). Lowe "asked around," and ultimately recommended that Celina utilize Dr. David Randolph, without giving other options. (Lowe Depo., Doc. 41, PageID 684, pp. 225-26; Doc. 42, PageID 750, pp. 391-92). Lowe understood that Dr. Randolph practiced in the area of occupational medicine, but was not aware of whether he saw patients. (Lowe Depo., Doc. 42, PageID 747, p. 378). Dr. Randolph told Lowe that he had written some papers on the type of surgery that Fortkamp underwent, and provided Lowe with copies. (*Id.*).[5]

Hazel's decision to force Fortkamp to submit to an IME actually dates back to March 20, 2008 – nine months prior to December 2008, when Fortkamp was fully released. (3/20/2008, Email Hazel to Fortkamp, Doc. 61-1, PageID 1656-1657; Hazel Depo., Doc. 39, PageID 514, pp. 304-05). Even at that point, Hazel admitted that his primary concern was not returning Fortkamp to his job, but was about his "potential for re-injury," which, in Hazel's mind, necessitated "review[…] by an Independent physician to ascertain his fitness to return to his former line of work & duty as a lineman." (3/20/2008, Email Hazel to Fortkamp, Doc. 61-1, PageID 1656-1657). Lowe confirmed that conceptions about re-injury and the potential cost to the City pre-dated the City's engaging Dr. Randolph to perform the IME. (Lowe Depo., Doc. 41, PageID 687, p. 237; Lowe Depo., Doc. 42, PageID 719, pp. 267-68).

Hazel's preoccupation with "re-injury" and his notions about Fortkamp's abilities are also reflected in a comment to Severns regarding Fortkamp's injury leave: "…***that's what you get for hiring someone with a bad back***[.]" (Severns Depo, Doc. 44, PageID 856, p. 124; Hazel Depo., Doc. 39, PageID 534, p. 384). Moreover, Hazel admitted that the City did not want to reinstate Fortkamp to the lineman position: "***for fear*** of the safety of Matt or the other employees that that

---

[5] Specifically, Dr. Randolph co-authored an article about the "long-term outcomes" of fusion surgery on workers' compensation claimants, in which he and his co-author that fusion surgery should "be performed only for certain indications." (Randolph Depo., Doc. 46, PageID 944, p. 101).

he worked with or the public at large." (Hazel Depo., Doc. 38, PageID 480, p. 192) (emphasis added).

Later in his testimony, Hazel was more explicit in tying his unfounded fears about re-injury to the City's potential financial liability:

> A: Well, if Fortkamp would reinjure himself and potentially even become paralyzed, let alone something else, ***there's a long-term liability for the city.***
>
> The liability could also be if he is out with another lineman and they were working on something and [Fortkamp] hurt his back and the other lineman got hurt, ***there could be a tremendous amount of potential liability***. Not to say that there couldn't be a liability with any employee, but in this particular case, ***we did not want reinjury, I did not want reinjury***, and I did not want anyone getting hurt, neither him or any other employee.
>
> Q: Were you concerned there would be a negative financial impact to the city if he got injured again?
>
> A: That was secondary to the health.
>
> Q: But was it a concern?
>
> A: Well, certainly, I can't say that it wouldn't have been.

(Hazel Depo., Doc. 38, PageID 495, pp. 252-53) (emphasis added).

Hazel called Dr. Randolph before he performed Fortkamp's IME, to give Dr. Randolph a "history," to explain why Fortkamp was coming, and why the City wanted Dr. Randolph to do an exam. (Hazel Depo., Doc. 38, PageID 443-44, pp. 44-45). Hazel also sent Dr. Randolph a letter and documentation "to provide some background information related to the City of Celina's request for an [IME.]" (1/2/09 Ltr. Hazel to Randolph, Doc. 60-1, PageID 1442-43).

Hazel's letter to Dr. Randolph contained incorrect information, including Fortkamp's "resist[ance]" to surgery; an incorrect date of Fortkamp's surgery (Fall of 2008 versus October 2007); and an incorrect date regarding when Fortkamp began physical therapy (November 2008 versus January 2008). (1/2/09 Ltr. Hazel to Randolph, Doc. 60-1, PageID 1442-1443; Dr. Mullin

File, Doc. 64-1, PageID 2363; Mullin File, Doc. 64-5, PageID 2503). Although Hazel had Dr. Wickstrom's report and admitted that his site visit was very "thorough," Hazel spent an entire paragraph in his letter to Dr. Randolph disputing Dr. Wickstrom's job analysis – despite the fact that he, himself, met with Wickstrom to confirm those were, in fact, the lineman job duties. (Hazel Depo., Doc. 38, PageID 494, pp. 245-48; 1/2/09 Ltr. Hazel to Randolph, Doc. 60-1, PageID 1442-43).

In addition to misstating critical information and disputing a job analysis in which he actively participated, Hazel also sent Dr. Randolph a DVD showing a "Lineman Rodeo," which consists of video and still photos that purportedly demonstrate some of the duties that a lineman is required to perform. (1/2/09 Ltr. Hazel to Randolph, Doc. 60-1, PageID 1442-1443). Hazel never even seen the video before sending it to Dr. Randolph, and admitted that linemen do not race up poles or lift mannequins up poles, as shown in the video. (Hazel Depo., Doc. 38, PageID 468, pp. 141-42).

Severns, who also participated actively in the Wickstrom job analysis, also admitted that the Lineman Rodeo video had very little to do with what linemen in Celina actually do in their jobs: "…*we don't climb very many poles*[.]"[6] (Severns Depo., Doc. 44, PageID 849, p. 95) (emphasis added). Severns also admitted that the Lineman Rodeo video is not an accurate representation of linemen's daily duties, particularly as compared to Dr. Wickstrom's site visits. (Severns Depo., Doc. 44, PageID 856, p. 124). **In fact, Severns had no idea why Hazel would even send the Lineman Rodeo video to Dr. Randolph**. (Severns Depo., Doc. 44, PageID 856, pp. 122-24).

---

[6] Jeff Severns also admitted that he did not want to return Fortkamp to work out of fear of re-injury:  "I just worry about him hurting himself . . . getting hurt again working on our watch...." (Severns Depo., Doc. 44, PageID 854, p. 116).

Dr. Randolph conducted a fitness-for-duty examination on Fortkamp on January 13, 2009. (Randolph Depo. 5/28/2015, Doc. 47, PageID 984, at 72-73). The physical examination took "*between five and 10 minutes*," and was "normal," other than the presence of a scar from Fortkamp's surgery. (Randolph Depo., Doc. 46, PageID 928, p. 39, emphasis added; 1/24/2009 Randolph Report, Doc. 60-1, PageID 1453). Dr. Randolph testified that, despite preparing a total of three reports, he conducted only the one five-minute physical examination that was "pretty good," and that there was no activity that Fortkamp could not, or would not, do during the examination because of back pain. (Randolph Depo., Doc. 47, PageID 983, p. 69).

Even though Fortkamp presented to Dr. Randolph as physically fit and with no back problems, upon reviewing Fortkamp's prior medical records, Dr. Randolph refused to release Fortkamp back to the lineman position. (1/24/2009 Randolph Report, Doc. 60-1, PageID 1458). Dr. Randolph impermissibly based his opinion on Fortkamp's record and history[7] of a disabling condition: "…Mr. Fortkamp has a *long history* of low back problems" and that "the only predictor for future low back pain is … a *prior history* of low back problems." (1/24/2009 Randolph Report, Doc. 60-1, PageID 1458, emphasis added).

Dr. Randolph also disagreed with Dr. Wickstrom's characterization of the lineman job duties – even though it was based on extensive site visits, observation, and verification by City officials – as encompassing "medium" physical demands, instead opining that the lineman job encompasses "heavy to very heavy" physical demands.  (1/24/2009 Randolph Report, Doc. 60-1, PageID#1457-58).  *This is so despite the fact that Dr. Randolph admitted that he has never been to Celina, and has never observed Matt Fortkamp or anyone else performing the lineman job duties*.  (Randolph Depo., Doc. 47, PageID 986-87, pp. 81-82).

