**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Matthew Fortkamp,                                        Case No. 3:14CV438

     Plaintiff

   v.                                        **ORDER**

City of Celina,

     Defendant

This is an employment-discrimination case under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and analogous state-law provisions.

The plaintiff, Matthew Fortkamp, injured his back while working as an electric lineman for the defendant, the City of Celina, Ohio. His injury led to a nearly five-year absence from work and two back surgeries. The neurosurgeon who operated on Fortkamp, Fortkamp's physician, and other specialists cleared Fortkamp to return to work as a lineman. But the City, relying on an independent medical examiner's opinion Fortkamp should not lift more than fifty pounds or climb utility poles, refused to return him to the lineman position.

Fortkamp alleges the City mistakenly regarded him as disabled, and that its refusal to reinstate him as a lineman constitutes discrimination on the basis of that perceived disability.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending is the City's motion for summary judgment. (Doc. 69). For the following reasons, I deny the motion.

## Background

Fortkamp began working for Celina in 1999 as a meter reader. Two years later, he became an Electric Line Maintenance Worker in the City's Electric Department.

There it was Fortkamp's responsibility to "keep the power on" in Celina. The essential functions of the job, according to the City's written job description, included: 1) operating an augur truck to dig holes for electric utility poles; 2) installing utility poles and maintaining them in working order; 3) helping his fellow linemen accomplish these objectives; and 4) trimming trees to ensure clear space around electric lines.

### A. Injury

In November, 2003, Fortkamp badly injured his back at work.[1]

As he and some coworkers lifted a steel frame weighing several hundred pounds, Fortkamp felt sharp, shooting pains in his lower back.

Doctors determined Fortkamp had torn at least one of the discs between his lumbar vertebrae. Fortkamp could no longer stoop, bend over, or lift most objects. He had difficulty sleeping, standing, and sitting down. His pain was often so severe that only by laying flat for twenty-two hours a day could he get comfortable.

In accordance with the collective bargaining agreement between the City and Fortkamp's union, the City placed Fortkamp on injury leave. Though the CBA required the City to provide only

---

[1] Apparently Fortkamp had a history of back problems, and there is some suggestion in the record the 2003 injury may have aggravated pre-existing injuries. Curiously, neither party's papers give much attention to the significance, if any, of any such prior injuries and whatever treatment plaintiff may have received.

six months of leave, it kept him on leave for nearly four years. During that time, Fortkamp earned his full salary and maintained health insurance.

During discovery in this case, City officials acknowledged that, by keeping Fortkamp on leave and not referring him to the Bureau of Worker's Compensation (BWC), the City saved roughly $180,000 per year by avoiding increased BWC premiums.

In June, 2007, however, the City notified Fortkamp it would no longer extend his leave. Director of Safety Services Jeff Hazel advised Fortkamp he could pursue disability leave, disability retirement, or a claim through the BWC. Fortkamp chose to make a claim through the BWC. The agency approved Fortkamp for a course of pain-management treatment, physical therapy, and, ultimately, back surgery.

In October, 2007, neurosurgeon Bradford Mullin performed two surgical procedures on Fortkamp's back: an artificial disc replacement at vertebrae L4/L5, and a spinal fusion at vertebrae L5/S1.

The disc-replacement surgery – and in particular the Charite artificial disc Dr. Mullin placed in Fortkamp's back – have generated controversy in the medical community. Studies and news reports documented the disc's high failure rate and the need of many patients who had the same type of surgery as Fortkamp to undergo further operations. The disc's manufacturer, facing a wave of products-liability lawsuits, halted production in 2010.

Despite these reports about the Charite disc's extensive failure rate, there is no evidence that Fortkamp's replacement disc has failed, caused him any type of problem, or in the past eight years have done anything other than serve its purpose of relieving him of the consequences of his November, 2003, injury.

## B. Fitness for Duty

In September, 2008, a physical therapist working for the BWC, Rick Wickstrom, performed a functional capacity exam (FCE) to determine whether Fortkamp was fit to return to work.

Wickstrom traveled to Celina, where he met jointly with Fortkamp, Hazel, and Jeff Severns, the City's Supervisor of Electric Line Maintenance. Severns showed Wickstrom the linemen's work site and described their job duties. Together he, Hazel, and Wickstrom validated the lineman's job functions.