---

[7] Dr. Randolph was not familiar with the phrase "perceived disability." (Dr. Randolph Depo., Doc. 47, PageID 975, p. 34)

Rather, Dr. Randolph based his opinion that the lineman position requires heavy physical exertion on the materials sent by the City, as well as a 2015 conversation with a lineman who works for Duke Energy, which he admitted has nothing to do with Fortkamp or his ability to perform his job in January 2009. (Randolph Depo., Doc. 47, PageID 987-88, pp. 85-86). Dr. Randolph also could not identify what, exactly, Fortkamp would be lifting that weighs 100 pounds or more, or when, despite using this "job function" as a basis to exclude Fortkamp from the lineman position. (Randolph Depo., Doc. 47, PageID 989, p. 90). In contrast, Fortkamp testified that linemen routinely used assistive equipment to move extremely heavy equipment:

> Q:  Okay.  There was also testimony that sometimes the linemen had to manually move or maneuver equipment like transformers that can weigh anywhere from [300] to [1500] pounds.  Do you remember … reading testimony on that?
>
> A:  I don't remember, but *we use equipment to move that*.
>
> Q:  Okay. …you would disagree that linemen sometimes have to maneuver those things and get them in position for the equipment?
>
> A:  Well, *it would be on a sling attached to a wench line*, and you can move it around easily.

(Fortkamp Depo., Doc. 37, PageID 380, p. 86) (emphasis added).

Ultimately, regardless of what Fortkamp's job duties were, or were not, Dr. Randolph admitted that his primary reason for refusing to release Fortkamp to work in the lineman position was due to his record of a disability and the related risk of re-injury – notably the same concerns that Hazel had. Dr. Randolph repeatedly testified that his conclusions about Fortkamp were "based on the *record of his [back] condition*," and that Fortkamp's "risk of re-injury" is tied to his "*history*."  (Randolph Depo., Doc. 47, PageID 988; 989; 994, pp. 88; 93; 112) (emphasis added).

While Dr. Randolph did not believe that Fortkamp should return to the lineman job, as described in the written job description sent by the City and as shown in the Lineman Rodeo

pictures and videos, he did state that Fortkamp could return to a job with "medium" physical

demands and with a lifting restriction of 50 pounds. (1/24/2009 Randolph Report, Doc. 60-1,

PageID 1459).[8]

> **C. After Dr. Randolph refused to release Fortkamp because of his history of a disabling condition, the parties engaged in a lengthy back-and-forth, where Fortkamp provided more and more medical evidence of his fitness for duty, which the City ignored, instead relying solely on Dr. Randolph's illegal conclusions, which it used to preclude Fortkamp from returning to work, ultimately "disability separating" him on October 16, 2009.**

After receiving Dr. Randolph's IME report, on February 13, 2009, Fortkamp sent a letter

to the City, asking to return to his job as a lineman. (2/13/2009 Memo Fortkamp to City, Doc. 60-

1, PageID 1463; Hazel Depo., Doc. 38, PageID 476, pp. 173-74). Fortkamp attached releases and

information from Drs. Snow (his physician of record), Mullin (his surgeon), and Wickstrom (who

performed a very thorough FCE) to bolster his request. (2/13/2009 Memo Fortkamp to City, Doc.

60-1, PageID 1463).[9] Instead of returning Fortkamp to work *post haste*, the City responded by

informing Fortkamp of its intent to initiate pre-separation proceedings. (2/21/2009 Letter Hazel to

Fortkamp, Doc. 60-1, PageID 1464). The City conducted this hearing on March 5, 2009. (3/5/2009

Meeting Notes, Doc. 61-3, PageID 1846-1850).[10]

The City seized on Dr. Randolph's opinion to justify its refusal to return Fortkamp to his

lineman position, stating that it would be "up to Dr. Randolph" to determine if there was

---

[8] It should be noted that the City paid Dr. Randolph $600 for the January 2009 IME and report. (Randolph Depo., Doc. 47, PageID 984, p. 73; Doc. 61-5, PageID 2006-07 [Exhibits 136, 137 to Randolph deposition]).  Dr. Randolph testified that he bills based on hourly rates, at $400 per hour at the time.  (Randolph Depo., Doc. 47, PageID 984, p. 73).  That means that, to come up with his conclusion that Fortkamp could not return to the lineman position, Dr. Randolph spent a total of 90 minutes.  That would include five to ten minutes examining Matt Fortkamp and the remaining time reviewing records and preparing a 10-page, single-spaced report.

[9] The documents referenced in this letter as "attached" appear in the record as deposition exhibits 4, 5, and 6 (Doc. 60-1, PageID 1439-41).

[10] The footer on these notes appears to indicate that they were not prepared until April 29, 2009. (3/5/2009 Meeting Notes, Doc. 61-3, PageID 1846-1850).

"anything that Mr. Fortkamp could have done… that would have allowed him to return to his position as an electric lineman with the city[.]" (Hazel Depo., Doc. 39, PageID 512, p. 299) In essence, Hazel claims that, if Fortkamp had "convinced" Dr. Randolph, the City would not have "gone through with the disability separation" (*Id.*, at PageID 525, p. 349).

Fortkamp attempted to "convince" the City to return him to work by providing Hazel with a letter from his neurosurgeon, Dr. Mullin, dated February 26, 2009. (Hazel Depo., Doc. 39, PageID 524, p. 347; 2/26/2009 Ltr. Dr. Mullin, Doc. 60-1, PageID 1465). Fortkamp also submitted a DVD showing him lifting weights. (3/27/2009 Ltr. Hazel to Fortkamp, Doc. 60-1, PageID 1466).

On March 27, 2009, Hazel sent Fortkamp a letter rejecting his submissions for various reasons, including that Fortkamp's submissions are "insufficient" to show that he can perform the "essential functions" of his position. (3/27/2009 Ltr. Hazel to Fortkamp, Doc. 60-1, PageID 1466). Even though Hazel is not a medical professional, and could not possibly predict Dr. Randolph's reaction to these materials, he told Fortkamp that his submissions were "insufficient" to change Dr. Randolph's mind. (3/27/2009 Ltr. Hazel to Fortkamp, Doc. 60-1, PageID 1466).

Despite telling Fortkamp that his materials were, *ipso facto*, insufficient, Hazel disingenuously invited Fortkamp to submit "any new medical information" or "reasonable accommodation request" that "may convince Dr. Randolph" that Fortkamp could return to work. (3/27/2009 Ltr. Hazel to Fortkamp, Doc. 60-1, PageID 1467). Hazel's letter then demanded that Fortkamp opt to either use sick leave or go through with a disability separation, forcing him to make this decision by April 3, 2009. (3/27/2009 Ltr. Hazel to Fortkamp, Doc. 60-1, PageID 1467).

On April 1, 2009, Fortkamp responded to Hazel's deadline by stating his intent to use sick leave, but that he was not waiving his right to continue contesting the City's refusal to return him to work. (4/1/2009 Ltr. Fortkamp to Hazel, Doc. 60-1, PageID 1468). On April 17, 2009,

16

Fortkamp filed a discrimination charge with the Ohio Civil Rights Commission (OCRC), alleging that the City was discriminating against him on the basis of perceived disability and a record of a disability. (OCRC Charge, Doc. 61-2, PageID 1759).[11] In addition, between April and June of 2009, Fortkamp's union got involved and attempted to get the City to agree to another IME, for which the parties would split the cost. (Fortkamp Depo., Doc. 36, PageID 329, p. 206).

Because the City never responded to this proposal, Fortkamp went to the IME anyway. (Fortkamp Depo., Doc. 36, PageID 329, p. 206). On June 2, 2009, Fortkamp saw Dr. Donato Borrillo, who issued his report on June 12, 2009. (6/12/2009 Borrillo Report, Doc. 60-1, PageID 1469-72). Dr. Borrillo opined that Fortkamp is "capable of returning to work without restrictions." (6/12/2009 Borrillo Report, Doc. 60-1, PageID 1472). Dr. Borrillo further noted that, because Fortkamp had taken a job in the concrete industry,[12] he was capable of performing heavy labor, which could entail lifting "up to 100 pounds, 33% of the work time (occasionally)." (6/12/2009 Borrillo Report, Doc. 60-1, PageID 1472). On June 23, 2009, Dr. Mullin issued a statement that he agreed with Dr. Borrillo's report. (06/23/09 Ltr. from Dr. Mullin, Doc. 64-5, PageID 2542).