Wickstrom took what he learned in Celina and prepared a six-page profile of the lineman position.[2] He described the lineman position as involving "medium" physical demands. He also noted:

- The heaviest item a single lineman had to lift was a forty-five-pound street light; and

- Linemen often work in pairs to lift seventy-pound junction boxes from knee to waist level.

He also concluded Fortkamp had "demonstrated a remarkable degree of functional recovery. This is one of the best functional outcomes I have seen for a fusion in combination with artificial disc surgery." (Doc. 60–2 at 14). In December, 2008, Wickstrom concluded Fortkamp "may be released to FULL DUTY" with no restrictions. (Doc. 60–1 at 11).

Dr. Mullin and Fortkamp's "physician of record," Dr. Keith Snow, also determined that, as of December, 2008, Fortkamp was fit to return to work. Mullin, who had last seen Fortkamp in October, wrote that Fortkamp "is doing extremely well," "continues to improve," and "is increasingly exercising his back." (Doc. 64–5 at 12).

---

[2] Although the City contends Wickstrom's report is riddled with factual errors, the only error it identified is the mistaken claim that linemen are never exposed to the elements or high voltage.

4

When the BWC received these reports and opinions, it suggested that the City hire Fortkamp for a thirty-day trial run, during which time the BWC would assume liability for Fortkamp and cover costs of reinstating him.

The City, through Hazel, declined the offer. He told the BWC its plan was unacceptable because the City "feared a reinjury and the cost that the city would incur as a result." (Doc. 39 at 8). The City also doubted the *bona fides* of Dr. Mullin's and Wickstrom findings. Given what the City characterized as both men's central role in operating on, and attempting to rehabilitate, Fortkamp, the City considered their opinions partial and self-serving.

Accordingly, the City exercised its contractual right to have Fortkamp undergo an independent medical examination (IME). It sent Fortkamp to see Dr. David C. Randolph, who is board-certified in occupational medicine.

Before Dr. Randolph began his work, Hazel gave him a "history" of Fortkamp's case. (Doc. 38 at 12–13).

Hazel also sent Randolph a letter containing misleading information about Fortkamp's condition and the duties of Celina linemen. Hazel – admittedly unqualified to evaluate Fortkamp's fitness for duty – claimed Fortkamp had shown resistance to surgery. He misstated when Fortkamp had surgery and when he began physical therapy. The errors suggested Fortkamp's surgery was more recent than it had been, and that Fortkamp had therefore spent less time in physical therapy than, in fact, he had been.

Finally, Hazel sent Randolph a DVD of a "Lineman Rodeo."

5

The DVD contained pictures and video footage supposedly "demonstrat[ing] some of the duties that a Lineman is required to perform" (Doc. 60–1 at 15), such as linemen using harnesses and spikes to scamper up utility poles and carrying mannequins while doing so.

Like a log-rolling contest between lumberjacks, it is undisputed the DVD in no way accurately portrays the job duties of a Celina lineman.

After receiving these materials, Randolph conducted a five- or ten-minute physical examination of Fortkamp. He reported Fortkamp appeared "pretty good," and that there was no activity Fortkamp could not or would not perform because of back pain.

Dr. Randolph also examined Fortkamp's medical records, which disclosed "a long history of low back problems resulting in several surgical procedures to [Fortkamp's] lumbar spine." (Doc. 60–1 at 29).

He interviewed Fortkamp about his duties as a lineman. According to Randolph's report, Fortkamp said the job required him to "stand and walk constantly with occasional to frequent bending, twisting, and stooping"; "lift and carry objects weighing in excess of 100 pounds"; and "perform climbing activities." (*Id.* at 24).

Based on these statements, Randolph concluded the lineman position "should not be placed at the medium physical demand characteristic level," as Wickstrom had determined in his FCE. (*Id.* at 29). Rather, the job fell into "the heavy to very heavy physical demand characteristic level based upon the requirements of working in the extremes of temperature and weather conditions, climbing poles (requiring full support of body weight against gravity), [and] sometimes repetitive twisting and torquing while pulling on heavy cables." (*Id.* at 30).

6

Finally, Dr. Randolph noted "the only predictor for future low back pain which has been found to be statistically relevant is a prior history of low back problems," and that Fortkamp had had a total of three back surgeries. (*Id.*).