On June 19, 2009, Lowe, on behalf of the City, sent Dr. Borrillo's report to Dr. Randolph, along with Dr. Mullin's February 26, 2009 letter regarding Fortkamp's ability to work, asking Dr. Randolph to "provide an updated opinion." (6/19/2009 Ltr. Lowe to Randolph, Doc. 60-2, PageID 1473-74). On July 7, 2009, Dr. Randolph issued an "addendum" to his January 2009 report, refuting and criticizing both Dr. Mullin's and Dr. Borrillo's conclusions, and casting the surgery

---

[11] The City received notice of the charge on April 23, 2009. (4/23/2009 E-mail Hazel to Lowe, Doc. 61-2, PageID 1754-59).

[12] In late March 2009, Fortkamp began working for Irving Concrete, pouring concrete without restrictions. (Fortkamp Depo., Doc. 36, PageID 308, pp. 122-23).

that Dr. Mullin performed in a very negative light. (7/7/2009 Randolph Report, Doc. 60-2, PageID 1476-80).

Most significantly, Dr. Randolph acknowledges that the real problem is Fortkamp's record of a disabling back condition: "***His past history speaks for itself***. He already has a significant history of low back problems and ***putting him back to this line of work only serves to increase the likelihood of another back injury***…." (7/7/2009 Randolph Report, Doc. 60-2, PageID 1479, emphasis added). Dr. Randolph characterizes as "foolhardy" the notion of returning Fortkamp to the lineman position, given his record of a disabling condition: "***Since he already has a demonstrated low back deficit based upon his multiple surgeries, procedures, and injuries***, such a concept can be considered nothing but foolhardy and gratuitous." (7/7/2009 Randolph Report, Doc. 60-2, PageID 1479, emphasis added).[13]

At the encouragement of Dr. Snow, on July 11, 2009, Fortkamp had another FCE with Dr. Wickstrom. (Fortkamp Depo., Doc. 36, PageID 297-98, pp. 81-82; 7/11/2009 Wickstrom FCE, Doc. 60-2, PageID 1486). According to Dr. Wickstrom, the reason he performed the July FCE was because the December 2008 FCE "only tested Mr. Fortkamp to his specific job demands that I verified with him and the City of Celina." (Wickstrom Depo., Doc. 49, PageID 1085, p. 29). After Wickstrom saw Dr. Randolph's report, and what he "felt like were very paternalistic, overprotective concerns," his testing of Fortkamp this time did not stop at the Celina job demands, but instead "tested him to full capacity to show his state of total health…." (*Id.*)

In his July report, Dr. Wickstrom notes that, in the Spring of 2009, Fortkamp began working as a cement-truck driver, which job involved similar "MEDIUM to HEAVY physical demands as those of his previous job as an Electric Line Maintenance Worker for the City of

---

[13] Shortly after receiving Dr. Randolph's "addendum," the Mayor of Celina requested Hazel's resignation. (Hazel Depo., Doc. 40, PageID 586, p. 128).

Celina." (7/11/2009 Wickstrom Report, Doc. 60-2, PageID 1487, emphasis sic). Dr. Wickstrom further notes that Fortkamp was working in the cement-truck job "***without any significant lower back symptoms or absenteeism***," noting the various demands of job. (7/11/2009 Wickstrom Report, Doc. 60-2, PageID 1487, emphasis added).

In addition to conducting another FCE and testing Fortkamp to greater capacity than the lineman job requirements, Dr. Wickstrom was very concerned about the illegality of the City's actions and its reliance on Dr. Randolph's reports. At one point, he provided Fortkamp with referrals to ADA attorneys. (Wickstrom Depo., Doc. 49, PageID1084, p. 24, referring to Exhibit 112, Doc. 61-4, PageID 1902-1903). When questioned on why he believed Fortkamp's case is "uncommon," Dr. Wickstrom testified unequivocally that what makes this case "unusual" is the City's and Dr. Randolph's "complete disregard for those objective facts showing that [Fortkamp] was capable of doing his job." (Wickstrom Depo., Doc. 49, PageID 1091, pp. 52-53).

According to Wickstrom, "Dr. Randolph, who [he] practiced with for many years, … just essentially disregarded all of the objective facts … and formed an opinion that made absolutely no sense to me whatsoever." (*Id.* at p. 52). Wickstrom also expressed disbelief that Hazel and Severns "agreed on a reasonable physical demand requirement for [Fortkamp's] job," and "if anything, we erred towards increasing the physical demands" to create a "safety margin" for that position.  (*Id.* at p. 53).  But then Wickstrom saw "correspondence from the City to Dr. Randolph" that did not "even accurately convey the demands for the job." (*Id.* at p. 54).[14]

---

[14]  In September 2009, Wickstrom e-mailed Dr. Randolph directly to express concerns about the opinions Dr. Randolph had issued, to let Dr. Randolph know that he had tested Fortkamp to "VERY HEAVY physical demands," and to express his hope that Randolph would clear the way for Fortkamp to return to work.  (9/25/2009 E-mail Wickstrom to Randolph, Doc. 61-2, PageID 1743-44, emphasis sic). Dr. Randolph's office manager stated that Dr. Randolph had "no intention" of responding to this communication. (*Id.*, at PageID 1742).

On August 7, 2009, the City held yet another pre-separation conference with Fortkamp, given that he had exhausted all of his other available leave. (8/11/09 Ltr. Lowe to Randolph, Doc. 60-3, PageID 1500-01). Fortkamp provided the City with additional materials, including Wickstrom's July 2009 report, a release signed by Dr. Snow on August 5, 2009, and a letter from Dr. Mullin agreeing with Dr. Borrillo's analysis. (*Id.*). Lowe forwarded these materials to Dr. Randolph for review on August 11, 2009. (*Id.*)

On August 13, 2009, Dr. Mullin saw Fortkamp again and wrote a letter to the City. (8/13/2009 Ltr. Mullin to Fortkamp, Doc. 60-3, PageID 1515). Dr. Mullin stated that Fortkamp "has been through full functional capacity evaluation greater than what it would take him to go to work [and] has passed that with flying colors." (8/13/2009 Ltr. Mullin to Fortkamp, Doc. 60-3, PageID 1515).  Dr. Mullin also opined that Fortkamp can work without restriction; that he has, in fact examined Fortkamp, contrary to Dr. Randolph's assertions; and that Fortkamp is at no greater risk than anyone else for further back injury:

> Myself nor his testing physician is relating any restrictions on his work. I have reviewed [Fortkamp's] job description and ***I am not placing any restrictions on his work***.
>
>         \*                 \*             \*
>
> I read with interest Dr. Randolph's report… ***I just saw Mr. Fortkamp***. I have also been in the middle of his spine operating on him. I have talked to him at length. I have put him through extensive evaluations by other evaluators (see Dr. Snow's report).
>
>         \*                 \*             \*
>
> … [Dr. Randolph] mentions possible problems that can happen with artificial discs. ***I would point out to him that a person who is performing Mr. Fortkamp's job with no back condition is also at risk of disc herniation, lumbosacral strain, and fall with thoracolumbar fracture.***

(8/13/2009 Ltr. Mullin to Fortkamp, Doc. 60-3, PageID 1515) (emphasis added).

Two months later, on October 2, 2009, Dr. Randolph provided his third and final report regarding Fortkamp. (10/2/2009 Randolph Report, Doc. 60-3, PageID 1516-21). Unsurprisingly,

Dr. Randolph, reaffirmed his previous opinions. (*Id.*). Ironically, Dr. Randolph criticized Dr. Mullin for not "physically examining" Fortkamp in order to reach his conclusion that Fortkamp can return to work, despite the fact that Randolph himself had not done so since early January 2009. (*Id.*; Randolph Depo., Doc. 47, PageID 985, p. 75 (July 2009 report); p. 77 (October 2009 report)). Once again, Dr. Randolph's opinion relied on his belief that Fortkamp's record of a disabling back condition precluded him from returning to the lineman position: "If one actually views the totality of [Fortkamp's] ***history***, physical examination provided records, … it becomes quite clear that the ***likelihood this claimant will have future ongoing disabling low back problems is high***."  (10/2/2009 Randolph Report, Doc. 60-3, PageID 1519) (emphasis added).

Dr. Randolph's report also criticizes medical professionals who disagree with his myopic – and discriminatory – viewpoint, particularly Wickstrom. (10/2/2009 Randolph Report, Doc. 60-3, PageID 1519-20, characterizing Wickstrom's detailed reports as "unfortunate and ill-informed," and stating that Wickstrom has "incorrect and incomplete information regarding claimant's job assignments"). In fact, at his deposition, Dr. Randolph stated that Dr. Wickstrom "doesn't know what he's talking about."  (Randolph Depo., Doc. 47, PageID 986, p. 80).