Based on all this, Dr. Randolph opined returning Fortkamp to the lineman position "is a poorly considered option and likely to result in recurrent low back complaints and . . . the possibility for more surgery based upon a repeat injury." (*Id.* at 31). Dr. Randolph agreed, however, Fortkamp could work in a "medium physical demand characteristic level," because he could lift fifty pounds and occasionally bend, stoop, and twist. (*Id.*).

### C. Request to Return to Work

Citing Wickstrom's, Dr. Mullin's, and Dr. Snow's opinions, Fortkamp asked the City in February, 2009, to return him to work as a lineman.

The City, relying on Dr. Randolph's opinions, responded by notifying Fortkamp it planned to begin "involuntary disability separation proceedings." It gave Fortkamp an opportunity "to present any evidence and testimony which you believe may refute Dr. Randolph's medical evaluation" that he was unable to "perform[ ] the essential functions of your position[.]" (*Id.* at 36).

Fortkamp took advantage of the opportunity by submitting: 1) an updated letter from Dr. Mullin opining he could return to the lineman position; and 2) a DVD depicting him lifting weights.

The City, through Hazel, told Fortkamp these materials were "insufficient proof of your ability to perform the essential functions of your position." (Doc. 60-1 at 38). Hazel, who had not first shown the materials to Dr. Randolph to learn whether it might have affected his assessment, asserted Fortkamp's submissions would not "refute the opinion of Dr. Randolph." (*Id.*).

7

Hazel therefore instructed Fortkamp either to use his accumulated sick leave or submit a notice of voluntary disability separation to avoid "being absent without approved leave." (*Id.* at 39). Fortkamp elected to use his sick leave, but reserved the right to contest the City's refusal to return him to work.

While attempting to convince the City he was fit for duty, Fortkamp had obtained full-time work as a cement-truck driver. In that capacity, Fortkamp:

> arrives to work between 6 AM – 8:30 AM, climbs into the cement truck, drive[s] the truck into the yard, climbs out of the truck, climbs up to the catwalk to spray out sand/concrete debris, receives a load of cement, drives to the job site, climbs out of the truck to load chutes . . . [which] requires lifting and carrying from pallet to chest level, helps rake out concrete, stows chutes, and then climbs back into the truck to drive back to the plant for another load. There are typically 3 washouts for every pour, 1–6 loads delivered per day, for 5–6 days per week.

(Doc. 60-2 at 15).

Fortkamp also submitted to a second IME in June, 2009.

The examiner, Dr. Donato Borillo, opined Fortkamp "is capable of performing full-time, regular work, as outlined in" the City's job description of the lineman position. (Doc. 60-1 at 44). Dr. Borillo determined Fortkamp could work in a "'very heavy' rated position" because he could "lift[ ] up to 100 pounds 33% of the work time[.]" (*Id.*). In his view, Fortkamp was not at an elevated risk, compared to the general population, of sustaining a severe back injury. On the contrary, all persons performing "very heavy" labor were at an increased risk of such an injury. (*Id.*).

Thereafter, Wickstrom, on behalf of the BWC, performed a second FCE. Whereas his first exam "only tested Mr. Fortkamp to his specific job demands that I verified with him and the City of Celina," this exam "tested [Fortkamp] to full capacity to show his state of total health." (Doc. 49 at 8).

8

Wickstrom's report recorded, *inter alia*, that Fortkamp had been working as a cement-truck driver for Irvine Concrete Co., in which capacity he performed similar "MEDIUM to HEAVY physical demands as those of his previous job as" as a lineman. (Doc. 60–2 at 15).

Wickstrom once again cleared Fortkamp to return to work with no restrictions. (Doc. 60–2 at 25). According to Wickstrom, there was no basis to conclude Fortkamp could not perform the essential functions of the job because Fortkamp: 1) "demonstrates absolutely no flexibility deficits"; 2) has "lift/carry abilities that average 2–3 times greater than his job demands"; and 3) the job duties of the lineman position do not, as Randolph erroneously concluded, fall into the very heavy category. (*Id.* at 25).