Dr. Randolph also clings to his misinformed notions of Fortkamp's job duties, failing to understand which duties are essential, and which are not, instead stating that how often Fortkamp has to perform certain job tasks, such as climbing telephone poles, "doesn't matter."  (Randolph Depo., Doc. 47, PageID 988, pp. 86-87). Dr. Randolph's misinformation about the actual job duties of a Celina lineman stand in stark contrast not only to the in-depth, onsite analysis Dr.

Wickstrom conducted, but also to the testimony of Severns, who worked as a lineman for 10 years prior to becoming the Superintendent. (Severns Depo., Doc. 44, PageID 830, pp. 17-19).[15]

Given his experience as a lineman himself and as a supervisor over the last three decades, Severns has experienced the shift and transition of lineman job duties that have occurred in light of modern technology. (Severns Depo., Doc. 44, PageID 830, p. 19). Given the use of mechanical equipment and general automation, Severns described the job duties of linemen to be less "physical" then they were when he was a lineman. (Severns Depo., Doc. 44, PageID 830-31, pp. 19-23).

Severns also described the essential functions of an electric lineman position as follows: "Keeping the power on and fixing lines, streetlights, traffic lights, substations, fixing lines whenever a storm comes through, working 40 hours . . ." (Severns Depo., Doc. 44, PageID 835, p. 40). Although Celina's employee manual "says something about being able to climb poles and lifting 100 pounds…," Severns admitted that he could not lift over 100 pounds by himself at the time of his deposition *and he could not recall seeing any lineman actually lift over 100 pounds during his time at the City of Celina*. (Severns Depo., Doc. 44, PageID 848, p. 89).

Severns also explained that linemen are *not* required to climb poles "very often" and that he himself had not climbed a pole since 2000. (Severns Depo., Doc. 44, PageID 839-840, pp. 56-58). Rather, in many cases, the linemen could use a bucket truck with a hydraulic lift, so that they did not have to climb poles with spikes.  (Severns Depo., Doc. 44, PageID 841, pp. 61-62).  In fact, Hazel himself admitted that bucket trucks minimize the amount of time linemen spend

---

[15] Dr. Randolph's misimpressions about the lineman position also conflict with a March 2004 Job Analysis that the City of Celina had a physical therapist perform, which the City apparently never submitted to Dr. Randolph. (City of Celina Job Analysis, Electric Line Maintenance Worker, Doc. 66-3, PageID 2953-54). This Job Analysis shows that the kinds of heavy lifting Dr. Randolph believes to be essential functions of Fortkamp's position are performed "rarely." (*Id.*).

spiking up poles – however, he never bothered to tell Dr. Randolph that, instead letting him rely on the Lineman Rodeo video and pictures showing lineman spiking up poles. (Hazel Depo., Doc. 38, PageID 437-38, pp. 19-22; PageID 472-73, pp. 160-61).

In addition, the lineman job description that Celina produced in discovery and that was provided to Dr. Randolph does not include any requirement to lift over 100 pounds or to climb poles. (Job Description, Doc. #60-1, PageID 1429; Hazel Depo., Doc. 38, PageID 445, p. 51). And, Severns agreed that this written job description "*accurately represents* what an Electric Lineman Maintenance Worker Number 1 does." (Severns Depo., Doc. 44, PageID 852, p. 108).

Moreover, witnesses who actually worked for the City as linemen testified that:

- Bucket trucks were used almost exclusively;
- The bucket trucks have material handlers on them that alleviate the need for the linemen to do the heavy lifting;
- Other types of equipment are used to lift extremely heavy objects; and
- *Most of the men performing these job duties have some kind of back trouble.*

(Pogue Depo., Doc. 56, PageID 1312, p. 14; *id.* at 1313, pp. 18-19; *id.* at 1319, p. 43; Huber Depo., Doc. 54, PageID 1271, pp. 10-11; Mertz Depo., Doc. 55, PageID 1296, pp. 26-27).  Most notably, according to Greg Pogue, a former Celina lineman, "*I don't think there is anybody in this town that works for the City, any part of the City, that's in as good shape as [Fortkamp] is.*" (Pogue Depo., Doc. 56, PageID 1319, p. 43, emphasis added).

Shortly after receiving Dr. Randolph's bogus October 2009 report, the City sent Fortkamp a letter enclosing a copy of the report, and informing Fortkamp that "*it is evident that you are not able to safely perform the duties of your previous position*," and that "*there is little expectation for you to be able to perform the duties of the electric lineman in the foreseeable future*."

23

(10/15/2009 Ltr. Bachelor to Fortkamp, Doc. 61-3, PageID 1836) (emphasis added).[16] Because Fortkamp was "currently absent without leave," the City involuntarily separated Fortkamp from his employment with the City "*due to [his] disability*." (10/15/2009 Ltr. Bachelor to Fortkamp, Doc. 61-3, PageID 1836, emphasis added).

> **D. In November 2009, the City agreed to permit Fortkamp to return to work as a Meter Reader as "reasonable accommodation" for his non-disability – the position in which Fortkamp started in 1999 – in which he had no seniority and was earning less, despite, ironically, engaging in job tasks that the City believed he could not do in the lineman position.**

From mid-August to November of 2009, Fortkamp worked for another construction company, Quality Ready Mix. (Fortkamp Depo. Doc. 36, PageID 308, p. 124). Fortkamp's job duties at Quality Ready Mix were similar to those he performed at the other construction company, and included shoveling stones, loading cement trucks, moving and stacking concrete chutes, and moving around other heavy objects. (Fortkamp Depo., Doc. 36, PageID 309, pp. 128-130).

In September 2009, the City posted a full-time Meter Reader position, stating that applications were due by September 25, 2009. (9/14/2009 Notice of Position Opening, Doc. 61-2, PageID 1739). Fortkamp applied for this position because he was going to be laid off from Quality Ready Mix. (Fortkamp Depo., Doc. 36, PageID 308, p. 124; PageID 332, p. 218). According to handwritten notes[17] on the September job posting, the City was well aware that Fortkamp had applied for this position on October 1st, before it received Dr. Randolph's October 2nd report and certainly before it initiated "disability separation" proceedings on October 16, 2009. (9/14/2009 Notice of Position Opening, Doc. 61-2, PageID 1739).

---

[16] At this point, Rick Bachelor had taken over the Safety-Service Position from which Jeff Hazel had previously resigned. (Bachelor Depo., Doc. 57, PageID 1337, p. 13).

[17] Although the handwritten notes reference 2010, it is clear from the context that they were written in October of 2009. (Bachelor Depo., Doc. 57, PageID 1368-70, pp. 140-47).

Very shortly after his "disability separation," the City offered Fortkamp the meter reader position for which he had applied prior to his separation, characterizing this position as a "reasonable accommodation," even though Fortkamp is not disabled and he was already fired by the time he received the offer. (10/30/2009 response to Fortkamp 10/23 Grievance, Doc. 60-3, PageID 1523-24).  In addition to "reasonably accommodating" a worker they clearly believe to be "disabled" – but who is not –  the City severely disadvantaged Fortkamp by waiting to offer him the meter reader position until after separating him. As a result, Fortkamp came into the position at "ground zero," meaning he was a probationary employee with no seniority, and a lower pay rate, $13.67 per hour (Fortkamp Depo., Doc. 36, PageID 311, pp. 136-37; 2/28/2010 OCRC Ltr. of Determination, Doc. 61-3, PageID 1822-26 at p. 4; Defendant's Answer to Amended Complaint, Doc. 19, PageID 216, ¶ 34 ).[18]

Fortkamp started working as a meter reader on November 16, 2009, but reserved his right to continue to pursue reinstatement to the electric lineman position. (11/11/2009 Ltr. Fortkamp to Bachelor, Doc. 60-3, PageID1525). The ultimate irony, however, is the fact that, in the meter reader position, the City is requiring Fortkamp to perform job tasks that Dr. Randolph opined would be "foolhardy and gratuitous" for him to do, ***including lifting things that weigh hundreds***

---

[18] Rick Bachelor also admitted Fortkamp lost seniority rights as a result of the City's waiting to place him in the meter reader position:

Q. If the position was posted on September 14 of 2009, why wasn't it offered to Mr. Fortkamp until late October?

A. I have no idea. I guess -- well, I won't guess.

Q. And by waiting until after he was involuntarily disability separated, he lost his seniority rights, correct?

A. That would appear to be the case.

Q. And by waiting until after he was involuntarily disability separated, he had to serve another probationary period, correct?