Dr. Mullin prepared a third statement in August, 2009. He concluded Fortkamp "has been through full functional capacity evaluation greater than what it would take him to go to work [as a new employee] and has passed that with flying colors." (Doc. 60-3 at 17). Mullin also emphasized "a person who is performing Mr. Fortkamp's job with no back condition is also at risk of disc herniation, lumbosacral strain, and fall with thoracolumbar fracture." (*Id.*).

The City provided these materials to Dr. Randolph, who prepared a series of addenda to his original report. He reaffirmed his previous findings that Fortkamp could not work as a lineman, because "the likelihood this claimant will have future ongoing disabling low back problems is high." (Doc. 60-3 at 21). In particular, Dr. Randolph emphasized Fortkamp was unable, due to his back problems, to climb poles and lift one hundred pounds. (*Id.* at 22).

### D. Involuntary Separation

On October 16, 2009, the City determined Fortkamp was absent without leave and, on the basis of Dr. Randolph's opinions, unable to perform the duties of a lineman. It therefore

"involuntarily separat[ed]" Fortkamp from his "employment with the City due to [his] disability." (Doc. 60-3 at 24).

Shortly thereafter, the City hired Fortkamp to work as a meter reader – his original, and lower-paying job.

The City had posted a job opening for a full-time meter reader in September, 2009. Fortkamp applied for the position, and the City was aware – before it had received Dr. Randolph's final report, and before it "involuntarily separated" Fortkamp – he had done so. The sequence of these events substantially disadvantaged Fortkamp: in addition to being paid less, he lost the seniority he had accrued in the lineman position and returned to the payroll as a probationary employee.

Fortkamp continues to work as a meter reader to this day, but still wants his old job back. Neither party has submitted an updated IME or other current medical assessment of his capacity to work as a lineman.

### E. Litigation

In April, 2009, Fortkamp filed a discrimination charge with the Ohio Civil Rights Commission (OCRC), alleging the City had taken an adverse employment action because of a perceived disability and/or his record of having a disability. The OCRC issued a right-to-sue letter (Doc. 18 at ¶5) and, in 2014, Fortkamp timely filed this action against the City.

The City contends it is entitled to summary judgment for three reasons.

First, it contends Fortkamp cannot establish two components of a *prima facie* case of disability discrimination: 1) he is "disabled" for purposes of the ADA; and 2) he is capable of performing the essential functions of the lineman position. Second, it argues it honestly believed Dr. Randolph's determination Fortkamp cannot safely perform a lineman's work, and that no reasonable

jury could find this was pretext for unlawful discrimination. Third, it argues Fortkamp poses a direct threat to the safety of others.

**Standard of Review**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Discussion**

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of a disability.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). To recover under the ADA, a plaintiff "must establish she has a disability, she is otherwise qualified to perform her job duties, and she was terminated on the basis of her disability."[3] *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013) (Helmick, J.).

---

[3] "Because Ohio's disability discrimination law parallels the [ADA] in all relevant respects," *Belasco v. Warrensville Heights City Sch. Dist.*, --- F. App'x ----, 2015 WL 8538096 (6th Cir.), my analysis of Fortkamp's ADA claim applies equally to his state-law claim.

11

A plaintiff may prove an ADA claim through direct or indirect evidence.

"Direct evidence is evidence which would require the finder of fact to conclude the challenged employment action was the result of discrimination." *Id.* (emphasis added).[4] When a plaintiff seeks to prove a discrimination claim through indirect evidence, the *McDonnell Douglas* burden-shifting framework applies.

"To make out a *prima facie* case of employment discrimination through indirect evidence under Title I [of the ADA], a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

---

[4] Fortkamp claims there is "overwhelming direct evidence" the City discriminated against him on the basis of a disability (Doc. 71 at 37), but in fact no such evidence exists. The only "direct evidence" Fortkamp cites is Dr. Randolph's opinion he could not safely work as a lineman, and some statements by City personnel that there was concern about financial liability should Fortkamp re-injure himself. (*Id.* at 39). An IME's opinion that the plaintiff is unable to perform the essential functions of a job is not direct evidence of disability discrimination. *Belasco v. Warrensville Heights City Sch. Dist.*, 86 F. Supp. 3d 748, 762–63 (N.D. Ohio) (Nugent, J.), *aff'd by Belasco*, *supra*, --- F. App'x ----, 2015 WL 8538096 (6th Cir.). Moreover, Dr. Randolph did not conclude Fortkamp was disabled; indeed, he found that Fortkamp could return to work that did not involve "heavy duty" physical demands.