A. That would be correct.

(Bachelor Depo., Doc. 57, PageID 1370, p. 147).

*of pounds*. (Fortkamp Depo., Doc. 36, PageID 316-17, pp. 156-60; Doc. 37, PageID 370, pp. 46-47).  In fact, Hazel, who became Mayor after resigning from the Safety Director position, asked Fortkamp to move three pieces of office furniture, including his desk, which is a very heavy piece of furniture. (*Id.*)[19]

 ***This is so despite the fact that Fortkamp keeps applying for the lineman position, and the City keeps refusing to place him into it, continually relying on Dr. Randolph's six-year-old reports***. (Fortkamp Depo., Doc. 37, PageID 371, p. 53 [describing applying twice]; Hazel Depo., Doc. 40, PageID 590, pp. 144-45). At his 2015 deposition, Dr. Randolph was asked "Is there anything that you would be able to have in front of you or want to have in front of you that would change your assessment of Matt Fortkamp and his ability to do the electric lineman job?"  His response: "***No.  The risk is there; that's not going to change. That's the problem with these back … surgeries***." (Randolph Depo., Doc. 47, PageID 994, p. 112) (emphasis added).

 Similarly, according to Hazel, "there's a medical opinion out there that stops [the City from putting Fortkamp back into the lineman position]," and that as long as that "medical opinion" is "out there," Fortkamp will be forever precluded from working as a lineman. (Hazel Depo., Doc. 40, PageID 590, pp. 144-45). Incredibly, Hazel also believes that the Americans with Disabilities Act is "not…applicable to the City of Celina" because the City was only willing to employ Electrical Linemen who can "fully perform the essential functions of the position." (12/8/2008 Email Hazel to J. August, Doc. 61-1, PageID 1661, 1666).

 Instead, Hazel and the City apparently believe it is more appropriate to leave Fortkamp, a "disabled" employee, in the lesser position of meter reader – and to assign him job duties that

---

[19] Hazel denied asking Fortkamp to move the furniture, although he admitted it was moved.  He claims that Tom Hitchcock, the new Safety Director, was in charge of the moving project.  (Hazel Depo., Doc. 40, PageID 591, pp. 146-47).

require the very kind of heavy lifting that the City believes his "disability" precludes him from performing as a lineman.

## IV. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is only proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The burden is on the moving party to show that no genuine issue of material fact exists. The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. The question is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Deleon v. Kalamazoo County Road Comm'n*, 739 F.3d 914, 917 (6th Cir. 2014) (internal quotations and citations omitted).

Even where the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn regarding material issues. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage). As noted in a recent Supreme Court decision, the trial court is precluded from weighing evidence and reaching factual inferences. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1868 (2014).

## V.  LAW AND ARGUMENT

**A. There is overwhelming evidence that the City of Celina unlawfully discriminated against Fortkamp based on his record of a past disability and based on its fallacious perception that he was physically unable to perform the essential functions of an Electric Lineman position, when it refused to return him to work as an Electric Lineman following his full recovery from his low-back injury and his full release by every single one of his treating providers.**

The ADA prohibits "covered entities" from discriminating against "qualified individuals" on the "basis of disability." 42 U.S.C. § 12112(a); *see also Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc).[20] The ADA defines "disability" in three ways, including "a record of … an impairment," and "being regarded as having … an impairment." 42 U.S.C. § 12102(1).[21]

In order to establish a violation of the ADA, a plaintiff must establish that: (1) he has a disability, as defined in the ADA (including a record of or being regarded as having a disability); (2) he is qualified to perform the essential functions of his position, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability (including a record of or being regarded as having a disability). *Demyanovich Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014).

A plaintiff may prove the third element by presenting either direct or indirect evidence. *See, e.g., Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).  Direct evidence is evidence that, if believed, does not require the fact-finder to draw an inference in order to conclude that discrimination occurred. *See e.g., Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.

---

[20] Disability discrimination claims under the ADA and the Ohio Civil Rights Act should be analyzed together because they use the same evidentiary standards. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

[21] Ohio law mirrors the ADA's tripartite definition of "disability." *See* Ohio Rev. Code Ann. § 4112.01(A)(13).

1999)). For example, direct evidence involving verbal statements is tantamount to an employer telling its employee, "I fired you because you are disabled." *Smith*, 155 F.3d at 805.

When there is direct evidence that the employer relied on the employee's "disability" in making adverse employment decisions, the *McDonnell Douglas* burden-shifting analysis does not apply.  *See, e.g., Shelton v. City of Cincinnati*, No. 1:11-cv-381, 2012 U.S. Dist. LEXIS 156595 at *26 (S.D. Ohio Nov. 1, 2012) (internal citations omitted).  Instead, the plaintiff must prove that he is "disabled" within the meaning of the ADA and that he was otherwise qualified for the position. *Id.* at *26-*27.

> **1) The City of Celina discriminated against Matt Fortkamp by failing to engage in an individualized inquiry into whether, in December 2008 and after, he could perform the essential functions of the Electric Lineman position, instead relying solely on the opinion of its third-party medical examiner, Dr. David Randolph, who admitted that his opinions are based on Fortkamp's "record" of a disability.**

A plaintiff is "disabled" under the "record of impairment" definition of "disability" if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002); 28 C.F.R. § 35.104; 29 C.F.R. § 1630.2(k). Courts that have analyzed "record of impairment" cases have held that it includes "people who *have recovered from* previously disabling conditions...*but who may remain vulnerable to the fears and stereotypes of their employers*." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998) (emphasis added). The "plaintiff only needs to show that 'at some point in the past' he had [a substantially limiting impairment]." *Knight v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 136 Fed. App'x 755, 760 (6th Cir. 2005) (internal citation omitted).

According to well-established law in the Sixth Circuit, the ADA mandates an *individualized inquiry* in determining whether an [individual's] disability or other condition

29

disqualifies him from a particular position." *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) (citing *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (emphasis added)). In *Keith*, the Sixth Circuit reversed the district court's entry of summary judgment, finding that the employer had failed to make an "individualized inquiry" with respect to a deaf man who sought to be a lifeguard. ***The cursory medical examination performed by the doctor hired by the employer was "precisely the type that the ADA was designed to prohibit***." 703 F.3d at 924 (emphasis added).

In *Keith*, the Sixth Circuit also questioned why the employer, the ultimate decision-maker, disregarded assessments by medical professionals who did make individualized inquiries into Mr. Keith's abilities, instead relying on those who had not – such as the physician hired by the employer, Dr. Work, and an aquatic consultant. *Id.* (noting that employers cannot escape liability under the ADA by ***mechanically relying on the medical opinions of third parties.***) (emphasis added, internal citation omitted).

Rather, as the *Keith* Court noted, a proper evaluation involves consideration of factors that include the individual's ***actual medical condition***. *Id.* (emphasis added). This follows from the ADA's underlying objective, which is to eradicate employment practices that are not based on an individual's actual capabilities, but that are "***based on unfounded fear***, prejudice, ignorance, or mythologies." *Id.* (emphasis added) (internal citations omitted). The ADA requires employers to act not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job. *Id.*; *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (reversing summary judgment in the case of a monocular firefighter based on whether driving a fire truck is an essential function of a Stow firefighter).

In this case, there is no dispute that Fortkamp has a record of a disabling low-back condition. There is likewise no dispute that, after suffering a workplace injury to his low back in 2003, Fortkamp was substantially limited in performing any number of major life activities, and was on a multi-year leave of absence from work as a result. Everything changed after Fortkamp had back surgery in October 2007, and spent the next year rehabilitating himself, including undergoing a physical conditioning program. Fortkamp's year of hard work left him in better physical shape than prior to the time he injured himself in 2003. Consequently, in December 2008, every single one of Fortkamp's physicians and physical therapists released him to return to his Electric Lineman position with the City of Celina – without restriction. Thus, starting in December 2008 and thereafter, Fortkamp was *no longer* disabled, but had only a record of a disability.

Based on the overwhelming direct evidence in this record, a jury could easily find that the City of Celina unlawfully discriminated against Fortkamp on the basis of his record of having a disabling back condition. In this case, the City wholly failed to engage in an individualized inquiry into whether Fortkamp was physically fit to perform the essential functions of the lineman position after December 2008. Instead, the City myopically relied on a medical opinion issued by Dr. David Randolph, which the City itself prejudiced by providing Dr. Randolph with erroneous information about the essential functions of the lineman position.