As for the comments about financial liability, this is not direct evidence either, as the jury would still have to infer the City did not actually believe Fortkamp's history of back problems posed an unacceptably high risk of further injury: the City could believe both that Fortkamp was at a greater risk of harm due to his prior injuries, and that this greater risk could materialize as a serious, and quite costly, re-injury.

If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.*

### A. Whether Fortkamp Has a Disability

The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).

Both sides agree Fortkamp is not, in fact, disabled. They disagree, however, whether Fortkamp had a "record of impairment," and whether the City regarded him as disabled.

### 1. Record of Impairment

The City argues there is no evidence Fortkamp had a record of impairment. It contends Fortkamp's "record of" claim rests solely on Dr. Randolph's reports concluding he was unable to perform the essential functions of the lineman position.

The City contends a plaintiff cannot base a "record of" claim on the results of an IME, particularly when an employer has good grounds for questioning the plaintiff's fitness for duty. Relying on *EEOC v. Daimler Chrysler Corp.*, 111 F. App'x 394, 404 (6th Cir. 2004), the City contends records of past employment, education, or medical conditions provide the proper foundation for a "record of" claim.

Fortkamp's opposition papers do not directly respond to that argument. But Fortkamp does contend he has "a record of a disabling low-back condition." (Doc. 71 at 37).

"An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared

to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1620.2(k)(2).

"Courts that have analyzed [the record-of-impairment] prong have held that it includes people who have recovered from previously disabling conditions . . . but who may remain vulnerable to the fears and stereotypes of their employers." *Neely v. Benchmark Family Services*, 2015 WL 1809369, *8 (S.D. Ohio). The plaintiff "only needs to show that at some point in the past he had [a substantially limiting impairment]." *Knight v. Metro Gov't of Nashville & Davidson Cnty.*, 136 F. App'x 755, 760 (6th Cir. 2005).

To the extent Fortkamp bases his claim on Dr. Randolph's IME, I agree with the City such evidence does not constitute a "record of" impairment.

"Employers are permitted to conduct voluntary medical examinations and make inquiries into the ability of an employee to perform job-related functions." *Belasco*, *supra*, 86 F. Supp. 3d at 762. Such examinations are appropriate when there is "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999).

The evidence shows the City, having developed concerns about Fortkamp's fitness for duty, exercised its right to send Fortkamp for an IME. There is little question, moreover, these concerns understandably led to referring Fortkamp for the IME: indeed, he concedes his 2003 back injury left him "substantially limited in performing any number of major life activities" (Doc. 71 at 37), and he was out of work for nearly five years.

But in conducting that examination, Dr. Randolph did not generate a "record of impairment."

14

He simply formed an opinion – however well- or ill-founded – based on what he deemed to be relevant medical evidence that Fortkamp could not safely work as a lineman. What is more, Dr. Randolph did not conclude Fortkamp was disabled; he concluded Fortkamp could perform work that involved "medium," but not "heavy," physical demands.

That said, I agree with Fortkamp that the records documenting his back injury in 2003, his physical condition thereafter, and his ensuing multi-year absence are evidence of a "record of impairment." Because this evidence would permit a jury to find Fortkamp "disabled," summary judgment is unwarranted on this issue.

### 2. "Regarded As" Disabled

The City also argues there is no evidence it regarded Fortkamp as disabled.[5] It contends its decision-making was "solely guided by Celina's reliance on Dr. Randolph's opinion that Fortkamp could not safely return to the electric lineman position." (Doc. 69 at 37–38).

To establish a "regarded as" claim, the plaintiff must show he was "subjected to an action prohibited [under the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." 42 U.S.C. § 12102(3)(A). "[I]f a reasonable jury could have concluded the City terminated [Fortkamp] because of an actual or perceived physical or mental impairment," then summary judgment is inappropriate. *Hoback v. City of Chattanooga*, 2012 WL 3834828, *5 (E.D. Tenn.).