This case is on all fours with the *Keith* case. Dr. Randolph, like Dr. Work in *Keith*, performed only a cursory medical examination of Fortkamp in January of 2009, which he testified lasted ***only five to ten minutes***. Dr. Randolph also testified that his physical examination of Fortkamp revealed no physical problems or concerns, meaning that Fortkamp's ***actual medical condition*** indicated that he was fit to return to the lineman position. Most striking is the fact that Dr. Randolph admitted multiple times during his deposition that his refusal to clear Fortkamp to return to work ***was based solely on his history and record of a disabling back condition***.

31

Just as the employer did in the *Keith* case, the City of Celina impermissibly and "mechanically" relied on Dr. Randolph's discriminatory opinions – which it had a direct hand in shaping – and disregarded the opinions of Fortkamp's treating providers, including Drs. Snow and Mullin.  The City also ignored the opinions of medical providers who conducted independent and individualized assessments of Fortkamp in his struggle to be reinstated, including Dr. Borrillo, and particularly Rick Wickstrom.

The City's ignoring the in-depth and individualized assessments performed by Wickstrom is particularly suspect under the ADA. In addition to an in-depth analysis of the job itself – assisted by City officials Hazel and Severns who verified the physical requirements – Wickstrom tested Fortkamp at, and later above, those physical requirements. Fortkamp passed all of Wickstrom's physical tests with flying colors. According to Wickstrom and an actual Celina lineman, after December 2008, Fortkamp was – and is – in better physical condition than the Celina employees actually working in the lineman position.

Regardless, the City steadfastly clings to Dr. Randolph's biased opinions to justify its position that Fortkamp can ***never*** return to the lineman position. Dr. Randolph testified that he will never "change his mind" about Fortkamp, based solely on Fortkamp's record of a disabling back condition. A reasonable jury could easily find that the City's refusal to return Fortkamp to the Lineman position in reliance on Dr. Randolph's flawed opinions is exactly the kind of discrimination the ADA is designed to prohibit: employment practices that are not based on an individual's actual capabilities, but on unfounded fear and stereotypes about past disabling conditions that have little to do with current reality. This is particularly true, given the City's participation in sending Dr. Randolph materials that did not accurately depict the Lineman job duties.

Because there is ample direct evidence in this record that the City impermissibly relied on Dr. Randolph's opinions, which are based on Fortkamp's record of a disability, to preclude Fortkamp from working as an Electric Lineman, the City is not entitled to summary judgment in this case.

> **2) A jury could easily find that the City's providing Dr. Randolph with false and misleading information about the essential functions of the electric lineman position – and Dr. Randolph's erroneous and made-up conclusions about the essential functions of the position – are indicia of unlawful disability discrimination.**

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Rorrer*, 743 F.3d at 1039 (citing *Keith*, 703 F.3d at 926). If an employer has a written job description, the written description is considered evidence of the essential functions of the job. *See* 42 U.S.C. § 12111(8). However, "testimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states that a job function is essential." *Rorrer*, 743 F.3d at 1040.

The City attempts to characterize the electric lineman position as one that is "inherently dangerous as a matter of law," by citing to cases that are predominantly from the 1980s, and one from 1998.[22] However, the cases on which the City relies have nothing to with "essential functions" of the City of Celina electric lineman job, or with disability discrimination.  Rather, the City's cases relate to negligence claims when an electric lineman has died on the job, (*Sigman v. General Electric Co.*, and *Angel v. United States*), and whether railway employees and teachers can be drug tested (*Skinner v. Railway Labor Executives' Association*, and *Knox County Education Association v. Knox County Board of Education*).

---

[22] See Motion for Summary Judgment at pp. 2-3 (Doc. 69, PageID 3064-65).

Even if these cases were relevant to Fortkamp's claims, they date back to a time when the lineman duties were far different than they are today, or even in 2009. As Severns himself admitted, the lineman position has changed as technology has advanced, and there is no question that an electric lineman job as it existed 20 to 30 years ago has no bearing on what the position looks like today.

In this case, what matters are the essential functions of the position as they exist today and as they existed in 2008 and 2009, which the City has presented both in written form and in the form of sworn testimony. As to written documents, the City has a job description that it sent to Dr. Randolph, which has a six-item list of "essential functions," and which cites to the ADA, 42 U.S.C. § 12101. (City of Celina Position Description, Doc. 60-1, PageID 1429-31). Nowhere on this list does it state that an electric lineman must spike up poles or engage in heavy lifting – the job functions that Dr. Randolph opines Fortkamp cannot perform. (*Id.*).

The same is true of the written job analysis that the City had done in 2004: there is no reference to climbing poles in this document, and the analysis of lifting tasks shows that heavy lifting occurs "rarely." (3/1/2004 Job Analysis, Doc. 66-3, PageID 2953-54). Likewise, there is testimony in the record from Fortkamp, Severns, and other linemen who verify that climbing poles and lifting very heavy objects is not something that Celina lineman do with any regularity. Rather, linemen generally use bucket trucks to access the tops of poles, and they use other assistive equipment to move heavy objects. In short, there is no factual dispute about what the essential functions of the lineman duties really are.

Thus, a jury in this case could easily believe that Dr. Randolph's – and by extension the City's – conclusion that Fortkamp cannot return to the lineman position because he cannot climb poles or lift heavy equipment is discriminatory because it has nothing to do with the actual essential functions of the lineman position. Rather, a jury could conclude that Dr. Randolph and

34

the City are hiding behind what they now assert to be "essential functions" of an "inherently dangerous" job to mask their stereotyped and unlawful beliefs that Fortkamp cannot do this job because of his past injuries and surgeries. Accordingly, the City is not entitled to summary judgment.

> **3) The City of Celina unlawfully regarded Fortkamp as disabled when it refused to return him to the Electric Lineman position, based on its directly articulated fears and assumptions that Fortkamp would re-injure himself and cause the City to incur financial liability.**

Under the ADA, an individual is "regarded as having [a disability]" if he establishes that he has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). An individual is "regarded as disabled" if his employer "entertain[s] misperceptions about the individual – it must believe either that [he] has a substantially limiting impairment that [he] does not have or that [he] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999).[23] According to the Supreme Court, these "misperceptions" typically "result from stereotypic assumptions" that are not true indications of "individual ability." *Id.*

Employers may lawfully "require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity . . . [and] may inquire into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c). However:

> ***The results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform*** the essential functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of ***future injury***, or absenteeism, ***or may cause future workers' compensation or insurance costs***.

---

[23] The ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(4)-(6), 122 Stat. 3553, overruled the *Sutton* Court's reliance on "mitigating factors" in determining whether an individual is disabled.

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 960 (10th Cir. 2002) (citing EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, TECHNICAL ASSISTANCE MANUAL ON THE EMPLOYMENT PROVISIONS (TITLE I) OF THE AMERICANS WITH DISABILITIES ACT § 6.4 (1992) (emphasis added)).[24]

Similarly, in *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 132 (D. Me. 2010), the court denied summary judgment in a disability-discrimination case, holding that a reasonable jury could find that the employer's fear of Carmichael re-injuring himself "stemmed from ***an impermissible speculation that a disability may indicate a greater risk of future injury*** . . . ." (emphasis added). In another case, the First Circuit recognized that an employer's "stated concern" that an employee could "***cost [the employer] thousands of dollars of liability*** if she were to fall may be interpreted as speculation as to risk of future injury," rather than a "legitimate concern" about the employee's present ability to safely perform the essential functions of her job. *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 163 (1st Cir. 2009) (emphasis added).

In this case, contrary to the City's assumptions in its Motion for Summary Judgment, Fortkamp does not dispute the City's right to request that he attend an IME with Dr. Randolph, for the purpose of determining whether he could perform the job functions of the lineman position after his treating doctors cleared him to work and after Wickstrom's FCE. Rather, in this case, a jury could easily find that the City's admitted and articulated fears and speculation about re-injury and financial liability were not "legitimate concerns" about Fortkamp's present ability to safely perform the lineman job functions, but amount to impermissible discrimination.

---

[24] While the Equal Employment Opportunity Commission's Technical Assistance Manual is not controlling authority, courts may properly "draw guidance from the views" it expresses. *Bragdon v. Abbott*, 524 U.S. 624, 647 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); 42 U.S.C. § 12206(c) (authorizing EEOC to offer technical assistance on compliance with subchapter I of the Americans with Disabilities Act).