There is ample evidence from which a reasonable jury could find the City regarded Fortkamp as disabled, and refused to reinstate him for that reason. Indeed, the City's moving papers

---

[5] The City argues at length that its decision to send Fortkamp for an IME is not evidence the City regarded Fortkamp as disabled. Because Fortkamp has made no such argument, and actually concedes the City had the right to request an IME, I do not address this argument.

acknowledge it separated Fortkamp from the lineman position because it believed Fortkamp could not, given his history of back troubles, safely perform the essential functions of the job.

The City's position, and the multiple statements City personnel made regarding the impact of Fortkamp's back problems on his ability to work safely, tend to show it regarded Fortkamp as disabled. *Schindewolf v. City of Brighton*, 107 F. Supp. 3d 804, 818 (E.D. Mich. 2015) (city manager's opinion that plaintiff's depression was "a rather serious situation" that could affect his decision-making showed that city regarded plaintiff as disabled); *Hoback*, *supra*, 2012 WL 3834828, at *5 (employer's statements that it fired plaintiff based on medical evidence that plaintiff's post-traumatic stress disorder rendered him unfit for duty warranted jury trial on plaintiff's "regarded as disabled" theory).

Summary judgment is therefore unwarranted on this issue, too.

## B. Fortkamp's Qualifications to Perform the Lineman Job

The parties next argue over the essential functions of the lineman position, and whether Fortkamp is qualified to perform them. In particular, the parties disagree whether "lifting heavy weights and climbing poles" are truly essential functions. (Doc. 74 at 4).

The City seems to argue climbing utility poles is an essential job function because, "no matter how infrequent[ly]" a storm or other force of nature causes a downed power line, when that happens "Celina's electric linemen will be called into duty" and may "have to climb poles once in a while" and move heavy tree limbs. (*Id.*).

The City also contends Fortkamp constitutes a direct threat to the safety of his coworkers, the citizens of Celina, and himself, and for that reason is unqualified to be a lineman.

16

### 1. Essential Functions

An employee is "otherwise qualified" for a position if he can perform the essential functions of the job in question, with or without a reasonable accommodation. 42 U.S.C. § 12111(8). "Essential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Rorrer*, *supra*, 743 F.3d at 1039 (quoting 29 C.F.R. § 1630.2(n)(1)).

"Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors" *id.*, including: "(1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013).

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment. *Id.* at 926.

Contrary to the City's claims, there is a genuine dispute of material fact as to just what, exactly, the essential duties of the lineman position are. The City's judgment that climbing utility poles and lifting heavy weights, while entitled to deference, is not dispositive. *Rorrer*, *supra*, 743 F.3d at 1039. While the City asserts in its reply brief these functions are essential, its written job description does not identify either of those tasks as an essential function.

Furthermore, there is considerable evidence suggesting lineman climb utility poles and lift heavy weights only rarely.

It is undisputed the City's linemen frequently, and, indeed, apparently as a matter of course, use bucket trucks when making repairs to utility poles and electric lines. These trucks, which lift

17

linemen into the air, obviate the need to climb the utility poles (and make the linemen's work much safer). Notably, Severns testified lineman do not climb poles "very often," and he had not climbed a pole since 2000. (Doc. 44 at 15–16). In line with Severens' experience, several lineman testified the City used bucket trucks almost exclusively.

As for lifting heavy weights (between fifty and a hundred pounds), there is not much in the record  suggesting this is an essential job function.

According to a 2004 "job analysis" of the Celina lineman position, lifting up to one hundred pounds or more was "[r]are," and lifting up to sixty five pounds was "[i]nfrequent." (Doc. 66-3 at 1). And while Severens testified the City's employee manual "says something about being able to . . . lift[ ] 100 pounds," he admitted that, were he called on to lift that much weight, he could not do so. (Doc. 44 at 24). Nor could he recall ever having seen a lineman lifting that much weight.

Taken as true and in the light most favorable to Fortkamp, this evidence would support a finding that lifting and climbing poles are not essential job functions. And as discussed below, there is abundant evidence showing Fortkamp could perform the actual "essential functions" of the job.

### 2. Direct Threat

"A disabled person is not qualified for an employment position . . . if he or she poses a direct threat to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2014). "The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted).

"Four factors are relevant to the direct-threat defense: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Siewertsen v. Worthington Steel Co.*, --- F. Supp. 3d ----, 2015 WL 5675072, *15 (N.D. Ohio 2015).