In addition to relying on Fortkamp's record of a disabling back condition, Dr. Randolph went a step further by tying his refusal to clear Fortkamp to what he believed was a likely "risk of re-injury." To follow Dr. Randolph's discriminatory logic, Fortkamp's record of a past disabling back condition renders him currently unable to perform the essential function of the lineman position because of the potential for re-injury. In this regard, Dr. Randolph's stated concerns about re-injury stand in contrast to the opinions of Fortkamp's providers, who noted that Fortkamp is at no greater risk for a back injury than anyone else doing the lineman job.

*Dr. Randolph's speculation is exactly the kind of bias and misperception the ADA is designed to prohibit*. And, because the City admits it is relying exclusively on Dr. Randolph's opinion as the basis for refusing to reinstate Fortkamp to the Electric Lineman position, the City is unlawfully discriminating against Fortkamp by regarding him as disabled.

Even if Dr. Randolph's opinions were not "in the mix," there is plenty of direct evidence that City officials were strongly motivated by fears about re-injury – and the potential liability to the City if Fortkamp were to injure himself on the job – in refusing to return Fortkamp to his lineman position. Hazel and Severns admitted to these fears as a driving factor in their decision-making about Fortkamp. Hazel in particular testified to his concern that Fortkamp would re-injure his back if he returned to the lineman position, which fears Severns echoed. Hazel likewise admitted that financial liability associated with a re-injury was also a big concern. Moreover, given that the City would have incurred a massive $180,000 annual experience rating on its workers' compensation costs had Fortkamp submitted a claim to BWC following his 2003 injury, a jury could easily believe that the City was motivated by financial concerns stemming from a misperception of Fortkamp as still being disabled.

The City is not entitled to summary judgment on Fortkamp's claims because a jury could easily find that the City's fears of re-injury and the accompanying financial fallout are nothing but impermissible and discriminatory speculation premised on a wholly unfounded perception that Fortkamp is disabled.

> **4) The City of Celina cannot rely on the "honest belief rule" to escape liability for its discriminatory actions against Fortkamp because it never pled this affirmative defense and because a reasonable jury could easily believe that the City's actions and admissions belie any such claim.**

The Sixth Circuit has set forth the burdens that apply when an employer seeks to evade liability for discriminatory actions, claiming that it had an "honest belief" in its justifications for those actions. *See, e.g., Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006).  For an employer to avail itself of this defense, it must establish "***reasonable reliance***" on the "particularized facts that were before it when the decision was made." *Id.* (emphasis added).  Even when the employer makes such a showing, ***the protection afforded by the rule is not automatic***. *Id.* (emphasis added, internal citations omitted).  Once the employer is able to point to the "particularized facts" that motivated its decision, the employee has an opportunity to produce proof to the contrary.  *Id.*

In this case, the City attempts to justify its discriminatory actions towards Fortkamp by claiming that it relied solely – and reasonably – on Dr. Randolph's reports to preclude him from returning to the lineman position. However, the City never pled the "honest belief rule" as an affirmative defense in its Answer to Fortkamp's Amended Complaint. And even if it had, the record is replete with evidence that a reasonable jury could easily believe shows that the City's reliance on Dr. Randolph's reports was neither justified, nor honest.

In addition to the inherent problems with Dr. Randolph's reports as set forth in the sections above, and the City's clear decision to ignore the mounds of objective evidence from other

medical practitioners, a jury could find that the City's own actions in facilitating Dr. Randolph's conclusions make its reliance on those conclusions untenable. The City of Celina sent Dr. Randolph inaccurate information about the lineman job duties, which certainly influenced his conclusions. This includes how often linemen climb poles, how much *manual* lifting linemen perform, and whether and when they use assistive equipment.

The City also sent Dr. Randolph inaccurate information about the dates when Fortkamp had his surgery and began his physical therapy. This misinformation, coupled with Hazel's fears about Fortkamp's chances of injury that predated Dr. Randolph's report, demonstrate that the City of Celina did not make a "reasonably informed and considered decision" with respect to denying Fortkamp's return to the lineman position.

A jury could also find that the City's actions towards Fortkamp in October 2009 and thereafter – each time he applies for a  lineman position – belie its claim that its decision-making as to his working in the lineman position is based solely on objective medical evidence before it. In the Spring and Summer of 2009, Fortkamp exerted herculean efforts to provide more and more medical evidence that he is fit to return to the lineman position – and to change the City's and Dr. Randolph's minds about his fitness for duty. However, the City resisted those efforts at every turn, the City "disability separated" Fortkamp in October 2009. ***And it did so despite the fact that it knew Fortkamp had applied for an open Meter Reader position in September 2009***.

Instead of terminating Fortkamp and then rehiring him in November of 2009, the City could easily have just transferred Fortkamp into the new job without costing him a decade of seniority.  These actions clearly show animus towards Fortkamp that has nothing to do with Dr. Randolph or safety concerns – and certainly does not reflect any true "honest belief" in the viability of relying on Randolph's 2009 reports to currently preclude Fortkamp from working as a lineman today.

39

The ultimate absurdity of the situation is that the City is fully aware that Fortkamp is engaging in heavy lifting and other manual tasks in the Meter Reader position that he is supposedly "unsafe" to perform in the Electric Lineman position.  However, the City continues to this day to permanently bar Fortkamp from working as a lineman.

For these reasons, no reasonable jury could find that the City "honestly believes" its actions are justified by Dr. Randolph's bogus reports, thus there are not grounds for summary judgment on this basis.

**B. The City of Celina is not entitled to summary judgment on the basis that Fortkamp presents a "direct threat" to the health or safety of himself or others because the City and its medical provider ignored objective evidence of Fortkamp's current condition and abilities, and because the City never pled "direct threat" as an affirmative defense to Fortkamp's claims.**

The ADA provides employers with an affirmative defense to discrimination claims where "employing the individual in the position in question will pose a direct threat to the health and safety of others in the workplace." *E.g., Wells v. Cincinnati Children's Hosp. Med. Ctr.*, 860 F. Supp. 2d 469, 480 (S.D. Ohio 2012) (citing 42 U.S.C. § 12113(b), 29 C.F.R. § 1630.2). A direct threat means that there is "***significant risk of substantial harm***" that cannot be eliminated or reduced by reasonable accommodation. *E.g., Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 431 (6th Cir. 1999) (citing 29 C.F.R. § 1630.2(r)).

There are four factors to determine whether an individual poses a direct threat: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood the harm will occur; and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r). An employer is not permitted to deny an employment opportunity to an individual "merely because of a ***slightly increased risk***; the risk can only be considered when it poses a significant risk," which means a "high probability of substantial harm." *Wurzel v Whirlpool Corp.*, 482 Fed. Appx. 1, 12 (6th Cir.

2012) (internal citations omitted). A "*speculative* or remote risk" is insufficient to show direct threat. *Id.* (emphasis added).

When it evaluates an employee's direct-threat risk, the employer must conduct an "individualized inquiry" into the individual's "actual medical condition, and the impact, if any, the condition might have on the individual's ability to perform the job in question." *Id.* (internal citations omitted). In addition, the assessment of the "direct threat" must be based on "medical or other *objective evidence*." *Id.* (citing, *inter alia*, *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998), emphasis added). Thus, courts are to assess the "objective reasonableness" of the views of the employer and/or the *employer's medical professionals who made the direct threat decision*. *Id.* (citing *Bragdon*; emphasis added).

As this Court is fully aware, the *Wurzel* case involved an employee of Whirlpool who had angina. In analyzing the factors set forth above, and whether the employer relied on objective evidence to conclude that Wurzel's angina posed a direct threat, the Sixth Circuit noted the steps that Dr. Marshall, the Whirlpool plant doctor, took to obtain "individualized information" about Wurzel's medical condition: seeing Wurzel himself, reviewing records from the plant's health center, obtaining the opinions of Wurzel's treating cardiologists, and seeking an IME himself because of the conflicting information. *Id.* at 15.