The City contends Fortkamp poses a direct threat because: 1) the spinal fusion and disc-replacement surgeries are permanent in nature and thus pose life-long risks of harm; 2) the lineman position is "inherently dangerous" as a matter of law[6], such that, should "Fortkamp's fusion or artificial disc . . . fail while he was on the job, . . . the consequences for his own-well being and others can hardly be disputed," (Doc. 69 at 39); 3) Dr. Randolph opined there is a seventy-nine-percent chance Fortkamp's artificial disc will fail; and 4) the failure is sufficiently likely to occur so that at any moment the risk of failure was imminent.

Fortkamp contends the evidence from his doctors and specialists show he was capable of working as a lineman, and of doing so safely. He alleges the City and Dr. Randolph "refuse[d] to consider all of th[e] objective evidence" showing his fitness for duty, and that their decisions "rely on nothing but fear and speculation to keep [him] from returning to work[.]" (Doc. 71 at 49).

I conclude there is a genuine dispute of fact as to whether Fortkamp poses a direct threat to the health and safety of others.

---

[6] The City's brief emphasizes a handful of Ohio cases observing that an electric lineman is an "inherently dangerous job." *E.g.*, *Sigman v. Gen. Elec. Co.*, 77 Ohio App. 3d 430 (1991). I do not disagree with that proposition, at least to the extent the cases discuss the dangers of working near high-voltage electrical wires, and often in unfavorable weather conditions. But these types of inherent dangers do not speak to the danger of back injury, which a jury could find is only slight, if manifest at all, given the prevalent use of bucket trucks and other machinery and safety equipment.

First, the City predicates its direct-threat defense on many of the same disputed contentions supporting its arguments re. the essential functions of the position.

But if the jury were to find those functions (particularly heavy lifting and pole climbing) were not essential functions of the lineman position – and as discussed there is ample evidence supporting such a finding – it could likewise reject the true-threat defense. *Siewertsen*, *supra*, --- F. Supp. 3d ----, 2015 WL 5675072, at *15. Stated another way, if Fortkamp were not performing tasks like climbing utility poles or lifting heavy weights, the risk allegedly posed by his artificial disc would seem appreciably lower.

Second, the City's true-threat defense rests, naturally enough, on Dr. Randolph's opinion Fortkamp cannot safely work as a lineman. But as I explain below, there is sufficient evidence for a jury to find the City's reliance on Dr. Randolph's opinion was pretext for unlawful discrimination.

In particular, Dr. Randolph disqualified Fortkamp from the lineman position because he cannot safely climb poles or lift more than fifty pounds. Yet, for reasons I have already discussed, those may not be essential job duties. Assuming the jury were to find they were not essential, the City would be exposed as having relied on a medical expert whose understanding of the lineman's essential functions contradicted the City's own understanding of those functions.

This evidence suggests, in short, that the City did not "honestly believe" Fortkamp was a safety risk, and that its reliance on Dr. Randolph's opinion was unreasonable. Such deficiencies could likewise defeat a direct-threat defense.

Third, Fortkamp has introduced substantial evidence tending to show he is fit to work as a lineman. That includes: 1) videos of him lifting weights; 2) his record of employment doing at least "medium" (and possibly "heavy") duty work after his back surgery; and 3) the unanimous opinions

20

of a neurosurgeon, two doctors, and a physical therapist that he is fit for duty as a lineman. Of special force are the observations by Dr. Borillo and Dr. Mulling that Fortkamp is at no greater risk, compared to either the general public or other lineman, of sustaining another back injury.

For all these reasons, a jury must decide whether Fortkamp posed a direct threat.

### C. Pretext

Because a reasonable jury could find Fortkamp made out a *prima facie* case, the burden shifts to the City to identify a non-discriminatory reason for not returning him to the lineman position. The City's evidence it refused to do so on the basis of Dr. Randolph's opinion Fortkamp cannot safely perform the duties is enough to meet that burden.

It now falls to Fortkamp to introduce evidence that could persuade a rational trier of fact that the City's stated reason is, more likely than not, pretext masking unlawful discrimination.

"To establish such pretext, a plaintiff must show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the employer to take the adverse employment action], or (3) that they were insufficient to motivate discharge." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal emphasis omitted).