The Sixth Circuit also noted that Dr. Marshall, as the plant physician, had access to *current and updated* information about Wurzel's medical condition as it changed, and he followed up with Wurzel's treating providers to update them on these changes, as well as to provide them with an understanding of the Whirlpool work environment. *Id.* (emphasis added). In finding that Wurzel posed a direct threat, the Sixth Circuit also found that Wurzel had an "extensive history" of heart spasms *that occurred in the workplace after Whirlpool returned him*

41

*to work.  Id.* (emphasis added). Five of these spasms required Wurzel to visit the plant emergency room – on one occasion by ambulance – and the majority of them required him to leave work.  *Id.*

In contrast, Wurzel's treating physicians did not have current or complete information about his health condition when they recommended that he work without restrictions. *Id.* at 16. This is because Wurzel was not completely honest or forthcoming with them about what was happening at work, and whether he was taking his medications. *Id.* In fact, as the Court noted, one of Wurzel's providers would have changed his opinion had he had all of the information that Dr. Marshall had. *Id.*

Fortkamp's case is actually the 180-degree opposite of the *Wurzel* case. Here, Fortkamp's treating providers had full, complete, and individualized information about his physical capabilities, along with the job analysis provided by Rick Wickstrom regarding the physical requirements of the lineman position, which included whether Fortkamp could specifically perform them. Here it was Dr. Randolph who lacked – or blatantly ignored – the objective information that myriad others were providing about Fortkamp's current condition and abilities.

The most striking difference between this case and the *Wurzel* case is that **the City never returned Fortkamp to work** to see if its articulated fears and speculation about his inability to do the job, his likelihood of re-injury, and the financial burdens of re-injury would, in fact, come to fruition. In fact, the City rejected an opportunity to have Fortkamp return to work in early January 2009, when Ms. Mitchell-Welch proposed a plan to the City whereby Workers' Comp would pick up the entire cost. Hazel rejected that proposal flat out, even though it pre-dated the Randolph IME and opinion.

Wurzel, on the other hand, did return to work and, unfortunately, his angina spasms continued to cause him to experience emergent health problems while he was at work. Another key difference between this case and *Wurzel* is that **Fortkamp never lied to his providers** about his

42

physical conditions and whether they actually caused him to experience problems in the workplace.

Rather, in this case, Fortkamp is physically fit, fully cleared to return to the electric lineman position, and has ample "objective evidence" from various sources to support this conclusion. It is Dr. Randolph and the City who refuse to consider all of this objective evidence and who continue to rely on nothing but fear and speculation to keep Fortkamp from returning to work in the lineman position. Instead, the City is content to keep Fortkamp in the lesser-paying position of meter reader, and to ask him to perform the very kind of heavy lifting that Dr. Randolph believes he cannot do. The hypocrisy of the City's action on this basis alone is sufficient for a jury to reject the City's attempt to rely on the direct-threat defense.

The City relies extensively on this Court's decision in *Wurzel v. Whirlpool*, 2010 U.S. Dist. LEXIS 36635, 2010 WL 1495197 (N.D. Ohio, Apr. 14, 2010), to attempt to show that the presence of the four direct-threat factors entitles it to judgment as a matter of law. However, the record in this case in way supports judgment as a matter of law – except perhaps in Fortkamp's favor.  Rather, the circumstances involved in Wurzel's case are very different from those here.

For example, this Court found that Wurzel's diagnosed condition of Prinzmetal angina was *actively* causing unpredictable and regular spasms *in the workplace* – after Wurzel returned to work post-surgery. In contrast, there is *no evidence* that Fortkamp suffered from any *active* symptoms of his prior back condition or otherwise, since December of 2008, at which point Fortkamp engaged in heavy physical jobs with concrete and constructions companies, and for the City itself. Moreover, Fortkamp was in the best shape of his life when he was cleared to return to work, and even Dr. Randolph noted that he had no limitations during the one physical exam he conducted in January 2009.

In addition, this Court noted that Dr. Marshall – the doctor on whose opinions Whirlpool relied – worked for Whirlpool. Therefore, unlike Dr. Randolph, Dr. Marshall had first-hand and current information about Wurzel's medical condition, his restrictions, and the environment at the plant, as well as the jobs that would fit Wurzel's restrictions.  In stark contrast, the City continues to deny Fortkamp the electric lineman position based on opinions from Dr. Randolph that are now six years old. Dr. Randolph saw Fortkamp in person once in January 2009; he never visited Celina or observed linemen performing the job duties; and his subsequent reports were largely refutations and criticisms of providers such as Dr. Mullin, Dr. Borrillo, and Rick Wickstrom, who had examined or tested Fortkamp, and who had current information about him.

The case that most closely factually resembles Fortkamp's case was recently decided by the Court of Appeals for Ohio's Third Appellate District, *Carnahan v. Morton Bldgs., Inc.*, 2015-Ohio-3528 (Ohio Ct. App., Paulding County Aug. 31, 2015). Carnahan, the foreman of a construction crew for Morton, was injured during a work-sponsored outing, in which he fell from an ATV and suffered severe head trauma, resulting in removal of a portion of his skull and temporal lobe. *Id.* at ¶2.

Following extensive therapies, Carnahan's neurosurgeon and physical therapist authorized him to return to work with "no restrictions." Morton refused to return Carnahan to work until he submitted to a fitness for duty examination with a neurosurgeon retained by Morton, Dr. Policheria. *Id.* at ¶3. Morton referred Carnahan to a fitness for duty exam out of concerns relating to his memory and "safety concerns we had on the current employees…we didn't want to jeopardize their safety, so we questioned his ability." *Id.* at ¶12.

Dr. Policheria determined that Carnahan could not perform the duties of a crew foreman absent certain accommodations. Morton then terminated Carnahan's employment based upon Dr. Policheria's report. *Id.* at ¶3. Carnahan brought a "perceived disability" discrimination claim under

44

Ohio law, which the trial court disposed of via summary judgment in favor of Morton, without any written opinion.

The Third District reversed. When Carnahan was examined by Dr. Policheria, he passed his neurological exam with a score of 30 out of a possible 30. *Id.* at ¶14. Given that Carnahan exhibited *no current limitations* when examined by Dr. Policheria, Morton's actions were based upon theirs and Dr. Policheria's *concerns about possible neurological impairments that could occur*. *Id.* at ¶15. The Court noted: "Viewing the evidence in a light most favorable to Carnahan, a reasonable juror could determine that *Morton, in relying on Policheria's report, perceived Carnahan as having an impairment*." *Id.* at ¶15 (emphasis added).

Fortkamp's case is practically on all fours with *Carnahan*. He suffered an injury, underwent extensive therapy, and was fully released to work in the lineman position. The City sent him for an IME with Dr. Randolph, who curiously echoed the fears and speculation of the hiring entity: Fortkamp could not return to work as a lineman because his past record of a disabling condition rendered him highly likely to re-injure himself (and cost the City a lot of money in the process). The City attempts to hide behind Dr. Randolph's discriminatory speculation about what might happen if Fortkamp returns to the lineman position, crying "safety" as its purported justification for doing so.

Because there is nothing in this record to support the City's attempt to rely on the direct-threat defense – which it never pled in its Answer as an affirmative defense – the City is not entitled to summary judgment on this basis.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff Matthew Fortkamp respectfully requests that this Court DENY the Motion for Summary Judgment filed by Defendant City of Celina.

Respectfully submitted,

s/ Bruce B. Elfvin

BRUCE B. ELFVIN (0015694)
CHRISTINA M. ROYER (0073695)
STUART TORCH (0079667)
Elfvin, Besser, Royer & Torch, LLC
4070 Mayfield Rd.
Cleveland, Ohio 44121
Tel:     (216) 382-2500
Fax:     (216) 381-0250
Email: bbe@elfvinbesser.com
        croyer@elfvinbesser.com
        stuart.torch@elfvinbesser.com

*Attorneys for Plaintiff Matthew Fortkamp*

46

## <u>CERTIFICATE OF COMPLIANCE</u>

It is hereby certified that this memorandum in opposition to summary judgment complies with the requirements set forth in Local Rule 7.1(f), for cases assigned to the <u>standard track</u>, and the page limits permitted by this Court in its standing order on "Civil Cases – Case Management Procedures" ("Although I welcome briefs that comply with the page limitations set forth in the Local Civil Rules, it is not necessary to obtain prior leave before filing a brief that exceeds those limitations.")

<u>November 2, 2015</u>                   *s/ Bruce B. Elfvin*
Date                                        One of the Attorneys for Plaintiff Matthew Fortkamp

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF CELINA'S MOTION FOR SUMMARY JUDGMENT [DOC. #69]** has been served on all parties via the Court's electronic filing system.


<u>November 2, 2015</u>                          *s/ Bruce B. Elfvin*
Date                                             One of the Attorneys for Plaintiff Matthew Fortkamp


1758\Summary Judgment\MSJ_v13

ix