"[T]o survive summary judgment a plaintiff need only produce enough evidence . . . to rebut, but not disprove, the defendant's proffered rationale." *Jones v. St. Jude Med. Ctr.*, 504 F. App'x 473, 477 (6th Cir. 2012).

Fortkamp invokes the second basis for showing pretext, whereby a plaintiff:

> attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

21

*Id.* (internal emphasis omitted).

Under the Sixth Circuit's "modified honest-belief doctrine," "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Russell*, *supra*, 537 F.3d at 605.

As the court explained in *St. Jude*, *supra*, 504 F. App'x at 477:

> As long as an employer has an honest belief in its proffered nondiscriminatory reasons, the employee cannot establish because the reasons is ultimately shown to be incorrect. The key in assessing whether an employer had an honest belief is whether the employer made a reasonably informed and considered decision before taking an adverse employment action . . . We do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Instead, a plaintiff must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.

(Internal quotation marks and citations omitted).

Contrary to Celina's claim, there is ample evidence in the record suggesting the City did not honestly believe in, or reasonably rely on, Dr. Randolph's opinion.

First, as discussed throughout this order, there is a genuine dispute of fact as to whether climbing utility poles and lifting between fifty and a hundred pounds really are essential job functions.

Dr. Randolph's opinion disqualifying Fortkamp from the lineman position depends, in no small part, on his conclusion those *are* essential functions that Fortkamp cannot safely perform. Yet substantial evidence suggests that the City did not truly consider them essential. Nevertheless, the City relied on Dr. Randolph's opinions, notwithstanding a major discrepancy between his understanding of a lineman's essential functions and its own understanding.

22

In these circumstances, a reasonable jury could find the City's reliance on Dr. Randolph's judgment was unreasonable.

Second, it is undisputed the City sent Dr. Randolph misleading information about the lineman position and Fortkamp's medical history. The City contends Dr. Randolph did not view the Lineman Rodeo DVD, and that he ultimately prepared his report in light of accurate information about Fortkamp's medical history. A jury could take a different view, however, and find the evidence suggests less than reasonable reliance on Dr. Randolph.[7]

Third, the City was preoccupied with the financial impact of Fortkamp sustaining another injury if he returned to work.

For example, the City turned down the BWC's offer to assume liability and cover costs of rehiring Fortkamp, on a trial-run basis, because it "feared a reinjury and the cost that the city would incur as a result." (Doc. 39 at 8). Hazel also testified that he was concerned about "a long-term liability for the city. The liability could also be if [Fortkamp] is out with another lineman and they were working on something and [Fortkamp] hurt his back and the other lineman got hurt, there could be a tremendous amount of potential liability." (Doc. 38 at 64).

This evidence supports a reasonable inference the City's preoccupation with avoiding additional financial liability – which predated Dr. Randolph's report – was the real motivation for

---

[7] Whether Dr. Randolph did or did not view the City-supplied DVD may well be immaterial. The City sent it to him, knowing (a jury could find) it would create a mistaken impression and cause Dr. Randolph mistakenly to believe that climbing poles was an essential, recurrent, and more dangerous part of the job than it really is. The City, moreover, could not, in all likelihood, have known ahead of time that Dr. Randolph would not view or rely on the DVD in formulating his opinion. In a word, the City's misleading materials, including not just the DVD, could have tainted, to the City's knowledge, his opinion. In other words, the City might be unable to persuade the jury that it did not drink from a well that it itself had polluted.

disqualifying Fortkamp. These fiscal concerns, a jury could find, stem from the City's misperception – thoroughly rebutted by Fortkamp – that his back problems render him unfit for the lineman job, and thus at greater risk of injuring himself and costing the City money.

And given some of the holes in Dr. Randolph's report, the evidence could also support a reasonable finding the City relied on his judgment – rather than the unanimous judgment of Wickstrom and Drs. Mullin, Snow, and Borillo – because it dovetailed with its own untutored understanding of Fortkamp's back condition.

In sum, there is a genuine dispute of material fact whether the City honestly believed Dr. Randolph's opinion, and whether its true reason for disqualifying Fortkamp from the lineman position was unlawful discrimination on the basis of his perceived disability.

## Conclusion

The City of Celina is not entitled to judgment as a matter of law.

It is, therefore,

ORDERED THAT: the City's motion for summary judgment (Doc. 69) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

24